# In the United States Court of Federal Claims

**No. 92-550C**
**(Filed February 8, 2007)**
**NOT FOR PUBLICATION**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **NORTHEAST SAVINGS, F.A.,** | * |
| | * |
| | * |
| **Plaintiff,** | * |
| | * |
| **v.** | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| **Defendant.** | * |
| | * |

* * * * * * * * * * * * * * * * * * * * * * * * * ** * * * *

---

### MEMORANDUM OPINION DENYING PLAINTIFF'S MOTION TO STRIKE

---

<u>**Williams**</u>, Judge

    This <u>Winstar</u> case comes before the Court on Plaintiff's post-trial motion to strike portions of Defendant's expert's testimony.[1]  This witness, Professor Daniel R. Fischel, was admitted as an expert for Defendant in the areas of "valuation, financial institutions, financial markets, regulation of financial markets, and the economic analysis of lost profits and other damage claims."  Tr. at 1772, 1775.[2]  Plaintiff claims that Prof. Fischel offered opinions that were not disclosed in his expert report and covered topics on which he expressly declined to opine during his deposition.  On

---

[1]  The Court held a trial on damages from October 23, 2006 through November 9, 2006, after granting Plaintiff's motion for summary judgment on liability.  <u>Northeast Savings v. United States</u>, 63 Fed. Cl. 507 (2005).  Specifically, the Court found that Plaintiff had entered into a contract with the Government to permit Northeast to record supervisory goodwill as an intangible asset that could be counted towards regulatory capital for 40 years in exchange for Northeast's acquisition of three failing thrifts and that the Government breached this contract when it enacted the Financial Institutions Recovery, Reform, and Enforcement Act of 1989, (FIRREA), Pub. L. No. 101-73, 103 Stat 183.

[2]  "Tr." refers to the transcript of the trial on damages unless otherwise indicated.

December 12, 2006, the Court orally denied Plaintiff's motion to strike on the grounds that Prof. Fischel's opinions were sufficiently disclosed in his expert report and deposition.[3]

## Background

As part of its case-in-chief, Plaintiff presented the opinion of Dr. Nevins Baxter, an expert witness who opined on the lost profits that Northeast suffered as a result of the breach. Defendant's expert, Prof. Fischel, critiqued Dr. Baxter's theory of lost profits damages, alleging that Dr. Baxter relied on unwarranted economic assumptions. In general, Prof. Fischel opined that -- contrary to Dr. Baxter's opinion -- Plaintiff ultimately benefitted from the breach because the breach forced the thrift to take steps to improve its capitalization -- steps which, in Prof. Fischel's opinion, Northeast would have been less likely to undertake in the nonbreach world.

In its motion, Plaintiff objects to four opinions offered by Prof. Fischel -- 1) that Northeast would not have securitized $500 million in loans absent the breach, 2) that Northeast would have continued to pay dividends on its preferred stock absent the breach, 3) that Northeast would have engaged in more "high-risk" lending absent the breach, and 4) that Northeast's incremental general and administrative (G&A) expenses but for the breach would have exceeded 0.5 percent.

## Standard

Rule 37(c) of the Rules of the Court of Federal Claims ("RCFC") provides that "[a] party that without substantial justification fails to disclose information required by RCFC 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any information not so disclosed." RCFC 26(a)(2)(B) provides that the expert report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor. . . ." Thus, to the extent that Prof. Fischel failed to disclose an opinion in discovery, thereby depriving Plaintiff of its right to probe his opinion prior to trial, such opinion should be stricken. As the Court recognized in Tritek Technologies, Inc. v. United States, 63 Fed. Cl. 740, 750 (2005):

> The Federal Circuit does not appear to have fashioned a test for applying the exclusion provisions of RCFC 26 and 37. Thus, this court does not have binding precedent as a guide. However, other circuit courts that have applied the RCFC 26 counterpart in the Federal Rules of Civil Procedure have held that the sanction of exclusion [under rule 37] is automatic and mandatory unless the sanctioned party can show that its violation [of rule 26] was either justified or harmless.

Tritek, 63 Fed. Cl. at 750 (citations and footnote omitted).

---

[3] This opinion memorializes and explains the Court's oral ruling, which the Court rendered on an expedited basis to permit the prompt submission of post-trial briefs.

**Challenged Testimony of Prof. Fischel**

1.  Prof. Fischel's Opinion That Northeast Would Not Have Securitized $500 Million in Loans Absent the Breach

Plaintiff seeks to strike the following testimony of Prof. Fischel:

> Q.    Now, sir, I want you to assume that Dr. Baxter agrees with you that securitization of loans at that time period, '89 and '90, and recourse removal and generally reduction in risk is actually economically beneficial given what we know now about the recession. With that assumption, how would that -- how is that relevant to analyzing his lost profits model?

> A.    Well, it would be -- if he agreed with that proposition, it would be fundamentally inconsistent with his lost profits damage model, because these were steps, as Mr. Rutland stated, which were taken solely because of the breach. In the absence of the breach, therefore, presumably, they would not have been taken. There would have been -- instead of the credit losses on these assets being shifted to a federal agency, they then would have been incurred by Northeast, but Dr. Baxter's model in the nonbreach world has zero dollars, not one cent, for loan losses, and therefore, if Dr. Baxter agreed with what I said, that would be a fundamental inconsistency with his lost profits damage model.

Tr. at 1804:10-1805:8. Plaintiff argues that this testimony should be stricken because it contains a new opinion which was not disclosed in Prof. Fischel's expert report or his deposition, -- that the but-for bank would not have securitized its residential loans.[4]   In his expert report, Prof. Fischel criticized Dr. Baxter's "assumption" that Northeast would have securitized $500 million in loans absent the breach on the ground that the "assumption" was "speculative." The report stated:

> Dr. Baxter implicitly assumes that the but-for bank would have securitized the same amounts of loans at the same time, because he makes no allowance for the additional credit loses that the but-for bank would have had otherwise. This is speculative because the but-for bank would have had more regulatory capital and, therefore,

---

[4]   Plaintiff also moved the Court to strike the following passages of Prof. Fischel's testimony that contained the same or similar assertions regarding Northeast's securitization of loans.  Tr. 1791:7-9, 1796:21-1798:9, 1812:1-1814:18, and 1835:1-25.

would not have had the same need to securitize loans in order to enhance its risk-based capital ratios.

PX 245 ¶ 25.

In his deposition, Prof. Fischel cited what he termed his "standing caveat" or "caveat number one" that "it's difficult to predict what would happened in a world which never existed."[5]  In his deposition, Prof. Fischel testified:

> Q.   Do you have an opinion as to whether Northeast would have done anything differently with respect to securitization if the risk-based capital requirements had been implemented, but supervisory goodwill was not phased out?

> A.   Well, in addition to caveat number one, I would just repeat again that there would have been some incentive to securitize, but it would have been a weaker incentive – weaker incentive than what, in fact, existed in the real world.

> Q.   But do you have an opinion one way or the other whether with that weaker incentive, they still would have done it?

> A.   No, I don't, because of caveat number one.

Fischel Dep. at 162.  Citing this testimony, Plaintiff asserts that at his deposition, Prof. Fischel had no opinion regarding whether Northeast would have securitized the loans absent the breach, because such an opinion would have been inherently speculative.  Plaintiff then characterizes Prof. Fischel's trial testimony as an expert opinion that Northeast would not have undertaken the securitization of loans.  Plaintiff argues that such opinion was never disclosed in discovery, that Plaintiff was deprived of its ability to probe Prof. Fischel's opinion before trial, and that this testimony should be stricken from the record.

This testimony is not an undisclosed opinion.  Rather, the opinion Prof. Fishcel voiced was that Dr. Baxter should have taken into account credit losses on certain residential loans because he wrongly assumed that these loans would have been securitized in the nonbreach world.  Prof. Fischel did not purport to offer his own opinion that Northeast would not have undertaken securitization at all absent the breach  -- he said Northeast would have had a weaker incentive to securitize those loans in the nonbreach world and that some credit losses would have resulted -- credit losses Dr. Baxter wholly ignored.

---

[5]  Fischel Dep. at 19.

The fact that Prof. Fischel asserted this more firmly at trial by stating that "presumably" the securitization would not have occurred does not mean that Plaintiff was not apprised of Prof. Fischel's views during discovery.  Indeed, Prof. Fischel's "presumption" at trial was based upon the testimony of a lay witness, Mr. Rutland, the former President and Chief Executive Officer of Northeast, who said these securitization measures were taken solely because of the breach.

The purpose of the expert disclosure provisions in Rules 26 and 37 is to prevent trial by ambush.  Plaintiff was on notice that Prof. Fischel opined that Northeast had a weaker incentive to securitize these loans in the nonbreach world and that he believed Dr. Baxter erred because he did not assume any credit losses based on the lack of securitization.  As such, the testimony is not a new opinion and should not be stricken.

2.    <u>Opinion That Northeast Would Have Continued Paying Dividends On Preferred Stock Absent The Breach</u>

Plaintiff claims that Prof. Fischel opined that, absent the breach, Northeast would have continued to pay dividends on its preferred stock and that Prof. Fischel did not disclose this opinion in his expert report or in his deposition.  Plaintiff seeks to strike the following testimony:

> Q.    Okay.  Now, let's move to point 4 of why the breach benefitted Northeast.  Can you explain that point to us, Professor?
>
> A.    Yes.  As a result of the breach, Northeast decided to cease making -- to cease paying dividends on two classes of preferred stock, and with respect to one of the classes of preferred stock the FSLIC, as a result of the, excuse me, nonpayment of dividends was willing to redeem the class of preferred stock at a large discount.

Tr. at 1820:22-1821:6.  This testimony does not purport to be an opinion -- it purports to be Prof. Fischel's understanding of what Northeast did "as a result of the breach."  There is no basis to strike this testimony as an undisclosed opinion.  Prof. Fischel did not opine that Northeast would have continued to pay dividends on its preferred stock in the but-for world.  Rather, he opined that Plaintiff benefitted from the breach because the breach forced Northeast to stop paying dividends on preferred stock, thereby improving its capital position, whereas in the nonbreach world, Northeast would have had less of an incentive to stop paying dividends because its regulatory capital position would have been stronger.

In his expert report, Prof. Fischel was critical of Dr. Baxter's assumption that "[t]he but-for world would have suspended dividend payments on its outstanding preferred and common stock at the same time that the actual bank did."  PX 245 ¶ 12.  Likewise, in his deposition, Prof. Fischel stated that he could not know whether the but-for bank would have paid more in dividends than the actual bank, but that the motivation to eliminate dividends would not have existed in the but-for bank

to the same extent that the motivation was present in the actual bank.  Prof. Fischel stated in his deposition:

> Q.      Do you have any opinion as to whether the but-for bank would have been paying more in dividends than the actual bank did?

> A.      Again, there is no way to know.  But to the extent that the but-for bank would have had more capital, putting the possibility of increased credit losses to one side, and to the extent that one of the reasons given for eliminating the dividend was to conserve capital, to assume that the same decision would have been made at the same time, even though the reason for the decision would have been different or the reason that motivated the decision in the real world would have been different would not have existed to the same extent in the but-for world, I think it's speculative to make the assumption that Dr. Baxter does.

Fischel Dep. at 149:2.

Thus, Prof. Fischel himself did not opine that Northeast would have continued to pay dividends on preferred stock absent the breach.  Rather, Prof. Fischel critiqued Dr. Baxter for his assumption that the same decision would have been made regarding suspending dividend payments in the breach and nonbreach worlds.  Because this opinion was disclosed in discovery, the Court denies the motion to strike this testimony.

> 3.      <u>Opinion That Northeast Would Have Engaged In More High-Risk Consumer And Commercial Lending Absent The Breach</u>

Plaintiff argues that Prof. Fischel's opinion that Northeast would have engaged in more high-risk lending absent the breach was not previously disclosed.  Plaintiff seeks to strike the following testimony:

> Q.      Do you have any opinion as to the amount of losses Northeast would have suffered had there been no phase-out of supervisory goodwill?

> A.      Yes, I do.

> Q.      Please explain.

> A.      In the absence of the phase-out, as I've described, Northeast would have had a weaker incentive to take steps 1, 2, and 3.

> They would have had a weaker incentive to reduce the number of loans that they originated, because they would have had more capital absent the breach; they would have had a weaker incentive to securitize residential loans and remove recourse provisions, again because they would have had more capital; and they would have had a weaker incentive to curtail high-risk lines of business, all of those steps that they took in the real world.

> All three of those steps allowed them to minimize losses as a result of the severe recessionary conditions that they were facing in the northeast and California, and if they had not taken those steps or if they had a weaker incentive to take those steps and therefore did less of them, the losses would have been greater, and Northeast would have performed more poorly.

Tr. at 1835:1-25.[6]

This testimony does not divulge a new opinion.  In his expert report, Prof. Fischel opined that "Northeast presumably would have been less profitable, not more, if it had originated more (and riskier) retail assets during this period."  DX 287 ¶ 20.  Moreover, in his deposition, he stated that "[i]n my opinion, they - in the real world, their profitability from operations was negative and the absence of these steps that Northeast took to remain in capital compliance subject to the caveat they would have lost more money, that's right, and that's why they benefitted."  Fischel Dep. at 27.  In short, Prof. Fischel did disclose his opinion that Northeast would likely have had higher losses from risky retail loans, such as consumer and commercial loans, absent the breach.

### 4.   Opinion That Northeast's Incremental G&A Expenses But For The Breach Would Have Exceeded 0.5 Percent.

Plaintiff alleges that Prof. Fischel expressed a new opinion that Northeast's incremental G&A expenses but for the breach would have exceeded 0.5 percent.  Specifically, Plaintiff seeks to strike the following testimony:

> Dr. Baxter assumes that the additional expenses resulting from holding billions of dollars of additional assets is close to zero, 0.5 percent. Less than one-half of 1 percent is the expense figure that he attributes to holding billions of dollars of additional assets, and I think that

---

[6]   Plaintiff also requests that the following passages in which Prof. Fischel opines on Northeast's high-risk lending be stricken from the record: Tr. 1791:7-22, 1814:19-1815:4, 1816:4-1819:16, 1836:18-1847:1.

figure is too low, which is why the blow-up exhibit refers to the assumption being implausible.

Tr. at 1884:17-25.[7]

In his expert report, Prof. Fischel was silent on the reasonableness of the G&A wholesale expense figure.  Plaintiff argues that Prof. Fischel had no opinion as to the reasonableness of Dr. Baxter's G&A ratio, citing the following passage from his deposition:

> Q.    If I'm recalling correctly, Dr. Baxter said that a five-basis point was a reasonable wholesale level of expenses, and I don't think you spoke to this in your report; is that right?
>
> A.    That's correct.
>
> Q.    Do you have an opinion as whether or not that's a reasonable expense figure?
>
> A.    No, I don't, at least not as I sit here.  It might be something I can check or investigate; but as I sit here, I don't have an opinion on it one way or the other.
>
> Q.    Do you have an opinion as to whether or not the expense levels for operating a retail operation are higher or lower than the expenses associated with a wholesale operation?
>
> A.    I would assume higher, but I haven't studied that either.

Fischel Dep. Tr. 259:16 - 260:7.

In his trial testimony, Prof. Fischel confirmed that he did not have an opinion on whether Dr. Baxter's G&A ratio was a reasonable calculation.  He testified:

> Q.     I think you've already covered this, Professor, but I just want the record to be crystal clear on it in light of Mr. Kirk's objection.  I want you to assume that we have a thrift, operating thrift, and it wants to put on an incremental portfolio of wholesale assets and wholesale liabilities.  Assume that its regulators don't mind and they don't think it's too risky, and they want to put on an incremental portfolio of wholesale

---

[7]  Plaintiff also requests the Court to strike similar opinions expressed by Prof. Fischel at Tr. 1887:8-1889:5, 1890:24-1891:5.

assets and wholesale liabilities. Do have any opinion whatsoever as to whether [.5] percent for the incremental G&A costs for that incremental wholesale assets and liabilities portfolio is a reasonable estimate or an unreasonable estimate?

A.     I don't have any opinion one way or the other.

Tr. 1889: 6-23.  See also, Tr. at 1887.

On the one hand, Prof. Fischel testified he thought Dr. Baxter's G&A figure was too low, but on questioning from Defendant's counsel, he disavowed that he had any expert opinion on the precise numerical estimate of G&A expenses Dr. Baxter made.  Counsel for Defendant, in responding to Plaintiff's objection, reiterated that Prof. Fischel was not opining on whether five basis points was a reasonable estimate of the G&A for a wholesale portfolio.  Tr. at 1886.  Compare Tr. at 1884 with Tr. at 1889.  Rather, Defendant contends that Prof. Fischel merely opined that because the incremental assets would have included retail assets, the use of the G&A cost of a portfolio containing only wholesale assets was inappropriate.  Def. Response to Mot'n to Strike at 18.  In support of this Defendant cites paragraph 20 of Prof. Fischel's expert report and the trial transcript at page 1887.[8] Id.  Paragraph 20 of Prof. Fischel's expert report stated:

In fact, Dr. Baxter concedes that 'the but-for bank would have had incremental retail business' but asserts that since retail banking typically has higher spreads, measuring lost profits with a wholesale spread is conservative.'  Baxter Report, ¶ 44.  Dr. Baxter provides no support for this assertion and, in any event, Northeast's retail banking was not profitable.  Due to severe recessions in New England and California, Northeast had substantial increases in non-performing assets and credit losses during the relevant period.  See, e.g., Northeast Federal Corp., 10-K for the fiscal year ended December 31, 1993, at 18.  Also, see Exhibit I and Exhibit J.  In fact, because Northeast's California lending operations were so unsuccessful, Northeast completely shut down its California loan origination network in February 1994.  See WOT9160674 and Northeast Federal Corp. 10-Q for the fiscal quarter ended March 31, 1994, at 6.  As noted above, Northeast's cumulative income from operations during the period from September 30, 1989 to March 31, 1995 was negative, even though Northeast held both retail and wholesale assets.  If Dr. Baxter's assertion that the wholesale assets were profitable investments is true, then this implies that Northeast's retail assets

---

[8]   This transcript is subject to Plaintiff's motion to strike.  It reflects Prof. Fischel's elaboration of his view that G&A expenses for the foregone assets which would have included retail assets would have been much higher than Dr. Baxter's assumption of .5 percent.

were unprofitable.  Therefore, Northeast presumably would have been less profitable, not more, if it had originated more (and riskier) retail assets during this period.

PX 245 ¶ 20.

In his deposition Prof. Fischel explained Paragraph 20 of his report:

> Q.    Am I correct in understanding that all of the points made in paragraph 20 go to your assertion that the credit losses would have brought the return on retail assets down below what the return was on wholesale assets?

> A.    I think what paragraph 20 states is that, again putting to one side the financing assumption, which is discussed in subsequent paragraphs, that Dr. Baxter provides no reason to believe that his assertion is correct, and there are a number of reasons to believe it is incorrect that relate to Northeast's experience in the real world having to do with real assets as opposed to his made-up assets.  And then the paragraph goes on to discuss Northeast's experience with certain lending operations and then the paragraph concludes that for the reasons discussed in the paragraph that Northeast presumably would have been less profitable not more profitable if it had originated more and riskier retail assets during the period of Dr. Baxter's damage calculations.

> Q.    Is it fair to say that all the reasons that are listed in paragraph 20 all relate to credit losses?  Is there any other topic you're discussing there that I'm missing?

> A.    I would say credit losses and all other relevant costs such as costs of operations.

> Q.    When you say costs of operations, do you mean general administrative expenses?

> A.    Costs of operating a particular business or line of business, whatever they are.

Fischel Dep. at 248:21 – 250:1.  In light of this testimony, Plaintiff was on notice that Prof. Fischel believed that any costs of operations, such as G&A, as well as credit losses would affect the return on retail assets.  Further, while Prof. Fischel himself did not have an expert opinion during his

deposition that expense levels for retail operations were higher or lower than those of a wholesale operation -- saying he had not studied that -- he "assumed" they were higher, and Plaintiff could have probed the basis for that assumption.  In any event, that assumption appears to be unremarkable and is borne out by other parts of the record, including the Kaplan Smith report and Dr. Baxter's testimony.  <u>See</u> PX 66 at 10; Tr. at 532.[9]  As such, striking this testimony is not warranted.

**<u>Exhibits</u>**

Plaintiff requests the Court to strike from the record a series of exhibits related to Prof. Fischel's testimony described above, specifically Exhibits DX 3003, points 2-4 of DX 3004 and point 2.c of DX 3013.  Because the Court has declined to strike any of Prof. Fischel's oral testimony,  the Court likewise declines to strike these exhibits from the record.

**<u>Conclusion</u>**

Plaintiff's motion to strike portions of Prof. Fischel's testimony and related exhibits is **DENIED** <u>in toto</u>.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

[9]  Plaintiff did not move to strike DX 3024, a chart entitled "General and Administrative Expenses as a Percent of Average Tangible Asset," which compared G&A expenses on Northeast's whole bank, retail bank, retail thrifts per Kaplan Smith and Dr. Baxter's assumed incremental bank.