# In the United States Court of Federal Claims

### No. 92-550C
### (Filed: February 1, 2010)

```
* * * * * * * * * * * * * * * * * * * * * * * * * * *
                                         *
NORTHEAST SAVINGS, F.A.,                 *
                                         *
              Plaintiff,                 *     Winstar Damages; Lost Profits;
        v.                               *     Cost of Capital; "Wounded Bank"
                                         *     Damages; Jury Verdict.
THE UNITED STATES,                       *
                                         *
              Defendant.                 *
                                         *
* * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Charles J. Cooper, Michael W. Kirk, Vincent J. Colatriano, David H. Thompson, David Lehn, Cooper & Kirk, PLLC, Washington, D.C., James C. Martin, Reed Smith, LLP, Pittsburgh, PA, for Plaintiff; Donna M. Doblick, Reed Smith LLP, Pittsburgh, PA, Of Counsel.

Tarek Sawi, Elizabeth M. Hosford, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant; Scott Austin, Amanda Tantum, Sameer Yerawadekar, U.S. Department of Justice, Washington, D.C., Of Counsel.

---

## OPINION ON DAMAGES

---

**WILLIAMS, Judge**

This Winstar-related case comes before the Court after a trial on damages. Plaintiff Northeast Savings, F.A. ("Northeast"), seeks three elements of damages: $112.352 million in lost profits, $15.287 million for the cost of raising capital, and "wounded bank damages" comprised of $313,000 in advisory service fees incurred in connection with an abandoned shareholder rights offering and $1.334 million in excess deposit insurance premiums. In the alternative, Plaintiff requests the Court to award it damages based upon a jury verdict methodology. Because Plaintiff has not demonstrated that the breaching provisions of FIRREA were a substantial factor causing it to lose profits or incur costs, the Court denies recovery.

1

## Findings of Fact[1]

### The Mergers: May 11, 1982 and October 8, 1982

In 1982, Plaintiff, Northeast, formerly known as Schenectady Federal Savings Bank, merged with three failing thrifts in two separate transactions. In the first transaction, on May 11, 1982, Schenectady Savings merged with Hartford Savings and Loan Association ("Hartford") and became Northeast. A few months later, the regulators invited Northeast to submit proposals for the acquisitions of Freedom Federal Savings and Loan of Worcester, MA ("Freedom Federal") and First Federal Savings and Loan of Boston MA ("First Federal"). Northeast bid on both ailing thrifts, resulting in the merger of Northeast with Freedom Federal and First Federal, effective October 8, 1982. PX 228; PX 231; PX 232; PX 234; PX 235; PX 236; PX 1065.

In its decision granting summary judgment on liability, this Court found that "[t]he merger agreements, resolutions approving the mergers, forbearance letters, and contemporaneous documentation surrounding [the] transactions evince[d] the Government's agreement to permit Northeast to record supervisory goodwill as an intangible asset that could be counted toward satisfying its regulatory capital requirements for up to 40 years." Northeast Sav. v. United States, 63 Fed. Cl. 507, 508 (2005). This Court further found that the enactment of the Financial Institution Reform, Recovery and Enforcement Act ("FIRREA") breached this contract. Id. at 518-19.

### Northeast's Accounting for Supervisory Goodwill

During the course of the contract, Northeast accounted for its supervisory goodwill as an intangible asset under generally accepted accounting principles ("GAAP"), counting the goodwill towards its regulatory capital requirements and amortizing the goodwill over a period of up to 40 years. As is well-known, "GAAP represents those accounting principles adopted by the Federal Accounting Standards Board ("FASB"). GAAP changes as FASB promulgates new standards."[2] Home Sav. of Am., FSB v. United States, 57 Fed. Cl. 694, 703 (2003).

In addition to GAAP, thrift regulators developed special accounting standards for thrifts for reporting to the FHLBB. These principles were known as "regulatory accounting principles" or "RAP." United States v. Winstar, 518 U.S. 839, 846 (1996). Under RAP, the regulators could permit thrifts to vary their accounting practices from GAAP. Accordingly, thrifts would report their financial status under GAAP in Forms 10-K or Forms 10-Q to the Securities and Exchange commission ("SEC") and separately under RAP to the FHLBB. Under the contract, Northeast accounted for its supervisory goodwill as capital under both GAAP and RAP.

---

[1] These findings of fact are based on the record developed during a two-week damages trial.

[2] "While the FASB is not a governmental agency, GAAP, as promulgated by FASB, is the standard for reporting to some government agencies, such as the Securities and Exchange Commission." Home Sav., 57 Fed. Cl. at 703.

2

FLHBB Resolution 82-167, approving the merger of Hartford and Schenectedy, required that Northeast stipulate that any goodwill arising from the transaction be determined and amortized in accordance with FHLBB Memorandum R-31b.  PX 228 at 2-3.  Memorandum R-31b required application of APB Opinion No. 16 "Business Associations," and APB Opinion No. 17 "Intangible Assets."[3]  PX 672.  APB No. 17 allowed amortization of supervisory goodwill for a period of up to 40 years under the straight-line method.  PX 668 at ¶¶ 29-30.  APB Opinion No. 17 provided for future writeoffs of goodwill under a paragraph entitled "Subsequent review of amortization," stating in relevant part:

> A company should evaluate the periods of amortization continually to determine whether later events and circumstances warrant revised estimates of useful lives.  If estimates are changed, the unamortized cost should be allocated to the increased or reduced number of remaining periods in the revised useful life but not to exceed forty years after acquisition.  Estimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly by a deduction in determining net income.

PX 668 ¶ 31.

Kent Dixon, then President of Schenectady, in a stipulation to the FHLBB, confirmed that Northeast would determine and amortize any goodwill arising from the merger of Hartford and Schenectady in accordance with Memorandum R-31b.  DX 829.  The independent accounting firm of Peat, Marwick, Mitchell & Co. substantiated that it expected that Schenectady's final accounting statements "would also comply with the requirements of FHLBB - R-31B."  DX 827.

**Projections on Northeast's Viability**

Before the regulators approved these acquisitions, they conducted a viability analysis to assess Northeast's long-term prospects.  The viability analysis, dated October 8, 1982, was authored by Brent Beesley, the Director of the Office of the Federal Savings and Loan Insurance Corporation ("FLSIC"), the highest authority in the day-to-day operations of that agency. Beesley Dep. at 4; PX 1065.  The regulators projected that "Northeast [would] operate at a loss for the first five years, [but] beginning in the sixth year the association [was] projected to become profitable."  PX 1065 at 14. The regulators determined that Northeast after the mergers "would result in a viable" institution.  PX 1065 at 14.  The regulators anticipated that Northeast would achieve profitability through a decline in market interest rates and the maturing or paying off of its assets, which were mortgage loans.

---

[3]  The Accounting Principles Board was the predecessor of the FASB.

## Northeast's Supervisory Goodwill and Issuance of Income Capital Certificates

The amount of supervisory goodwill recorded by Northeast was $108,951,000 as a result of the Hartford acquisition, to be amortized over 40 years, $163,330,000 as a result of the Freedom Federal merger, and $17,738,000 as a result of the First Federal merger.  PX 2 at 54.  Northeast booked this supervisory goodwill as an asset included in capital for regulatory purposes in reports it filed with the FHLBB.  See, e.g., PX 120.

On October 8, 1982, Northeast issued $50 million in income capital certificates ("ICCs") to the FSLIC in connection with the Freedom Federal acquisition, which Northeast could also count toward its regulatory capital requirements.  Northeast, 63 Fed. Cl. at 510-13; PX 6 at 23; PX 231 at 5-6; PX 235.[4]

## Northeast's Performance (1982-1987)

### 1982-1985

At the time of its creation, Northeast had a high interest rate risk and negative net-earning assets.  PX 192 at 2.  To overcome these problems, Northeast's management decided to "streamline and enhance retail distribution and pursue growth through increasing the origination of ARMs [adjustable rate mortgages]."  Id.  Northeast leveraged its supervisory goodwill, growing the balance sheet by acquiring wholesale securities, though Northeast's wholesale investments were limited at the outset.  PX 192 at 2.  Additional capital was raised to increase Northeast's assets, which included some wholesale investments.  Id.[5]  Northeast also grew its traditional retail operations from 1982-

---

[4]  In March 1987, Northeast exchanged its ICCs and a portion of the $19 million in accumulated interest payments for $60 million in cumulative preferred stock issued to the FSLIC.  Northeast was contractually entitled to count the FSLIC preferred stock towards regulatory capital requirements.  PX 18 at 1-2; DX 225 at 8.

[5]  Wholesale assets and liabilities are assets and liabilities that a thrift or bank would purchase from third parties or the marketplace.  Wholesale assets include mortgage-backed securities ("MBS") which are sometimes created by government-sponsored enterprises such as Freddie Mac ("FHLMC"), Fannie Mae ("FNMA") and Ginnie Mae ("GNMA").  Wholesale assets also include collateralized mortgage obligations ("CMOs"), purchased loans, and corporate bonds.  Examples of wholesale liabilities are FHLBB advances and Fed funds borrowings between banks. Other forms of wholesale liabilities are borrowings in the market such as medium-term note programs, subordinated debt, and collateralized borrowings, such as  reverse repurchase agreements. Tr. 224-27.

1985. This included originating home mortgages and funding them through retail deposits from consumers.[6]

However, by the end of FY 1985, Northeast's retail business had not grown as expected and its earnings were worsening -- there was a $5.1 million loss for that year. G&A expenses greatly increased as a result of alternative lines of activity, which included "nationwide mortgage banking, out-of-area consumer lending, and retail investment brokerage services."  PX 192 at 2.1.  These endeavors were not successful and were expensive to unwind.  Id.  In year-end 1984, Northeast had total assets in the amount of $4.11 billion, which included, inter alia, $2.56 billion in net mortgage loans and contracts, $177 million in net non-mortgage loans, and $822 million in mortgage securities.  In year-end 1985, Northeast had total assets of $4.6 billion, which included, inter alia, $3.1 billion in net mortgage loans and contracts, $298 million in net non-mortgage loans, and $739 million in mortgage securities.  At year-end 1986, its total assets increased to $5.93 billion, of which $4.66 billion were in net mortgage loans and contracts, $273 million were in net non-mortgage loans, and $1.97 billion were in mortgage securities.  DX 224 at 4.1-4.2.  By 1986, Northeast had a higher percentage of total assets in mortgage securities than its peers.  Id. at 4.1.

<u>1985-1988 Risk Controlled Arbitrage ("RCA") Strategy</u>

After the acquisitions, Northeast participated in limited wholesale investment activities. However, starting as early as FY 1985, Northeast's management began to rely increasingly on risk-controlled arbitrage ("RCA") activities -- a portfolio of wholesale liabilities funding wholesale assets to produce earnings and compensate for a lack of growth in Northeast's retail activities.  PX 192 at 2.18; Tr. 1465-66; Tr. 227-28.  In calendar year 1986, the wholesale assets were funded by short-term borrowing sources, primarily reverse repurchase agreements.  DX 224 at 2.8.  Substantial growth occurred in traditional wholesale investments such as MBS, purchased 1-4 family housing loans, and CMOs.  PX 192 at 2.6.  However, the RCA program included some riskier wholesale investments, such as high-yield corporate securities, and purchased CMO residuals.  PX 192 at 2.5. The regulators later found that Northeast's RCA activities ultimately resulted in large amounts of criticized assets -- 6.6% of Northeast's total assets as of the December 12, 1988 Report of Examination.  PX 192 at 1, 2.5.

The RCA or wholesale banking strategy differed from retail banking activities in three ways that affected the income statement of Northeast.  First, wholesale banking typically has narrower spreads than retail banking because wholesale assets tend to have lower interest rates than retail assets and wholesale liabilities tend to have higher interest rates than retail liabilities.  PX 192 at

---

[6] Retail assets include residential mortgages, commercial real estate loans, and consumer loans.  Retail liabilities include customer deposits, such as certificates of deposits ("CDs"), savings accounts, and checking accounts.  Tr. 224, 227-28; Tr. 1464-65.

2.33; PX 2038; PX 2039.[7]   Second, wholesale assets, such as MBS that are backed by a federal housing agency, have relatively low credit risk in comparison to a retail portfolio. Tr. 225-2, 230-31, 2700-01. Third, the G&A expenses associated with a wholesale portfolio were normally much lower than the expenses of retail banking. Tr. 227.

### Northeast's Interest Rate Risk

Northeast's RCA activities (as well as its retail activities) were subject to interest rate risk -- the degree to which a thrift is exposed to changes in interest rates. The effect of rising and falling interest rates on Northeast's books were described in terms of the "repricing gap" -- the difference in the speed at which the thrift's assets and liabilities reprice.[8]   A thrift's repricing gap is calculated by determining what proportion of its assets will reprice within a given period, and then subtracting the proportion of liabilities that will reprice in the same period and dividing by total assets. Tr. 251.

The repricing gap signifies whether a thrift is at more risk in the event of falling or rising interest rates. If a thrift is positively gapped, i.e., asset-sensitive, then the net interest spread of the thrift increases if interest rates rise and narrows if interest rates fall.[9]   Conversely, for a negatively gapped, liability-sensitive thrift, the net interest spread will narrow if interest rates rise and will widen if interest rates fall. Tr. 2152-54.

During the time in which it engaged in RCA activities, Northeast hedged its exposure to interest rate risk by entering into interest rate swap agreements "with the intent of synthetically increasing the duration of the short-term borrowed funds to match the increased duration of the MBS investments." DX 224 at 2.9. Between March 1986 and March 1988, the one-year cumulative repricing gap of the thrift ranged between about -9% and -13%. PX 2061.

---

[7]  Northeast's net interest spreads on its wholesale holdings were very narrow and variable. At first, the net interest spread increased from 1.49% in FY 1983 to 2.36% in FY 1986. PX 6 at 2, 25. However, the net interest spread began to narrow in FY 1987 (2.14%) and again in FY 1988 (1.59%). PX 7 at 25.

[8]  Assets reprice as they run off the balance sheet. When the borrower repays a loan in full, that asset, along with its interest earning income, ceases to exist. When the loan runs off the books, a thrift can either take the proceeds and pay off an equivalent liability or reinvest in a new asset. If the thrift reinvests in a new asset, the new asset has the prevailing market interest rate, which may differ from the rate it replaced. This change in interest rates is a "repricing" of the asset. Tr. 247-48. In addition, assets reprice through adjustable rates which necessarily change with the market. Id. Liabilities reprice in similar ways -- they may be paid off at an old interest rate and replaced by a new liability with a new interest rate or the liability may have an adjustable rate. Tr. 677.

[9]  This is because the assets reprice faster than liabilities, i.e., more assets will take on the new higher interest rates while the fewer liabilities retain the old lower interest rates, thereby increasing the spread between the assets and the liabilities.

<u>Northeast's Balance Sheet Growth</u>

From the time of the acquisition up to just before the time of the breach, Northeast's balance sheet growth as a result of the RCA strategy or wholesale banking was dramatic.  In March 31, 1984, Northeast had $3,477,494,000 in total assets.  PX 2005.  On March 31, 1985, Northeast had $4,089,882,000 in total assets.  <u>Id.</u>  By March 31, 1986, when the RCA strategy was strongly under way, Northeast had expanded by nearly $1 billion to $5,075,023,000.  <u>Id.</u>  Northeast expanded in excess of $1 billion for the years ended March 31, 1987-88, with total assets in the amounts of $6,264,657,000 and $7,555,281,000, respectively.  <u>Id.</u>  However, by March 31, 1989, Northeast had slowed down its expansion, with total assets in the amount of $7,942,695,000.  <u>Id.</u>

<u>Northeast's Growth in Net Interest Income</u>

With growth in the balance sheet came growth in net interest income.  Northeast's net interest income grew from $14.5 million in FY 1983, to $40.5 million in FY 1984.  PX 2005.[10]  By March 31, 1985, the net interest income earned for this fiscal year was $50.3 million, and with the RCA strategy under way, expanded to $78.2 million for FY 1986.  <u>Id.</u>  Finally, Northeast reached a height in net interest income earnings of $102 million for FY 1987.  However, net interest income declined to $98.5 million for FY 1988 and further to $94.2 million for FY 1989.  <u>Id.</u>

The net interest income grew from FY 1983 through FY 1987 because the net interest spread throughout the period remained positive.  PX 6 at 2; Tr. 540.  In addition, during this period of time, interest rates declined, which, along with the running off of low-earning loans from the thrift's books, helped close the gap in the negative spread for Northeast's retail assets and liabilities.  As the process was explained by Dr. Baxter:

> And [Northeast] had to work its way out of this hole, if you will, through a combination of hoped-for declines in market interest rates, which would raise the value of the assets; through the fact that the assets would ultimately be paid off, they were mortgage loans, the people would pay off the mortgages, move out of their homes, refinance them; through the fact that some of the assets would be held to maturity and then they would gradually appreciate because if they weren't bad, if they got paid off, they would get paid off in par, but that wouldn't be immediately.  That would be as they approached maturity.
>
> So that was the workout.  And then the goodwill would be amortized and these discounts would be either accreted into income, which is the accountant's term for some of the opposite of depreciation, you

_____

[10]  From 1983 through 1992, Northeast's fiscal year ended on March 31.  In 1992, Northeast transitioned to a fiscal year ending December 31.

gradually raised the value of these assets or if rates permitted and the market permitted, they might be sold for gains, and that's the way they would ultimately turn a profit.

But the regulators expected that would take until the sixth year,[11] actually it took less time than that.

Tr. 527-28.

<u>The FHLBB's February 17, 1987 Report of Examination</u>

The FHLBB conducted an examination of Northeast that began on February 17, 1987, using financial data as of December 31, 1986, which provided an evaluation of the bank, including its RCA strategy.[12] DX 224. In this Report of Examination ("ROE"), the FHLBB found that Northeast had overall "favorable" findings, improved profitability, "satisfactory" asset quality, increased regulatory capital, and, with respect to interest rate risk, an "appropriate" one year repricing gap. <u>Id.</u> at 1. However, it also found that Northeast's earnings were lower than those of its peers and that an accelerated write-off of goodwill was "highly desirable." <u>Id.</u> Specifically, the FHLBB stated in relevant part:

> Overall, the findings of the examination are favorable. Asset quality remains satisfactory with only one percent of assets subject to criticism. Regulatory capital has increased and is now equal to 6.3 percent of assets. The one year gap position has been maintained at appropriate levels despite a $1.3 billion or 28.2 percent increase in assets for calendar year 1986. At year end, the one year gap stood at a negative 7.7 percent. Although earnings continue to be lower than New England peers, the institution is showing improved profitability on an operating basis and has managed a consistent [return on assets] during a high growth period. Operating expenses, as a percentage of average assets, have declined and, with the impending sale of 17 branch offices in 1987, expenses are expected to decline further. However, the decline in expenses will be offset by the acceleration of the write-off of goodwill. Although the two actions cancel each other out in terms of the institution's bottom line, the faster write-off of goodwill is regarded as highly desirable and a sound operating strategy that will be to the long term benefit of the institution.

---

[11]  This is a reference to the 1982 Beesley Memo which projected Northeast's post-merger viability. PX 1065 at 14.

[12]  The financial data time period differs from the then fiscal year of Northeast which ended March 31.

Id.

The February 17, 1987 ROE, however, expressed concerns about Northeast's RCA strategy, specifically, with respect to the utilization of interest rate swaps to hedge the repricing gap.  The report continued:

> Arbitrage: The institution's growth has come primarily from its investment arbitrage strategy, whereby, short-term funds were used to acquire long term, higher yielding mortgage-backed government obligations.  To hedge the mismatch inherent in this activity, the institution has utilized interest rate swaps.  While the hedging activity has been effective to this point, we have noted a number of steps that should be taken such as periodic review of the activity by the Board, improved documentation; and, better analysis to support the correlation considerations of the hedge.

Id.  The ROE also found that the tangible capital base of the thrift was thin as a result of the goodwill in its assets, which made it difficult for Northeast to achieve earnings parity with its New England peers:

> Intangibles: Due to a substantial amount of goodwill, the institution's tangible capital base is thin, but improving.  The significant amount of non-earning assets makes it difficult for the institution to achieve earnings results comparable to its New England peers.  The quality of the institution's assets and improvements . . . serve to mitigate concerns normally associated with the low tangible base.  Moreover, we note that the institution is using every opportunity to improve its tangible capital position and we believe that this is a prudent strategy.

Id. at 1.2.  As of December 31, 1986, the institution's regulatory capital totaled $378.1 million or 6.3% of total assets, which exceeded the minimum regulatory capital requirement of $171.0 million by $207 million.  Id. at 2.7.  However, the ROE found that GAAP net worth and tangible net worth were significantly below the level of regulatory capital.  GAAP net worth was $245.5 million or 4.1% of total assets.  Id.  Tangible net worth, which was measured by GAAP net worth less goodwill plus general loan loss reserves was negative $82,000, which represented an increase of $28.4 million over the prior year's level.  Id.  For calendar year 1986, total regulatory capital growth was $96.5 million or 34.2%, but the majority of growth was attributed to the addition of $57.5 million in 8% convertible subordinated debentures; absent these debentures there would have been 13.8% regulatory capital growth.  Id.

Northeast's Performance from 1987 to 1988

In the late 1980s, interest rates began to rise. As a result of the rising interest rates and the fact that it was liability-sensitive, Northeast's net interest spreads began to narrow. Tr. 266; PX 19 at 15. While Northeast's net interest spread was 2.36% in FY 1986, its spread narrowed to 2.14% in FY 1987 and to 1.59% in FY 1988. PX 6 at 2, 25; PX 7 at 25; PX 19; PX 262. As such, Northeast's net interest income in FY 1988 was $98.5 million -- $3.5 million less than in FY 1987. PX 2005.

Reduced Amortization and Write-off of Goodwill

During FY 1988, Northeast reduced the amortization periods for its contractual goodwill from 40 and 30 years to 25 years for both RAP and GAAP purposes. Tr. 2340-41; DX 7 at 28. The accelerated amortization necessarily applied to contractual supervisory goodwill because goodwill was counted towards both GAAP capital and regulatory capital. In addition, in 1988, Northeast sold 17 of its less profitable branches, which resulted in a write off of $16 million in goodwill -- including contractual goodwill. PX 7 at 28, 36.

The September 21, 1987 Special Report of Examination

On September 21, 1987, the FHLBB commenced a special examination of Northeast, using financial data as of August 31, 1987, in light of "recent changes in the overall direction of the institution and the management changes which followed."[13] DX 225 at 1. The regulators found that "the institution is sound, but in a period of transition as management seeks to ensure profitable operating results." Id. With respect to regulatory capital, the ROE found that Northeast's ratio of regulatory capital to total assets declined from 6.3% to 5.3%, which was "fully due to the growth of the institution." Id. However, "the amount of net worth [was] still more than adequate to meet regulatory requirements." Id. As of August 31, 1987, Northeast had regulatory capital plus general loan loss reserves in the amount of $379.2 million. Id. at 7. The ROE found that GAAP net worth and tangible net worth improved since the previous examination as a result of trading ICCs for preferred stock and profits from the sale of 17 branch offices. Id. at 1. As a result, GAAP net worth was now $316.1 million as opposed to $245.5 million in the last examination, and tangible net worth was $90.9 million as opposed to a negative $82,000. Id. As a whole, Northeast's capital base was deemed to have "improved since December 31, 1986; yet tangible capital [remained] low." Id. at 7. Additionally, the regulators found the interest rate risk assumed by the thrift "to be manageable." Id. at 1.

---

[13]   The regulators noted that since the February 17, 1987 examination, Northeast had undergone a "significant reorganization." Id. at 3. Northeast's Board believed that then President Harry F. Martin and Executive Vice President George Scott, Jr. hired unnecessary middle managers and support staff. These men resigned in September and August 1987, and Chairman of the Board and CEO, Kent Dixon, was subsequently elected as President. Id.

However, the regulators found that Northeast was "operating at a loss." Id. at 1. Northeast would have reported a $2.7 million loss for the calendar year without net non-operating income of $9.2 million. Id.

The regulators also found Northeast's underwriting for corporate debt securities ("junk bonds") to be inadequate. Id. With respect to the RCA activities, they noted that such activities had increased in 1987 with the purchase of $322 million in MBS, funded by $472 million in reverse repurchase agreements. Id. at 8-9. As of August 31, 1987, there was $2.3 billion in MBS and $1.8 billion in reverse repurchase agreements outstanding. Id. at 9. The regulators found that management was not properly reporting Northeast's RCA activities to the Board of Directors. They recommended that "[r]eports to the board should reveal the goal to be achieved from the transaction, the effective cost and the effect on the net interest margin of the hedge in place." Id. at 2, 8.

The April 15, 1988 Special Board of Directors' Meeting

On April 15, 1988, the Board of Directors held a special meeting. At the meeting, Dixon announced that a potential acquirer had decided not to extend an offer to purchase Northeast for the foreseeable future. DX 334 at 1. The would-be acquirer stated that the amount of goodwill on the balance sheet and the intent of the acquirer to dismantle the RCA portfolio caused pricing problems. Id. The Board reached a consensus that no further efforts to solicit a purchaser for the bank should be made. Id. Accordingly, "Mr. Dixon stated that future strategic direction should have as a foundation the improvement of the balance sheet, by reduction of goodwill and the increase of tangible net worth." Id. The Board agreed to a press release which, among other things, said that Northeast intended to increase its tangible net worth through acquisitions and other growth and by providing service to customers. Id. at 2. The Board also engaged in a discussion concerning its search for a new Chief Executive Officer. Id.

Northeast's New Management

In July 1988, Northeast's Board of Directors brought in a new Chief Executive Officer and Chairman, George Rutland. PX 19 at 4; PX 192 at 1.2, 2; Tr. 218-19. The regulators stated that Dixon was replaced by Rutland, in part, as a result of deteriorating conditions at Northeast including higher interest rate risk exposure and a RCA mismatch problem that was an obstacle blocking attempts to sell Northeast. PX 192 at 2.1-2.2. Rutland had previously been President and CEO of California Federal Bank or CalFed, a $30 billion thrift. Tr. 218.[14]

At the July 22, 1988 annual meeting of shareholders, Rutland outlined the state of the thrift and prospects for its future operations. DX 513. He stated that Northeast had increased its tangible

---

[14] George Rutland was deceased as of the trial in this action. However, Rutland did testify in an affidavit that was submitted in connection with Northeast's motion for a preliminary injunction in Northeast Sav., F.A. v. Director, Office of Thrift Supervision, 770 F. Supp. 19 (D.D.C. Apr. 1, 1991), and submitted for the record in this proceeding. PX 241.

net worth with a corresponding decrease in goodwill.  Id. at 17.  After noting that the faster goodwill could be written off, the greater Northeast's tangible net worth would be, he stated that among his goals would be to continue Northeast's increase in tangible net worth.  Id.  Rutland identified as a challenge to Northeast's future operations its "interest rate sensitivity in an environment of unsettled interest rates."  Id.  Although the March 31, 1988 one-year gap was less than 10%, the rise in interest rates caused Northeast's net interest income margin to decline from 1.78% to 1.5% between June 1987 and June 1988.  Responding to this decline would be his "most immediate priority area over the near term."  Id.; see also DX 341 at 1 ("[Rutland] was particularly concerned about the effect of the recent sharp increase in interest rates upon Northeast's business plan.").

The July 28, 1988 Meeting with Regulators

On July 28, 1988, less than a month after Rutland's arrival, the regulators called a meeting with Rutland and other Northeast representatives in order to get a better sense of Northeast's current condition and strategies for future operations.  PX 1146 at 1.  John E. "Jack" Ryan, Executive Vice President of the Federal Home Loan Bank of Boston, noted that earnings were below projections even though Northeast was tracking its business plan.  Id. at 1.  He expressed concerns about Northeast's investments in junk bonds and the overall growth in assets, funded by short-term funds such as REPOs.  Id.  Northeast's decline in income from 1987 to 1988 was attributed to the faster repricing of the short-term liabilities, particularly brokered CDs and REPOs, as a consequence of an increase in interest rates, as well as an agreement with regulators to build up a general reserve to 1% of outstanding junk bonds.  Id.

Further, as the regulators recounted, Rutland intended to change Northeast's strategy:

> Rutland spoke up and indicated that he is not comfortable with the composition of [Northeast's] balance sheet and that he shares the concerns expressed by Jack Ryan.  He said that the present strategy of purchasing ARMs . . . produces too narrow a spread to be profitable and that the small spread is eroding as interest rates rise. The only profit being produced is in the new loans being purchased which requires the bank to continue to grow in order to remain profitable.  He noted that [Northeast] is running out of capital and cannot pursue this strategy very much longer.

> Rutland said that he does not believe the strategy employed by [Northeast] over the past few years has been the correct one.  He said he intends to return to the fundamentals and rely less on a money market operation.  Rutland is looking at various alternative ways to address [Northeast's] future all of which will involve some major changes.  He said he is considering unwinding the money market operation which will shrink the bank by billions of dollars.  If the reduction strategy is employed, [Northeast] will have to take large

12

> losses.  Rutland believes, however, that even with the large losses, [Northeast's] remaining capital will be sufficient to support additional growth off the smaller base.

Id. at 1-2.  Rutland also considered taking the thrift private, expanding the junk bond portfolio, concentrating on the local mortgage market, or performing some commercial lending.  Id. at 2. However, Rutland stated that he had not decided on a strategy and would keep the regulators informed.  Id.

### The July 1988 Kaplan Smith Special Study

In July 1988, Rutland undertook an assessment of Northeast and evaluated various strategies for the business because he was concerned about the impact of the sharp increases in interest rates on the business strategy of Northeast.  DX 341 at 1.  To that end, Rutland hired the consulting firm, Kaplan, Smith & Associates ("Kaplan Smith"), to examine strategic options.  Kaplan Smith filed two reports in connection with the assessment, one dated August 19, 1988, and another September 16, 1988.  PX 66; PX 67.  The August 19, 1988 report reviewed Northeast's historical financial performance and condition.  PX 66.  The September 16, 1988 report reviewed the current conditions facing Northeast and presented alternative strategic options for Northeast's future operations.  PX 67.  In its first report, Kaplan Smith found that, as of June 1988, Northeast held over $6.5 billion in wholesale assets derived from non-retail loans, MBS, and investments, and nearly $4.5 billion in wholesale liabilities derived from brokered deposits and borrowings.  PX 66 at 6.  Kaplan Smith also found that, for the year ended March 31, 1988, Northeast -- which was a mixed wholesale/retail thrift -- had a lower net interest spread (1.57%) than either its wholesale peers (1.73%) or its retail peers (2.79%).  Id. at 17.

### The August 19, 1988 Kaplan Smith Report

On August 19, 1988, the first Kaplan Smith report was presented to Northeast's Board of Directors.  DX 341.  The presentation consisted of four parts.  The first part was "A Review of Northeast's Historical Financial Performance and Condition."  Id. at 2.  Points raised during the first part of the presentation included:

> During the past four years Northeast Savings has experienced significant asset growth while retaining modest earnings thereby diluting its capital position;
>
> Northeast's growth in assets has been sustained in large part from purchased assets versus retail originations;
>
> Most of Northeast's income has been generated through non-recurring items and taxes; and

> Over the past year and one half, the Association's common stock price has declined.

Id. at 2.

The next part of the presentation was entitled "Peer Group Analysis: Northeast Versus Wholesale Thrifts Versus Northeast Retail Thrifts."  Key points from this part included:

> Northeast has approximately $2.4 billion of retail deposits funding wholesale assets (termed the "mixed bank");
>
> Northeast's net interest income when compared with other wholesale and retail institutions is lower than both;[15]
>
> Both Northeast Savings and other wholesale banks have higher funding costs than retail institutions; and
>
> Net operating income generated by Northeast Savings has been somewhat lower than that of wholesale institutions and significantly lower than income generated by Northeast retail thrifts.

Id.

The discussion during the next part of the presentation "Pro Forma Financial Projections - - Status Quo Growth Scenario," included:

> Maintaining the present growth direction results in a very narrow margin of profitability.
>
> At current growth, Northeast Savings would fail to meet its minimum regulatory capital requirements at the end of the 1989 fiscal year.

Id.[16] (emphasis added).  The final part of the presentation was entitled "Analysis of Problem." Major points raised during this part included:

---

[15]  The August 19, 1988 Kaplan Smith report stated that Northeast's net interest income was 1.32% of average total assets for the year ended March 31, 1988, while net interest income at wholesale thrifts averaged 1.30% and retail thrifts averaged 2.78%.  PX 66 at 11.  The same report indicated that, for the year ended March 31, 1988, Northeast had net income of 0.30% of average total assets, slightly higher than wholesale thrifts (0.26%) but significantly lower than Northeastern retail thrifts (0.71%).  Id.

[16]  Northeast's fiscal year at this time ended on March 31, 1989.

14

The retail bank is earning a good spread;[17]

The wholesale bank is earning a poor spread;[18]

The combined spread of retail and wholesale is mediocre;[19] and

The mixed bank is operating at a loss.

Id. at 2-3.

### The September 16, 1988 Kaplan Smith Report

The September 16, 1988 Kaplan Smith report identified the major issues facing Northeast and some options to deal with these issues. The first problem was that the "mixed bank" had a narrow yield-cost spread with high G&A expenses. DX 67 at 2. Second, Northeast had a high level of overhead for the amount of retail liabilities and a very high level for the amount of retail assets that it held. Such underutilized retail infrastructure resulted in low profitability. Id. Third, Northeast had limited retail asset generation capability, which meant limited fee income, less interest income and no off-balance sheet assets derived from loan servicing. Id. Fourth, Northeast had a low level capital base which constrained future growth and caused higher costs for borrowing. Id. Fifth, Kaplan Smith found an asset/liability repricing mismatch resulting in less net interest income in a rising interest rate environment. Id. Sixth, wholesale assets were carried at more than market value, which would mean that, if sold, they would cause a $132 million total loss. Id. Seventh, there were unspecified "regulatory concerns" and thus less flexibility in choice of operations. Id.

Kaplan Smith identified seven options for Northeast's future operations. Id. at 4. The first option was to continue the current business plan which represented a 20% annual growth in the thrift, which would result in a net worth below the regulatory requirements after March 1989. Id. at 14. The second option was to cut the current $88 million in G&A expenses by either $5, $10, or $15 million. Id. at 15. The third option, entitled "Freeze Entire Bank" would decrease the capital

---

[17] Northeast earned a 2.81% spread on the retail portfolio for the three months ended June 30, 1988. PX 66 at 18.

[18] Northeast earned a 1.01% spread on the wholesale portfolio for the three months ended June 30, 1988. Id.

[19] Northeast earned a 1.47% spread on the combined retail/wholesale spread for the three months ended June 30, 1988. Id.

15

position of Northeast, as Northeast took writedowns on assets or if rates continued to rise. Id. at 16. Northeast's capital position would be less than the 4% required on January 1, 1990. Id.[20]

The fourth option, entitled "Unwind Wholesale Bank," provided that Northeast would sell off immediately over $3 billion in wholesale assets and use the receipts to pay off an equal amount of wholesale liabilities. Id. at 21. However, Kaplan Smith recognized that this option would have a very negative impact on Northeast's earnings. Id.

Under the fifth option, entitled "Replace Wholesale Assets," Northeast would sell $2.4 billion of assets and replace them with newly originated ARM mortgages at a rate of $1 billion a year. The impact of such a strategy, however, would be that Northeast would have negative income for four years and slightly positive in the fifth year, and the capital ratio would decrease over time to less than 3%. Id. at 25. Under the sixth option, "Dispose of Retail Liabilities," Northeast would sell $2 billion of deposits for a $120 million or 6% gain, and fund that sale with $1.9 billion of wholesale assets. Northeast would take a loss on the sale of assets in the amount of $33 million, thereby netting a gain of $87 million. Id. at 29. While net interest income would decline, net income would increase as a result of the gain from the sale. Id. The ability to achieve these earnings would be dependent on G&A cuts as a result of branch sales. Id. Northeast's capital ratio would increase to over 5% and would increase further over time. Id.

The seventh option was disposing of retail liabilities and replacing wholesale assets with retail assets -- which is a combination of options four and six. Id. at 34. In this scenario, Northeast would sell $2 billion in retail deposits for a $120 million gain and fund that sale by selling $1.9 billion of wholesale assets for a $32 million loss. Id. It would sell $2.8 billion in wholesale assets over time taking a $63 million loss and use the proceeds plus loan repayments to fund $1 billion a year in ARM originations. Id. G&A expenses would be reduced by $40 million, and net income could increase over time as ARMs reprice. Capital immediately would increase to over 5% and increase further over time. Id.[21]

On September 16, 1988, the Board rejected options one through five outright "because of the resulting reduction in capital and/or losses and/or decreases in earnings that would be incurred." PX 250 at 3. Upon Rutland's recommendation "that the Association move forward in preparation with a branch sale combined with partial unwinding of the Association's wholesale assets over time

––––––––––––––––––––

[20] Effective January 1, 1987, the FHLBB amended the minimum net worth requirements applicable to FSLIC-insured institutions. These amendments required such institutions to gradually increase their regulatory capital from 3% to 6%, subject to certain adjustments that could not reduce the minimum regulatory capital below 3% of total liabilities prior to January 1, 1990, or 4% of total liabilities afterwards. 12 C.F.R § 563.13(b) (1987).

[21] The difference between option six and option seven was that, in option seven, Northeast would continue to sell wholesale assets and use the proceeds to reinvest in single-family loans. Tr. 2216.

replaced by future ARM originations," the Board reached a consensus approving the strategy recommended by Rutland -- apparently adopting Kaplan Smith's option seven. Id. at 3-4.[22]

Rutland then conducted a series of meetings with regulators. On September 28, 1988, two Federal Home Loan Bank of Boston officials, Ford Peckham[23] and Bill Murphy, visited Rutland and two other officers of Northeast. PX 1151 at 1. At the meeting, Northeast informed the regulators that the next week it would announce a loss of $15-$16 million. Id. However, the "good news" about the loss was that it was "non-recurring, and represent[ed] 'clear the decks' chargeoffs by a new CEO." Id.

In his memo recapping the visit, Peckham recounted that:

> Mr. Rutland is uncomfortable with the wholesale operation, and plans to unwind it over five years with a "back to basics" plan. Northeast will be originating its own mortgage product, and will phase out asset purchases. This will require a re-invigorating of the branch system and to do that, Mr. Rutland plans to remove a layer of management over the branch system. This will cut G&A expenses and make lines of accountability shorter and more precise.

Id. at 2; Peckham Dep. 22-23. Rutland went on to inform the regulators that "[o]verall, Northeast's thrust will remain consumer real estate lending. The emphasis will be to generate core deposits to support Northeast's own mortgage production. At the same time, [Northeast's] wholesale purchased assets/funds positions will be unwound." PX 1151 at 2.

Another regulator, Richard Riccobono,[24] recalled that he met with Rutland and Walters when they were trying "to see if they could turn the institution around by raising capital and their plan was to sell off a piece of the business, the New York sector, if you will, of the business and take the proceeds from the sale and put it into the Connecticut and Massachusetts operations." Riccobono Dep. at 25-26.

---

[22] Bankhead testified that, in his opinion, Northeast pursued option seven, "which entailed the sale of $2 billion in branches, the sale of wholesale assets equal to that amount, and then the continued sale of wholesale assets replaced by mortgage loans." Tr. 2217.

[23] Ford Peckham was an assistant vice president and later vice president and manager of analysis on the regulatory side of the Federal Home Loan Bank of Boston. After OTS was formed, Peckham was an assistant director in the Boston office. Peckham reported to John Burke and Ralph Gridley. Peckham Dep. at 11-12.

[24] Riccobono, at the time, was a regulator for the Federal Home Loan Bank of Boston and subsequently became deputy district director for policy and enforcement for the Boston district of OTS. Riccobono Dep. at 12, 15.

At an October 12, 1988 meeting, the FHLBB representatives reserved support of the branch sale pending further study. Id. at 27-28. On or about October 20, 1988, Jack Ryan phoned Rutland and informed him that the FHLBB of Boston was not yet ready to support Northeast's restructuring proposal. PX 1156 at 1. Among other reasons, Ryan indicated his concern that the most valuable part of the bank and the most difficult to rebuild -- New York branches -- would be sold. Id. When Rutland expressed his disappointment, Ryan stated that Rutland could cut expenses, run the bank on a breakeven basis, and unwind the RCA portfolio when market conditions permitted him to do so without taking capital losses. Id. As Ryan testified, this strategy,

> wouldn't be necessarily to stop growth per se. I mean, as I looked at the institution it was really a bifurcated institution. I mean, you had a retail franchise and you had the money market operation. And what I was suggesting was that the emphasis should be put on improving and building the retail side and unwinding the other side. . . . [n]ot stopping growth entirely, but trying to reduce this in order to offset any additional growth that you might have or hopefully more than offset.
>
> Q. Growing retail, shrinking wholesale?
>
> A. Yeah.

Ryan Dep. at 71.

Rutland stated in response that he would resign before undertaking such a strategy. Ryan then indicated that the proposed plan might be possible on a more measured basis. PX 1156 at 1. Rutland responded that such a plan might work and "proposed Northeast sell only one or two of the New York branches to see how it works out." Id. at 1. Rutland agreed to consult with the Board of Directors. Id.

Rutland reported to Northeast's Board that the Federal Home Loan Bank of Boston did not support the branch sale and that Northeast "must now focus on less desirable strategic alternatives." PX 251 at 2. "In conjunction therewith the Chairman announced that the Association [would] reduce staff by approximately 9% or 164 officers and employees, which will reduce General and Administrative expenses by an estimated $4.1 million." Id.

**The FHLBB's Proposed Risk-Based Capital Requirement**

On December 23, 1988, the FHLBB published a proposed new risk-based capital requirement which included an interest rate risk component, but continued to allow thrifts to count goodwill as regulatory capital. Regulatory Capital Requirements for Insured Institutions; Proposed Rule, 53 Fed. Reg. 51800 (Dec. 23, 1988); DX 855. This proposed risk-based capital requirement, however, never went into effect and was superseded by the FIRREA risk-based capital requirement.

18

The proposed FHLBB risk-based capital requirement included a provision under which an insured institution was required to have capital in the amount of 6% of its risk-weighted assets. 53 Fed. Reg. at 51818. On-balance sheet assets -- cash, U.S. government obligations other than mortgage backed securities, and items collateralized by cash were given a zero percent risk weight. Obligations by U.S. government sponsored enterprises and qualified mortgage-related securities guaranteed or sponsored by government sponsored enterprises, such as Ginnie Mae, Fannie Mae, and Freddie Mac were given a 20% risk weight. Qualifying mortgage loans, were given a 50% risk weight. Assets not classified were given a 100% risk weight. Intangible assets, including goodwill, and real estate owned were given a 200% risk weight. Equity-risk investments were given a 300% risk weight. 53 Fed. Reg. at 51805-08.

The proposed FHLBB risk-based capital requirement included an interest rate risk component. 53 Fed. Reg. at 51810. The interest rate risk component would be calculated by means of "[a] discounted cash-flow analysis . . . to estimate the effect on an institution's value (market value of portfolio equity) of an immediate and permanent 200-basis-point movement in interest rates, either up or down." Id.

The proposed risk-based capital rule provided that thrifts structure their portfolios so that they would be in full compliance with the rule by January 1, 1993. Id. at 51814. However, there was to be a transition period requiring that by January 1, 1991, all insured thrifts have capital equal to 80% of their fully phased-in capital requirements and core equity equal to 2% of assets. Id.

## The December 12, 1988 Board of Directors Meeting

At the December 12, 1988 regular Board of Directors meeting, there was a discussion concerning the FHLBB's proposed new risk-based capital requirements. PX 253 at 1. The minutes reflect how Northeast understood the components of the proposed new capital requirements:

1)  a credit risk component which is calculated by multiplying asset balance by risk weight by 6%. The proposed risk weights are 0% for cash and U.S. government obligations, 20% for GNMA, FNMA, FHLMC mortgaged-backed securities, 50% for qualifying 1-4 residential mortgages, 100% for all other assets, 200% for goodwill and real estate owned and 300% for equity risk investments;

2)  an interest rate risk component which equals 50% of change in value of the Association resulting from a 2% change in rates; and

3)  a pledged asset component which is calculated by multiplying pledged assets by 3%.

19

Id. at 3.  The minutes noted that the proposed requirements would be phased in from January 1, 1990, through January 1, 1993.  During the phase-in period, Northeast would be required to maintain capital levels at 70% of total capital requirements with a 10% annual increase until full capital compliance was achieved.  Id.  Rutland indicated that the proposed regulation was applied to Northeast's current portfolio, and while there might be difficulties, he believed that Northeast would be able to meet or exceed the proposed risk-based requirement.  Id.

**Northeast's December 1988 Business Plan**

A new strategy for Northeast was set forth in a business plan for calendar year 1989 that would gradually shift Northeast's business from wholesale to retail banking while holding the size of the bank's assets constant.  PX 146 at 2.[25]  The document was titled "Northeast Savings, F.A., 1989 Business Plan."[26]  Id. at 1.  Although the document stated that "[t]he new strategy is aimed at enhancing the long term profitability and capitalization of the Association," the document did not address a plan beyond calendar year 1989 and included no projections beyond calendar year 1989.  Id. at 3.  As stated in this plan:

The key elements of this strategy are:

1)      rebuild a mortgage loan origination network,

2)      build a commercial lending capability,

3)      stop balance sheet growth and substitute loans made directly within Northeast's primary markets for wholesale assets,

4)      improve the capital position by managing the Association's size and maximizing contributions to capital, and

5)      maintain the current ratio of general and administrative expenses to total assets while improving fee income.

---

[25]  Plaintiff referred to this plan as the "December 1988 Business Plan."

[26]  This document was one of many business plans that Northeast made.  "[Northeast] amended their business plans a lot, you know, adjusted them and tweaked them. . . ." Tr. 1716.  However, some of Northeast's business plans were not submitted into evidence, making it difficult to determine with precision which business plans were adopted and implemented at specific dates.

PX 146 at 2.[27]

The Business Plan stated that "[t]he new strategy is aimed at enhancing the long-term profitability and capitalization of the Association." PX 146 at 3. Northeast intended to retain the additional earnings it would receive from the shift from wholesale to retail banking in order to strengthen the thrift's regulatory capital position. PX 146 at 2-3; PX 241 ¶17. Under the Business Plan, Northeast intended to increase income and profit as the portfolio shifted from wholesale to retail assets. Tr. 229. Northeast also hoped that a ramped-up retail operation would generate additional spin-off income by developing customer relationships that would enable it to sell additional products, thereby generating additional fee income. PX 19 at 6; PX 146 at 3.

<u>Northeast's Plan to Shift from Wholesale to Retail Banking</u>

The December 1988 Business Plan indicated that "[r]ebuilding the mortgage lending network is a key element in the Northeast Savings' strategy of generating its own assets through a return to portfolio lending, and the rebuilding effort [was] the dominant part of the Association's 1989 business plan." PX 146 at 4. As Walters testified, "[t]he traditional thrift and banking activities would be to originate residential mortgages, typically single-family residential mortgages, often referred to as 1 to 4 residential mortgages, and [t]o fund[] those mortgages through retail deposits from consumers." Tr. 224. Northeast projected that by December 31, 1989, it would have $1.4 billion on its balance sheet in residential mortgages that it originated. PX 146 at 17. "The overall goal of this effort is to develop the capacity to originate $1 billion in mortgages annually, and to originate as much of this volume as possible in variable rate products to be booked for portfolio." <u>Id.</u> at 4. Specifically, Northeast hoped to originate $302 million in residential mortgage loans in New York, Connecticut, and Massachusetts, $340 million in southern California, $91 million in Long Island, and $97 million in New Jersey. <u>Id.</u> at 3. The plan stated that Northeast was already in the process of expanding in the southern California, Long Island, New Jersey, and Connecticut markets. <u>Id.</u> at 1.

In addition to residential mortgages, Northeast sought to originate $150 million in commercial mortgage loans. <u>Id.</u> at 3. Such lending was to be "almost exclusively devoted to real estate lending" including "commercial mortgage lending, construction financing, and industrial development loans." <u>Id.</u> at 2, 5. In addition, this business plan projected that it would originate "other" loans which include "consumer loans." Northeast's planned consumer lending operation would originate "mainly real estate related [loans] such as home equity credit lines and loans and home improvement loans." <u>Id.</u> at 6.

---

[27] No fact witness testified about the creation of this document based upon personal involvement. However, Rutland shared this Business Plan, which is undated, with Walters. Tr. 222 ("This document would have been the document that George would have shared with me at some point regarding the plans going into 1989. . . . My recollection is that [the document] would have been prepared - - obviously I wasn't there - - but it would have been prepared in the fall, fourth quarter of 1988."). Walters joined Northeast in April 1989. PX 259 at 3.

The Business Plan anticipated that, as of December 31, 1989, wholesale assets would still comprise nearly 70% of its total assets -- 31% in mortgage-backed securities, 18% in investment securities, and 19% in purchased loans. Id. at 17.

<u>Northeast's Plan to Hold Balance Sheet Size Constant</u>

The December 1988 Business Plan provided that "the bank size [would] stay[] constant" despite the change from a wholesale-oriented profile to a retail-oriented profile, stating:

> The strategy calls for a stop to the aggressive asset growth which the Association has experienced in the past several years. This growth has come about largely through the purchase of wholesale assets funded by wholesale borrowed funds at narrow margins. Under the new strategy, as the Association originates its own assets, they will be substituted for wholesale assets. No growth in the balance sheet will be required.

Id. at 2. With respect to the asset side of the balance sheet, Walters testified that as Northeast's wholesale assets ran off the books, Northeast planned to reinvest those assets in new retail loans, primarily residential home loans. Tr. 232-33. On the liability side of the balance sheet, Northeast planned for no growth with gradual substitution of retail deposits for wholesale borrowings. PX 146 at 2, 12.

The December 1988 Business Plan contemplated that the wholesale assets would run off the books gradually. PX 146 at 13; Tr. 237. Moreover, revamping its retail operations, as a practical matter, would have been difficult to complete quickly. Tr. 238.

The plan included a pro forma projection for required regulatory capital for December 31, 1989. It included an alternative minimum capital requirement of 4%, and Northeast projected that it would have $1.3 million in excess of the 4% minimum capital requirement. PX 146 at 21. It also included a pro forma projection for the proposed FHLBB risk-weighted capital requirement which Northeast would not have met, instead incurring a deficit of $16 million. PX 146 at 24. The pro forma sheet assumed that Northeast would count all of its supervisory goodwill towards regulatory capital. PX 146 at 24; Tr. 374-75. The plan also assumed that the key interest rates would remain unchanged through calendar year 1989. PX 146 at 21, 26; Tr. 375.

<u>Interest Rate Risk Strategy</u>

According to the Business Plan, Northeast's assets and liabilities were structured such that it had "generally implie[d] a repricing mismatch between assets and liabilities within the one year time horizon (one-year gap) of 20% of total assets or less." PX 146 at 8. Under the then current regulations, such a range was acceptable to the regulators as FHLBB regulations provided that an institution whose one-year gap was less than 15% would receive a credit of 1% of total liabilities towards meeting capital requirements. Id. at 19. In addition, the same regulations provided that an institution whose three-year gap was less than 15% would receive an additional credit of 1% of total

liabilities towards meeting capital requirements.  Id.  If the gap were within 15% and 25%, the institution would receive a reduced credit.  Id.; Tr.1662-63.  As of October 31, 1988, Northeast was entitled to a 1% credit as a result of the one-year gap, and an 0.85% credit for its three-year gap.  PX 146 at 20.

The Business Plan included the following strategy regarding interest rate risk:

> With regard to the management of interest rate risk, Northeast Savings maintains a balanced asset and liability repricing structure. Such a structure generally implies a repricing mismatch between assets and liabilities within the one year time horizon (one year gap) of 20% of total assets or less.  This range provides the flexibility to respond to the basic risk of all financial intermediaries whose retail assets and liabilities do not move in lock step with rate changes in the money markets.  Therefore, the Association manages the interest rate risk profile of the entire institution and does not place undue emphasis on discrete components of the balance sheet.  This "macro" approach enables the Association to manage the dynamics of its balance sheet most effectively without exposing the company to undue rate risk or the corollary erosion of asset values and net interest margin.  This gap range will again be maintained in 1989.

PX 146 at 8.[28]  At the same time as Northeast intended to maintain the 20% one-year gap, it intended to increase its origination of residential mortgage lending by means of variable rate assets, i.e., adjustable rate-mortgages.  Id. at 4.  Northeast expected that its three-year gap would be less than 15% by December 31, 1989, and would receive the full 2% in matching credits from the FHLBB instead of the 1.85% that it expected to receive otherwise.  PX 146 at 20-21.[29]

The Regulators' Knowledge of Northeast's New Business Strategy

The regulators were aware that Northeast planned to shift from wholesale banking to retail banking.  Ford Peckham testified that a letter dated December 12, 1988, stated: "the new plan, in qualitative terms, calls for a refocused retail banking effort.  Balance sheet growth has stopped and wholesale mortgage asset runoff will be substituted for loans originated by Northeast."  Peckham Dep. at 28.  Jack Ryan also testified that this letter was consistent with his recollection of Northeast's

---

[28]  Northeast "managed [interest rate risk] primarily around the one-year gap."  Tr. 2184, 2804; PX 146 at 8.  The regulators also focused on the one-year gap.  Tr. 2804; PX 1148 at 1; DX 224 at 2.8; DX 225 at 1, 8.

[29]  However, in terms of the interest rate risk policy that the FHLBB subsequently adopted under Treasury Bulletin ("TB")-13 after December 1988, the regulators did not know whether this was a reasonable model.  Kovac testified: "I don't know that a one-year gap of 20 percent would actually ensure that you would end up in an okay interest rate risk position."  Tr. 1670.

23

business plan, namely, to "stop overall asset growth, grow the retail side of the bank, and use that to replace the wholesale side of the bank, which was the risk-arbitrage strategy." Ryan Dep. at 80.[30]

Ryan further testified that Rutland's new strategy "was in general to run a thrift institution rather than a market-based kind of strategy that the former management was going to run. He was going to wind down this huge arbitrage, concentrate on building the franchise, and make loans locally and deal with the local customer base. . . . [H]e was going to take deposits from local customers, instead of buying money from Wall Street. And instead of investing in residuals and exotic instruments that were involved in the risk-controlled arbitrage, he was going to invest in generating local business" -- residential and commercial. Ryan Dep. at 40-41. He also testified that Rutland planned to unwind the RCA portfolio "over time." Id. "It took some doing to unwind it, I think. There were complicated hedges and -- that had to be undone and had to match up his funding with his unwinding. It was . . . going to take a while." Id. at 41-42; 76.

## FHLBB's Examination of Northeast for the Period February 18, 1987-December 31, 1988: A MACRO Rating of "4"

On December 12, 1988, the Federal Home Loan Bank of Boston commenced an examination of Northeast. PX 192. The examiner in charge was Thomas C. Kovac. Id.; Tr. 1454. The examination was based on December 31, 1988 consolidated data and covered the time frame since the prior examination of February 17, 1987, through December 1988. PX 192 at 1.[31] The regulators found that Northeast was in an "unsatisfactory condition," PX 192 at 1, and gave it a composite MACRO[32] rating of "4," which meant that Northeast "was in very serious trouble, that unless certain actions were taken, there was  a -- given the existence of current market conditions, there was a possibility of them failing." Tr. 1457-58; PX 192 at 1.3.

The ROE found that "[g]iven its $7.9 billion in liabilities and $305.4 million (3.7%) of regulatory capital at December 31, 1988, the institution, in the absence of certain prompt measures, faces the prospect of failing the pending January 1990 [non-FIRREA] four percent minimal capital requirement." PX 192 at 1. The $305.4 million of regulatory capital included goodwill. Tr. 385. The report went on to state that Northeast:

---

[30] This December 12, 1988 letter to which Messrs. Peckham and Ryan refer is not in the record. However, later in a letter dated July 6, 1989, Rutland represented to the regulators that the Board of Directors approved a "strategic direction" that would "restructure our balance sheet by reducing the dependency on wholesale sources and uses of funds and establishing a stronger retail orientation" in December 1988. PX 211 at 1.

[31] On-site work for the examination was conducted through April 1989. Tr. 1455. The ROE was transmitted with a cover letter from the Federal Home Loan Bank of Boston to the Board of Directors of Northeast, dated June 6, 1989. DX 228A.

[32] A composite MACRO rating is a composite of the regulators' assessment of Management, Asset Quality, Capital, Risk Management, and Operations into a single number. Tr. 1456-57.

> must also contend with the probability of generating little or no
> earnings for at least the next one to two years. There exists, therefore,
> a strong need to shrink assets and for the recently hired new CEO,
> George Rutland to establish a basis for adequate future profitability
> in an extremely competitive New England banking environment.

PX 192 at 1. Kovac testified that the shrinking of Northeast's balance sheet was "needed to bring about capital compliance and, secondly, to ensure the continued existence of the institution." Tr. 1461.

The regulators stated that despite positive earnings reported in FYs 1986-88, Northeast "fundamentally was and continues to be in a weakened condition . . . in large part brought about by a dwindling retail business generating capacity, a more heavily leveraged capital, and an unacknowledged, but greatly increased interest rate risk exposure." PX 192 at 1.1. The report went on to say that the interest rate risk exposure "was masked by frequent reference to one year gap position that was misleading considering the hedges in place and other activities being conducted." Id. The report noted than "an acceleration in the rate of decline in the net interest spread and margin [was] brought on by a prolonged period of steadily rising rates and more recently by the inversion of the yield curve. This rate exposure is expected to be a continuing factor and explains why annualized net income remains at the same total dollar amount as two years ago, in early 1987 when assets were $2 billion less, not as risky, and capital was far less leveraged." Id. at 1.2.

The regulators found that Northeast's capital level, while exceeding its minimum capital requirement, was marginal. PX 192 at 2.13. Regulatory capital totaled $347.6 million for the fiscal year-end March 31, 1988, with a minimum capital requirement of $216.9 million, but declined to $305.4 million as of December 31, 1988, or 3.7% of total assets, exceeding the minimum capital requirement of $237.8 million. Id. at 2.13, 2.16. The decline in the capital bases was a result of "[w]eak earning performances and a substantial increase in the financial leverage" of Northeast. Id. at 2.13. However, the regulators noted that Northeast's general loan loss reserves of $18 million of regulatory capital were sufficient to protect the capital base under the risk profile of Northeast's asset portfolio. Id. Because Northeast projected no asset growth and only net income of $2.1 million in its business plan for the year ended December 31, 1989,[33] the regulators anticipated that Northeast would fail to have sufficient regulatory capital for the first quarter ended March 31, 1990. Id. at 2.16. As stated in the report: "[b]arring the absence of additional capital or a reduction in liabilities the scheduled increase in its minimum capital requirement beginning on January 1990, would cause the institution to fail its capital requirement for the quarter ended March 31, 1990." Id. at 2.14. Walters testified that, according to the regulators, this meant that Northeast faced two alternatives: either raise capital or shrink. Tr. 387.

The regulators expressed concern about Northeast's tangible capital. Northeast had only $68.1 million in tangible capital as of December 31, 1988, representing 0.83% of total assets which was deemed "marginal" to Northeast's long-term viability. PX 192 at 2.16. It attributed the low

---

[33] The report stated December 31, 1988, but this appears to have been a typographical error.

level of tangible capital to the level of goodwill in Northeast's asset base, amounting to 2.6% of total assets or $217.0 million, as of December 31, 1988.  Id.  According to this ROE, Northeast was insolvent on a tangible capital basis -- after adjustments were made for unrealized losses, off-balance sheet items and unearned purchase accounting discounts, Northeast had a total adjusted tangible capital of negative $31,969.  Id. at 2.16-17.[34]  According to Kovac, insolvency on a tangible capital basis "means you are broke."  Tr. 1484.  Based on Northeast's tangible capital position, the regulators "would significantly restrict the amount of leveraging that would be permitted."  Id. 1485.

The regulators also found that Northeast was subject to "a significant degree of interest rate risk."  PX 192 at 2.18.  This risk contributed to operating losses for the nine months ended December 1988, and a "significant deterioration in the net asset value of the institution since December 1986. The risk existent in the balance sheet is a result of the strategic direction pursued by the institution, the implementation of this strategy, and adverse market conditions which unfolded in a manner contrary to assumptions made and tactics employed."  Id.  The "strategic direction" referred to Northeast's wholesale strategy.  Tr. 390.  The regulators noted that Northeast's interest rate risk was "masked to an extent by six month and one year 'gap' measures which do not account for the very slim margin being earned on assets, and which are distorted by a portfolio of ineffective interest rate swap liability hedges."  PX 192 at 2.18.  "Management's interest rate risk policy, which largely focuses upon the one year 'gap' measure as an indicator of the degree of risk, is considered to be overly simplistic and inadequate as a guide to decision making and performance evaluation for [Northeast]."  Id.  The regulators found that Northeast's exposure to interest rate risk caused significant unrealized losses of $127.8 million in the wholesale asset portfolio as of December 31, 1988, which:

> far exceeds the institution's tangible capital base, and illustrates the imprudence of the operational strategy pursued to the extent that the wholesale activity cannot generate acceptable margins insulated from rate risk, and cannot be unwound without large losses. . . . The only option available to the institution in the absence of a significant drop in interest rates is to stop wholesale asset growth and allow the assets to pay down and converge with par value.

Id. at 2.26.  In other words, "the $127.8 million [in unrealized losses] would wipe out tangible capital."  Tr. 1493.  These unrealized losses reflect a lower market value of Northeast's wholesale investments as compared to their book value.  PX 192 at 2.6.

In this ROE, the regulators outlined the history of the management of Northeast from the time of its creation in the 1982-1983 acquisitions by the former Schenectady Savings Bank up through the time of the examination.  Id. at 2.-2.4.  Specifically, the ROE indicated that, beginning in 1985-1986, Northeast grew its wholesale banking portfolio by purchasing mostly mortgage securities funded by short-term non-retail liabilities hedged with interest rate swaps.  Id. at 2.1, 2.18.

---

[34]  In particular, the regulators found that unrealized losses and interest rate swaps depleted the year-end tangible capital.  PX 192 at 2.17.

Northeast "understood at the outset that the margins available from this activity would be substantially less than those available from retail banking . . . yet this approach allowed the institution to rapidly grow in order to provide needed additional, absolute net interest income." Id. at 2.18.  However, the manner in which the RCA portfolio was managed and market events, including rising interest rates and inappropriate hedge positions, caused the incremental yields to decline.  Id.  To increase yields, Northeast began to invest in adjustable rate MBS and CMOs.  Id. at 2.20.  Northeast also purchased high-yield junk bonds and CMO residuals and increased asset growth to generate net interest margin sufficient to cover operating expenses.  Id.  However, these purchases increased the risk to Northeast's limited tangible capital base and did not return hoped-for yields.

During fiscal years 1986, 1987, and 1988, Northeast generated profits by selling off mortgage securities and loans during periods of falling or low interest rates, which was motivated in part to maintain its stock price and to discourage hostile takeovers.  Id. at 2.1, 2.19.  The regulators also found that the interest rate swaps entered to protect the spread on wholesale assets were not terminated as they were supposed to be, but were maintained rather than acquiring lower-yielding replacement assets because the hedges would have created some losses that would have offset the gains.  Id. at 2.1. The effect was an appearance of an improved one-year gap position which lowered the regulatory capital requirement permitting additional leveraging, but the hedges could not work as intended.  Id.  Thus, Northeast was being fundamentally weakened as its capital was leveraged at dangerous levels and its retail asset generation capacity was declining.  Id.

In addition, the regulators found that "[s]ince its formation in 1982 the institution has never been able to generate[,] except for a small profit in FY 1986[,] any bona fide core earnings.  With the exception of 1986, sizeable losses would have been shown for every year without gains on sales, net purchase accounting and tax benefits and net extraordinary gains." Id. at 2.2.  The lack of core earnings was related to Northeast's "lack of growth in retail activities."  Id.  Kovac testified that the negative core earnings indicated that Northeast's "operations are not producing any positive income."  Tr. 1468-69.

The ROE then stated that "[t]he presence of goodwill cannot alone primarily account for the fact that net retained earnings have increased by only $33.2 million, to $118.8 million, since FY 1983 while during this time assets have grown from $3.1 billion, to $8.2 billion at December 31, 1988."  Id.  When asked what this finding indicated about Northeast's profitability, Kovac stated:

> Well, that the course of action [Northeast] had pursued was not producing positive results.  The reason I expressed this in this way, I wanted to explain to the reader, it wasn't simply the existence of goodwill.  In other words, the cost of amortizing goodwill each year or the fact that there was a sizeable amount of goodwill, which is a nonearning asset on the asset side of the balance sheet, that was not the explanation of why they had such poor -- why they had such small amounts of an increase in retained earning.  It had to do with fundamental flaws in the way the business was being operated . . .

27

> [which] were mainly manifest in the RCA, the fact that they had taken
> on a large growth in wholesale assets funded by wholesale liabilities,
> which produced little or no positive benefit.

Tr. 1470-71.

According to the regulators, Northeast's Board of Directors did not realize that the RCA program was not working properly until it became a barrier to attempts to sell the institution.  PX 192 at 2.2.  In 1987, during the period of time when there was a change-of-control challenge, the Board was informed that sometimes "leverage banking" did not work.  Id.  Moreover, according to the thrift examiners, the interest rate risk policy was overly simplistic, and there were neither reviews of the policy nor systematic reports showing separately the deterioration of the "leveraged banking" component of the thrift.  Id.

George Rutland replaced Dixon in mid-1988, and undertook a new business strategy.  Id. at 1.2, 2.3.  The regulators described Northeast's new business strategy as follows:

> After a period of assessing the causes of the institution's present
> predicament, Mr. Rutland beginning in December 1988 initiated a
> new course of action for Northeast Savings.  The plan calls for no
> growth in assets beyond the approximate $8 billion present total;
> shrinking, as necessary, at minimal or no loss to meet future increased
> capital requirements; holding the line on non-interest expenses and a
> return to a more traditional retail thrift orientation.  Emphasis will be
> placed on originating ARMs for portfolio that will gradually replace
> existing wholesale assets.  The objective of the redirection is to
> achieve larger gross spreads (compared to wholesale), reduce the
> level of credit and interest rate risk of recent years, and in general,
> achieve a more productive leveraging of capital with better utilization
> of the retail infrastructure.

Id. at 1.2.

**The Regulators and the Unwinding of Northeast's RCA Portfolio**

The regulators would not have permitted Northeast to continue RCA activity, if a near-term decline in interest rates allowed the disposal of the RCA in less than three years.  Kovac testified: "we wanted [Northeast] to get out of [RCA] as quickly as possible, without causing a threat to capital, . . . they would not have been permitted to loiter in the RCA program and let it hang around. We wanted it closed out."  Tr. 1489.

Other regulators reiterated that Northeast's RCA program was a serious problem and that they wanted Northeast to wind it down and shrink the thrift.  Jack Ryan testified that the regulators were concerned with RCA activities because "all other things being equal, you don't make money

on a financial transaction unless you take a credit risk or an interest rate risk. [Northeast was] doing too much of this, given their capital structure.  That was the concern." Ryan Dep. at 36.  Ryan agreed with Rutland's strategy of unwinding the RCA position over time, and neither recommended nor thought that it would be a good strategy to "dump this entire portfolio overnight." Id. at 41-42.

Peckham recalled several meetings on unspecified dates among Rutland, Gridley, the Deputy Regional Director of the FHLBB in Boston, and himself, in which Rutland said that "the bank's balance sheet was much too large, that they had a huge volume of mortgage backed securities that was supported with borrowed money, that they had hedges in place.  They weren't sure how the hedges would perform, and the spreads were narrowing."  Peckham Dep. at 57.  "So he wanted to dismantle that part of the balance sheet, which was pretty dramatic." Id.

Ralph Gridley stated that the shrinking of Northeast "helped it to survive" because "if they had stayed with all of the assets that they had originally, when they were at about $9 billion, they'd have tanked." Gridley Dep. at 18.  In Gridley's view, Northeast would have not survived "[b]ecause the assets stunk." Id.  Such assets included "[h]igh risk [assets].  Junk bonds, for one.  They had some . . . securities . . . some repos and some other stuff that was just dangerous stuff for them to have on the balance sheet." Id.  Such assets had "interest rate risk dangers." Id. at 19.

## Changing Regulatory Environment: The Advent of FIRREA

### February 1989 – FIRREA Proposed

On February 17, 1989, the Board of Directors Northeast met and discussed the Bush Administration's proposed thrift rescue plan and recognized that "a major concern may be that the administration plan may not include supervisory goodwill as a part of capital." PX 257 at 1. Rutland indicated that he had met with members of Congress and testified before the FHLBB on "the origin and role of supervisory goodwill as a component of capital." Id.  With respect to the treatment of goodwill as capital, Rutland stated that "under the proposed regulatory capital requirements goodwill is assigned a risk factor of 200% which requires the maintenance of 12% capital against goodwill." Id.  He further stated that "capital requirements under the proposed regulations are going to be substantially higher than presently required." Id. at 2.

### March 1989 Board of Directors Meeting

At the March 17, 1989 Board of Directors Meeting, Rutland reported on the status of the Government's proposed thrift rescue plan.  He stated that "the legislative process is moving extremely rapidly, with House committee markup scheduled for April 6." PX 258 at 1. According to Rutland, the thrift rescue plan provided that, among other things, by June 1, 1991, regulatory capital requirements for thrift will be at least equal to those required of national banks. Id. Rutland further stated that "management is continually reviewing the ability of the Association to meet the capital requirements as likely to be passed by Congress and as proposed by the regulators.  If additional capital cannot be raised, it appears the balance sheet of the Association will have to be reduced." Id. at 2.

March 17, 1989 Financial Management Committee Meeting

At a meeting of Northeast's Financial Management Committee, Rutland reviewed proposed legislation to rescue the thrift industry.  DX 509 at 1.  Along with an increase in the minimum capital requirement, Northeast anticipated that the new legislation would phase out goodwill as capital over a 10-year period starting in 1991.  Id. at 5.

The Committee noted that applying the proposed regulation to Northeast's December 31, 1988 assets, there would have been a regulatory capital deficiency of $147,327,000.  Id.  To meet the capital deficiency, Northeast would have to shrink from $8.2 billion in December 31, 1988, to $7.5 billion by December 31, 1989, and to $5.2 billion by December 31, 1992.  Id. at 2, 8.[35]

**Northeast's April 21, 1989 Board of Directors Meeting**

At the April 21, 1989 meeting, the Board of Directors formally approved the hiring of Kirk Walters, Rutland's former colleague at CalFed, as executive vice president of Northeast.  PX 259 at 1, 3.  Walters later assumed the duties of Controller and Principal Accounting Officer of Northeast.  PX 260 at 1.  He subsequently became Chief Financial Officer, then President in 1991, and CEO and Chairman in 1993.  Tr. 219-21.  Previously, Walters had risen through the ranks of CalFed, becoming Controller of the entire bank at the age of 33.  Tr. 217-18.

In addition, Rutland reported on the state of the House and Senate versions of FIRREA.  Both versions contained a 1.5% tangible capital requirement, but the Senate version deferred implementation of the new capital standards until June 1, 1991, rather than June 1, 1990, as provided in the House version.  Id. at 4.  Northeast would not, under any reasonable interest rate scenario, meet the tangible capital requirement in June 1990, and so Rutland intended to actively lobby Congress to adopt the Senate version or to limit enforcement actions to a growth restriction if a thrift failed to meet regulatory capital requirements.  Id.

**Northeast's Revised May 15, 1989 Business Plan**

A new strategy for Northeast was set forth in a document entitled "Northeast Savings, F.A. Revised 1989 Business Plan with 1990 & 1991 Projections," dated May 15, 1989.  DX 179.[36]  The revised plan stated that:

---

[35] Bankhead opined that goodwill was included in the $5.2 billion size because Northeast's goodwill could be counted towards regulatory capital under the proposed, but never enacted, FHLBB risk-based capital requirement.  Tr. 2235-36; see also DX 509 at 9.

[36] This revised business plan is not reflected in any of the minutes of the Board of Directors' meetings in the record.  Walters stated that he would have reviewed this business plan while he was at Northeast, but had no specific recollection of the document.  Tr. 376, 497.

> [t]he original business plan for 1989 established a new strategic direction for Northeast Savings. In place of the previous course of aggressive asset growth achieved by wholesale banking, the new direction called for a return to traditional thrift and banking activities with an emphasis on residential mortgage lending, a deemphasis on wholesale activities and a stop to the growth in the balance sheet. This new direction remains the fundamental strategy of the Association.

Id. at 1. The revised business plan, however, was designed to take into account FIRREA as then proposed, with the assumption that regulatory forbearances of supervisory goodwill would be provided:

> The original business plan for 1989, however, was drafted within the context of a much different regulatory environment from what has evolved since the plan was drafted. And although the changing regulatory environment has not substantially affected the new strategic direction of the Association, it has affected the manner in which Northeast Savings intended to implement that strategy. For this reason, the Association has reviewed its business plan for 1989 and revised it in light of the new capital requirements contained within the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) currently before Congress. This revised business plan is part of a long range strategic plan under which the Association meets the proposed capital requirements for tangible capital, core capital and total risk-based capital assuming regulatory forbearance of supervisory goodwill.

Id. (emphasis added); Tr. 377. Unlike the original 1989 business plan which assumed that the balance sheet would be held constant, the revised 1989 business plan contemplated shrinking the wholesale portfolio and the balance sheet of the thrift more quickly in order to meet the then-proposed FHLBB capital guidelines that would be in effect for 1990 -- that assumed the continued forbearance of supervisory goodwill. DX 179 at 1.

Specifically, the revised May 15, 1989 business plan projected that Northeast would shrink from $7.9 billion in assets as of March 31, 1989, to $6.79 million by December 31, 1989, then to $4.9 billion on December 31, 1991, in order to comply with the anticipated FHLBB risk-based capital requirements and anticipated increases in the minimum capital requirement. Id. at 4, app. at 5, 17, 24, 26; Tr. 379-80; Tr. 2243. Northeast was projected to have $266 million in regulatory capital as of December 31, 1989, including goodwill. DX 179 at 5; Tr. 377-78. The revised business plan stated that "[t]hese objectives, combined with the goals stated below for the other business units of Northeast, result in a net loss for 1989 of $17.6 million." DX 179 at 5; Tr. 378.

**Northeast's May 19, 1989 Board Meeting**

At the May 19, 1989 Board of Directors meeting, Rutland reported on the status of FIRREA as then proposed by the House and Senate and urged directors to contact members of the pertinent House committees to request consideration of an amendment that would permit inclusion of supervisory goodwill in core capital or limit regulatory remedies against supervisory acquirers. PX 260 at 1.

The Board also discussed Northeast's commercial lending activities and how they fit into Northeast's strategic and business plans in light of the proposed legislative capital requirements and proposed risk-based capital regulation. Id. at 3. Rutland stated that Northeast would be required to maintain 6% capital for commercial loans as opposed to 3% for residential loans, thereby reducing margins earned. Id. Under the current regulatory environment, it was probable that commercial lending activities would have to be curtailed. Id. Furthermore, the ability of Northeast to originate assets would be limited by its efforts to meet new capital requirements, thereby causing Rutland to conclude "that it may no longer be prudent to emphasize the commercial lending as a line of business." Id. at 3.

**Northeast's 1989 Annual Report and Rutland's May 31, 1989 Letter to Shareholders and Q&A Interview**

Included in Northeast's annual report and 10-K for the fiscal year ended March 31, 1989, was a letter from Rutland to Northeast's shareholders, dated May 31, 1989, and an accompanying question-and-answer interview with Rutland. PX 19. As of March 31, 1989, Northeast had total assets in the amount of $7.9 billion, including $211 million in supervisory goodwill. Id. at 3. However, Northeast also had a loss that year of $12.9 million, in part due to writing down or selling off certain marginal or non-earning assets. Id. at 21. Rutland attributed that year's "lackluster performance" to a sharp rise in interest rates and the fact that the interest rate swaps and hedges in place did not sufficiently offset the rising rates. Id. at 8.

The annual report also noted the deemphasis of commercial lending as a line of business as a result, in part, of the risk-based capital regulations and legislation setting new capital requirements. Id. at 16. Rutland, in his letter to stockholders, reiterated Northeast's new business strategy shifting focus from wholesale to retail banking. Id. at 4.

Rutland maintained that this new strategy would "over the long term, provide a basis for sustained earnings."[37] Id. at 5. Rutland went on to say that Northeast's "return to profitability will be gradual, and an element which is key to our success is the direction of interest rates. Our return

---

[37] Walters testified that net interest income would be a component of "sustained earnings." Tr. 268. Gains on sales of assets in the normal course of business, such as single family residential mortgages are also part of "sustained earnings." Tr. 266-67. However, one-time gains on sales such as disposing of "a major piece of your operations or exiting a major portfolio" are not a part of "sustained earnings." Tr. 267.

to consistent operating earnings will be dependent upon a downturn in rates." Id.  According to Walters, a downturn in interest rates was necessary for consistent operating earnings because Northeast was liability-sensitive, and a decrease in interest rates would have increased earnings and capital.  Tr. 266.

In a question and answer section of the Annual Report, Rutland addressed the reasons Northeast's "lackluster" financial performance for the past year and stated:

> There are several reasons.  First, after I joined the Company last July, the Board and I made a careful review of the Company's current and proposed new direction, and consistent with this new direction, the Company subsequently wrote down or sold down certain assets to strengthen the balance sheet.  We completed those steps in the second and third fiscal quarters.  Clearly, however, the most adverse [effect] on us has been the sharp rise in interest rates.  The interest rate swaps and hedges we had in place were not sufficient to offset the recent large rise in interest rates.  As the Federal Reserve continues to hold or push rates higher, we experience a squeeze on our interest rate margin, and that won't change until there is a downturn in rates.

PX 19 at 8 (emphasis added).

When asked how long it would take for Northeast to have "consistent core operating earnings," Rutland stated: "It's a three to five year turnaround.  Three years if we get a substantial downturn in interest rates.  If there's no downturn in interest rates it will probably take longer than five years."  Id.

When asked about the proposed thrift rescue plan, Rutland stated:

> I commend the Bush Administration for acting quickly to take control of unhealthy savings and loans.  And generally, I view the proposed changes as necessary and positive, with one significant exception: the way supervisory goodwill is treated in the proposed capital requirement.  In 1982 and 1983, the government strongly encouraged healthy financial institutions to take over failed institutions, and we took over three.  These three supervisory acquisitions resulted in putting on our books $285 million in supervisory goodwill.  At the time of the mergers, the government made it clear that generally accepted accounting principles would be used, thereby counting supervisory goodwill for all capital purposes.  If we and others like us are no longer permitted to count this supervisory goodwill for all capital purposes, then the government is unilaterally breaching its contract.

Id. at 9.  When asked what Northeast's biggest challenge would be in the coming years, Rutland responded that the "capital requirements [in the pending legislation] are going to be the single biggest hurdle [for Northeast], because the legislation calls for the thrift industry to raise ten times the amount of capital in the public markets in a two-year period than the amount it raised over the previous ten-year period." Id. at 10.

When asked about the impact of "full interstate banking" on Northeast, Rutland responded:

> [Full interstate banking] will improve our franchise value.  Today, it's very difficult for another financial institution to look at Northeast Savings as an acquisition candidate because of the regulations against interstate operations.  Once interstate branching becomes reality, our operations will have a higher franchise value.  The strategy to build our retail and loan business will enhance the value of our franchise whether we remain independent, acquire another institution in the future, or become an acquisition candidate.

Id. at 11.  Shortly after that time, interstate banking laws changed to permit banks such as Northeast that were not headquartered in a state to branch into that state or to acquire banks within that state. Tr. 328-29.

**Northeast's June 1989 Board Meeting**

Northeast's Board of Directors held a meeting on June 16, 1989.  Both Rutland and Walters attended this meeting.  PX 261 at 1; Tr. 449.  At this meeting, the Board adopted a new interest rate risk management policy.  PX 261 at 5.  With respect to the proposed savings and loan legislation, Rutland reported that "the Bush Administration has clearly prevailed in its position on supervisory goodwill and core capital requirements and other issues of concern to Northeast." Id. at 6.

In addition, the CEO presented his recommendation to the Board that commercial lending be significantly curtailed for the next six months to allow the Association the opportunity to assess the impact of the risk-weighed capital requirements for commercial loans.  Id. at 5-6.

Finally, Rutland and Walters presented a proposed interest rate risk management policy, as required by FHLBB Thrift Bulletin 13 ("TB 13"), and the Board adopted this Interest Rate Risk Management Policy as proposed. Id. at 1, 5; PX 560.  Thrift Bulletin 13, issued on January 26, 1989, required insured institutions such as Northeast to adopt formal interest rate risk policy statements which establish limits on the sensitivity of the thrift's earnings and net asset value to changes in interest rates.  PX 558 at 1-2.  TB 13 "imposed behavior constraints on an institution because . . . they couldn't have too much risk relative to the level of their economic capital." Tr. 1662-63. Northeast's new interest rate risk policy stated, in relevant part:

> In formulating this interest rate risk management policy, the Board of Directors acknowledges that Northeast faces major uncertainties about future capital requirements and the impact which such

34

> requirements may have on interest rate risk management. Legislation
> now pending in Congress may have a direct impact on the level and
> the composition of the Company's required capital and an indirect
> impact on the size and composition of the Company's balance sheet.
> These issues in turn may have a substantial effect on how the
> Company manages interest rate risk.

PX 560 at 1. The interest rate risk policy also recognized that "the interest rate risk in the basic
business cannot be permanently offset through the use of hedges at a cost consistent with a
reasonable return to shareholders." Id. at 2.

Table B of the policy set forth limits on changes in net interest income or net asset value for
a given change in market interest rates. Id. at 10-11. The exposure limits in Table B were to be
viewed in conjunction with the probabilities of interest rate changes contained in Table A of the June
16, 1989 policy. Id. at 10-11. Thus, this new interest rate risk policy no longer measured interest
rate risk in terms of the one year "gap" of +/- 20% of total assets as an acceptable range. Because
exposure limits would be sensitive to changes in the interest rate outlook, the Board was to review
the limits periodically in light of such changes and could modify the exposure limits in Table B as
required. Id. at 11.

### Northeast's July 6, 1989 Response to the December 12, 1988 FHLBB Report of Examination

On June 6, 1989, the FHLBB transmitted its Report of Examination of Northeast,
commenced December 12, 1988, with a cover letter. DX 228A. The letter stated that "[t]he findings
of the enclosed report of examination (ROE) indicate a generally unsatisfactory condition of your
institution." Id. at 1. The letter also stated that "[o]f paramount importance now is the necessity to
restructure your balance sheet by reducing the dependency on wholesale sources and uses of funds
and establishing a stronger retail orientation for your institution." Id. The letter went on to state that
as a result of its RCA activity, Northeast was in danger of failing its minimum capital requirement
and was potentially subject to enforcement action:

> A direct and unfavorable result of the wholesale strategy pursued by
> your institution is the excessive leveraging effect it has on your
> capital position. Such effect in tandem with recent losses and poor
> prospects for earnings in the near future raises the possibility that the
> institution will fail its minimum capital requirement in early 1990.
> Among the consequences of such a failure are the prohibition on the
> payment of dividends on common and preferred stock, certain
> operating restrictions, . . . and the possible imposition of a capital
> directive . . . .

DX 228A at 1. The letter requested Northeast to outline the actions that it intended to take to avoid
failing the minimum capital requirement and to improve its interest rate risk profile. Id.

On July 6, 1989, George Rutland sent a response to the regulators on behalf of the Board of Directors and "[did] not disagree with [the regulators'] characterization of [Northeast's] condition as generally unsatisfactory." PX 211 at 1. Northeast further "agree[d] that the necessity to restructure [its] balance sheet by reducing the dependency on wholesale sources and uses of funds and establishing a stronger retail orientation for Northeast Savings is of paramount importance." Id. The letter stated that this need to restructure the balance sheet was identical to the "strategic direction that was presented by Management to the Board of Directors and approved by it in December 1988, prior to the commencement of the Examination." Id.

The letter went on to state that Northeast's previous RCA strategy could have resulted in the inability of Northeast to meet its minium capital requirements:

> As the strategic direction alternatives available to the Company were reviewed during the fall of 1988 by the Board of Directors and Management, it was fully understood that the wholesale strategy in tandem with recent losses could have adversely affected our ability to meet minimum capital requirements in early 1990. Hence, following the study, the new strategic direction.

Id. at 1. Such "minimum capital requirements" referred to "pre-FIRREA capital requirements." Tr. 1500. Walters, however, testified that the response reflected "knowledge of FIRREA at that point." Tr. 401.

As part of a summary of "substantial progress" made towards its "new strategic direction," Northeast stated:

> [Northeast] has reduced assets from $8.2 billion at December 31, 1988 to $7.8 billion at June 30, 1989 ($7.2 billion if the balance sheet is reduced for asset sales commitments at June 30, 1989 that will settle in July or August) and expects a further reduction to approximately $5.8 billion by December 31, 1989.

PX 211 at 1. According to a table in the letter listing the projected capital structure, Northeast projected to shrink further to $5.42 billion in assets by December 31, 1990, and then increase slightly to $5.49 billion by December 31, 1991 -- throughout which time it projected keeping supervisory goodwill on the balance sheet. Id. at 18; Tr. 1502. The next table indicated that the ratio of tangible capital to total assets as of December 31, 1989, would have been 1.15%. PX 211 at 19.

Northeast's letter also stated that it had reduced wholesale brokered deposits by $450 million, originated $600 million of ARMs, reduced its junk bond portfolio by $234 million and CMO residual portfolio by $16 million since December 31, 1988. Id. at 2. Consequently, Northeast projected regulatory capital of $283 million and a capital ratio of 4.88% of total assets, which would result in Northeast meeting its minimum capital requirement in the first quarter of 1990. Id. This projection of regulatory capital and capital ratio included the use of supervisory goodwill and did not contemplate FIRREA's requirements. Tr. 402-04.

36

The cover letter also discussed Northeast's proposed corrective action with respect to "[i]mprovement in the institution's Interest Rate Risk (IRR) profile, including the data and means of measuring the IRR, together with better information systems for reporting IRR." PX 211 at 6.

With respect to its RCA portfolio, Northeast's response stated that its "Risk Controlled Arbitrage activity was conducted within FHLBB regulations Sections 563.17-6 and 571.3." Id. at A-1. Kovac disagreed with Northeast's comment. Tr. 1505-06. Northeast's response continued, "[t]he . . . Company's experience in this activity shows that RCA is an inappropriate, risky activity and should not be allowed as a permissible activity." PX 211 at 4.[38] Based on "extensive continuing discussions with George Rutland," Kovac understood that Rutland "didn't like [RCA activity], wanted to get rid of it." Tr. 1506.

### The July 14, 1989 Meeting Between Northeast's Board of Directors and the FHLBB

On July 14, 1989, Northeast's Board of Directors met with Federal Home Loan Bank of Boston officials regarding the results of the December 12, 1988 ROE. DX 229 at 1. Representing the FHLBB were Jack Ryan, Kevin McCarthy, Thomas Kovac, and Colin Greeley. Id. Representing Northeast were Rutland, Walters, and other members of the Board. Id. A memo recounting the meeting prepared by the regulators stated:

> Jack Ryan informed the board members that as a result of receiving an examination composite rating of "4" we were required to initiate supervisory action. He stated that we would rely upon the board resolution to be passed in lieu of formal cease and desist supervisory action in light of our agreement as to the direction the institution is pursuing (i.e. a further reduction in asset size and a retail orientation).

Id. at 2. Kovac testified that if Northeast had not voluntarily agreed to reduce asset size and switch to a retail orientation, the regulators would have issued a cease and desist order requiring Northeast to stop the RCA activity. Tr. 1508-09. Such supervisory action would not have related to FIRREA. Id. at 1509.

Rutland informed the attendees that Northeast had reduced its assets to $7.5 billion as of June 30, 1989, and, as of the date of the July 14 meeting, further reduced them to $6.8 billion. DX 229 at 1.

---

[38] In a handwritten notation Kovac stated "Not Agree" -- referring to Northeast's statement in its response that the RCA program conformed with the regulations. Tr. 1505. Kovac testified that the RCA program did not conform to regulations "[b]ecause of the extreme amount of interest rate risk and credit risk that was assumed. These regulations pertained to the proper management of interest rate risk and that did not happen." Tr. 1506.

**The July 21, 1989 Revised Business Plan and 1990 Outlook in Contemplation of FIRREA**

On July 21, 1989, Northeast again revised its December 1988 Business Plan. PX 154. This revised business plan, which included a 1990 outlook, was submitted by Northeast, with a cover letter from George Rutland, to the FHLBB on July 31,1989, "in accord with our response to the report of examination." Id. Walters testified that Northeast would have been revising the business plan "for -- where . . . we thought FIRREA was going. But aside from that, also addressing any questions, issues that they would had in the examination report." Tr. 292. The Board of Directors reviewed the plan and outlook at its regular July 1989 meeting. PX 154.[39] While the revised plan reaffirmed the strategic direction called for in the original December 1988 business plan, "[t]he original business plan for 1989, however, was created within the context of a much different regulatory environment from what has evolved since the plan was created" which "has brought about some adjustments to the strategy and to the manner in which Northeast will implement the strategy." Id. at 1. The revised plan stated that it would "put the Association in a better posture to meet whatever capital requirements result from [FIRREA] currently before Congress." Id.

The revised business plan contained three pertinent changes from the original December 1988 business plan. First, Northeast would "reduce its portfolios of wholesale assets and liabilities more rapidly than previously planned and concomitantly . . . reduce the size of the Association more quickly." Id. Specifically, Northeast projected that it would shrink to $5.603 billion by December 31, 1989. Id. at 2, 6. Second, there would be a stronger emphasis on residential mortgage lending than under the original plan as Northeast reduced its risk-based capital requirement by reducing lending and investment activities requiring higher capital. Id. at 1. Third, Northeast would reduce G&A expenses during the course of its shrink. Id. at 1-2. Northeast projected that these changes would result in "a substantial reduction in the leverage of capital, an increase in the overall credit quality of assets and a corresponding decrease in risk based capital requirements, a decrease in interest rate risk, and an enhancement to the long-term profitability of the Association." Id. at 2.

With respect to short-term profitability, the plan stated, "[a]lthough the strategy and plans encompassed in the revised 1989 plan are designed to improve the long term profitability of the Association, a return to profitability in the short-term will require a reduction in the overall level of interest rates and in the level of short term interest rates in particular." Id. at 3-4. This was because, at that time, Northeast had a negative gap position with liabilities repricing faster than assets. Tr. 294-95. With falling interest rates, Northeast would make more net interest income. Id.

Walters testified that Northeast held discussions with investment bankers and private equity firms to raise capital in 1989, because it was unclear during that year what the regulatory "changes were going to be exactly, how the standards were going to be interpreted, and as importantly how the regulators were going to implement them, [which] provided a tremendous level of uncertainty in the capital markets, which made it, you know, impossible to raise capital." Tr. 285.

---

[39] Walters testified that he recalled that the Board was required to review the business plan before it was presented to the examiners and that he never recalled a business plan being formally adopted by Northeast, which had not been presented to the Board. Tr. 292.

In anticipation of FIRREA, Walters testified that Northeast started selling corporate bonds in the second quarter of 1989. Tr. 289. "And then continuing to go ahead and downsizing the balance sheet . . . based on what we knew at that point, which was the expectation of the final rules." Id. When asked why wholesale assets were selected for divestment, Walters responded:

> Well, for a couple of reasons. One, because our strategy was to focus on moving back to and also expanding our retail assets and our liabilities, and we did not want to lose sight of that strategic focus. And the second was the wholesale assets tended to be very liquid and readily marketable within the market, and so you could quickly sell the assets and pay off wholesale liabilities to effectuate the shrink as quickly as possible.

Id.

## The Enactment of FIRREA and the Ongoing Shrink of Northeast

On August 9, 1989, FIRREA came into effect. The legislation abolished the FHLBB, created the Office of Thrift Supervision ("OTS") and directed OTS to promulgate new regulatory capital requirements to replace those that were previously in effect. United States v. Winstar Corp., 518 U.S. 839, 886 (1996); 12 U.S.C. §1464(t). These regulations became effective as of December 7, 1989. 54 Fed. Reg. 46845. FIRREA imposed three requirements pertinent to Northeast.

First, thrifts were required to maintain "tangible" capital equal to 1.5% of assets. 12 U.S.C. § 1464(t)(2)(B). Tangible capital under FIRREA did not include supervisory goodwill or cumulative preferred stock. 12 U.S.C. § 1464(t)(g)(A). Because Northeast was contractually entitled to count its supervisory goodwill and some of its cumulative preferred stock for regulatory capital purposes, and FIRREA excluded those items from regulatory capital, the new tangible capital requirements constituted a breach of contract by the Government. Northeast, 63 Fed. Cl. at 518-19. As a result of the new regulations, Northeast fell out of capital compliance as of December 31, 1989. Northeast, 63 Fed. Cl. at 513.

Second, thrifts were required to maintain "core" capital equal to 3% of total assets. 12 U.S.C. § 1464(t)(2)(A). The amount of supervisory goodwill that could be counted toward core capital would be phased out over several years. Specifically, thrifts could count supervisory goodwill up to 1.5% of total assets through 1991; up to 1.0% through 1992; up to 0.75% through 1993; and up to 0.375% through 1994. After December 31, 1994, thrifts could not count any supervisory goodwill towards core capital. Id. § 1464(t)(3)(A). At no point could thrifts count cumulative preferred stock towards core capital.

Third, regulations promulgated by OTS as required by FIRREA imposed a new "risk-based" capital requirement, in which Northeast was required to maintain "risk-based" capital equal to 6.4%

of "risk-based" assets.  12 U.S.C. § 1464(t)(2)(C); PX 156 at 4.[40]  The risk-based requirement was to escalate to 7.2% on December 31, 1990, and then to 8.0% on December 31, 1992.  PX 156 at 15.  The risk-based capital requirements constituted a breach to the extent they restricted inclusion of supervisory goodwill in meeting these capital requirements.

**The 1989 Shrink**

Walters testified that Northeast shrank in 1989, "[b]ecause we knew that we had to do everything possible within our power to come into capital compliance as soon as possible, and so we tried everything we could, including the fact that we aggressively shrank the balance sheet. . . .  Shrinking of our balance sheet was strictly driven by the lack of capital."  Tr. 287.

According to its Form 10-Q for the quarter ended September 30, 1989, Northeast reduced its asset size to $6.3 billion "in anticipation of the new capital regulations which [were] being promulgated by the Office of Thrift Supervision in accordance with FIRREA."  PX 46 at 7.  Walters testified that at the time of this report, there was enough detail in FIRREA to understand the direction the new capital requirements, though it was not entirely clear how FIRREA would be implemented.  Tr. 298.  Walters also testified that, after FIRREA, Northeast continued the shift from wholesale to retail.  Tr. 320.  Walters could not say whether the wholesale or retail side of the business performed better after the breach, but he said that, in general, Northeast believed that it would get a better spread in the retail bank, and that the credit risk was sufficiently nominal that the retail assets funded by retail liabilities would generate more net income than wholesale assets.  Tr. 321-22.

**Northeast's November 13, 1989 Five-Year Plan**

On November 13, 1989, Northeast submitted to OTS a five-year financial plan in response to the new capital standards.  PX 156.  This plan discussed the capital position of Northeast relative to the capital standards mandated by FIRREA and outlined the steps which the Association would take to meet these standards.  Id. at 1.  The Five Year Plan stated that the new capital standards prohibiting the inclusion of supervisory goodwill in capital would prevent Northeast from coming into compliance as the new regulations became effective on December 7, 1989, but that Northeast would return to compliance with all capital standards by December 31, 1990, so long as OTS did not

---

[40] Risk-based capital included core capital requirements with certain adjustments.  Total risk-based assets were calculated by assigning different asset types different weights as a proxy for measuring their credit risk.  For example, U.S. Treasury bonds received a 0% rating, as they have virtually no credit risk and therefore require no capital to support them.  12 C.F.R. § 567.6(a)(1)(i)(B) (1990).  On the other hand, commercial loans required a 100% weighting, 12 C.F.R. § 567.6(a)(1)(iv)(B) (1990), while qualifying residential mortgages required a 50% rating.  12 C.F.R. § 567.6(a)(1)(iii)(B) (1990).  Mortgage-backed securities (MBS) usually received a 20% weighting, reflecting significantly lower credit risk than home mortgages or commercial loans.  12 C.F.R. § 567.6(a)(1)(ii)(H) (1990).

make any deductions from Northeast's risk-based capital on account of supervisory goodwill.  Id. at 2.

As of September 30, 1989, Northeast had an asset size of $6.3 billion, had a negative tangible core capital of $28.218 million, translating to negative 0.47% of tangible core assets below the new 1.5% requirement.  Id. at 4.  Northeast had $62.7 million in core capital, translating to 1.02% of assets, also far short of the 3% anticipated requirement of FIRREA.  Id.  Likewise, Northeast had $125.308 million in risk-based capital, translating to 3.84% of assets, also far short of the 6.4% requirement of FIRREA.  Id.

In order to comply with FIRREA's capital standards, Northeast proposed to convert its outstanding issues of cumulative preferred stocks to noncumulative form, which would infuse $100 million to core capital and to tangible core capital.  Id. at 5.  This conversion would allow Northeast to add $169 million to total capital.  Id.  Northeast stated that the result would be full compliance with FIRREA's capital standard by December 31, 1990, provided no deductions from risk-based capital were made for supervisory goodwill.  Id.  Northeast offered two alternative capital strategies to achieve compliance.  The first or "base" strategy offered was to 1) convert cumulative preferred stocks to a noncumulative form, 2) reduce the asset size of the thrift from $6.3 billion in September 1989 to $5.3 billion by December 31, 1990, and 3) securitize $500 million in residential mortgage loans to mortgage backed securities to reduce the risk-based requirement.  Id. at 6.  The second strategy was to either convert the public preferred stock to a noncumulative form or downstream the public preferred equity in the form of common stock from a holding company to Northeast, convert FSLIC preferred stock to subordinated debt, and perform the remainder of the base strategy.  Id.  In either case, Northeast's fundamental business strategy would continue to be a return to basic thrift activities: gathering retail deposits and making residential housing loans.  Id. at 5-6.

### November 27, 1989: The Regulators' Proposed One-Year Capital Exemption

On November 27, 1989, Ford Peckham wrote a memo to Ralph Gridley, the Deputy Regional Director of OTS in Boston, recommending that Northeast be given a one-year exception to comply with the new capital requirements.  DX 207.  Peckham stated, under the heading "Fairness Argument" that:

> Northeast has had the proverbial rug pulled out from under them by FIRREA in that the cumulative preferred stock was ruled negligible and so was the Goodwill they had contracted for with FHLB Bank Board.  It is only proper to give them a decent time interval to bring the preferred stock into compliance with FIRREA.  The present course envisions a holding company which will takeover the preferred [stock] and downstream common [stock] to the subsidiary bank.  This will take 60 to 90 days to put the corporate pieces in place.

Id. at 1.  Peckham testified that "there was a point in which this preferred stock was counted as capital, and when FIRREA came into being, it was not, or it was not counted to the same extent.

And therefore . . . it was the recommendation to give them the opportunity to change . . . that form of capital." Peckham Dep. at 40.

Gridley agreed with Peckham's statement that "Northeast has had the proverbial rug pulled out from under them," Gridley Dep. at 38, but also stated that FIRREA's new capital requirements "might have saved them." Id. at 39. Although it was "difficult for [Gridley] to go back and assess the immediate condition of Northeast . . . at the time [FIRREA] was written," he testified that "in view of the ultimate results of Northeast, . . . [FIRREA] was more beneficial than harmful." Id. By "ultimate results," Gridley meant "the fact that they were able to settle the institution." Id.

Kovac did not agree with Peckham's statement that FIRREA pulled the rug from under Northeast. Tr. 1706. Kovac stated that he would have instead "put it that [FIRREA] presented a challenge" to Northeast, and he agreed with giving Northeast a one-year capital exception. Id. Northeast "faced significant restrictions apart from removing goodwill. They had a very low level of tangible, positive tangible capital under GAAP. And that would have . . . been a constraint in the courses of action they could have pursued, regardless of whether goodwill was counted or not." Tr. 1707-06.

In the November 27 memo, under the heading of "Good Faith Argument," Peckham noted that:

> CEO Rutland has embarked on a plan to unwind the risk in the organization. Since Dec-31-88, the institution has been wound down from $8.215 billion to $6.288 billion, a 23% decline in the asset base. The decline in the asset base has come from an emphasis on running out wholesale liabilities (reverse repos and brokered funds) and the mortgage backed securities supported by these funds. These positions held substantial interest rate risk due to imperfect fund matching and basis risk, and spreads were minimal.

DX 207 at 2; see also Gridley Dep. at 44. The Peckham memo also noted that the junk bond portfolio had been reduced 74% between December 31, 1988, and September 30, 1989, from $414 million to $106 million, and also that G&A expense had been reduced by 36% on a quarterly basis from September 30, 1988, to September 30, 1989. DX 207 at 2. It does not appear that the requested one-year capital exception was granted.

**The December 5, 1989 Waiver Application**

On December 5, 1989, Northeast submitted an application to the FDIC, authored by Walters, for waiver of Section 29(a) of the Federal Deposit Insurance Act, which is prohibition against a

"troubled institution" accepting or renewing brokered deposits. Tr. 287-88; PX 1199.[41] With respect to the 1989 shrink Northeast informed the FDIC:

> Following the introduction of FIRREA by the administration and during the ensuing debate and amendment in Congress, Northeast made a continual analysis of its financial condition as the legislation approached final form.  Northeast determined even as the legislation was still pending, that in addition to its traditional thrift retail strategy discussed above, it would shrink its assets and liabilities, primarily wholesale, to assist it in meeting the evolving capital requirements.

PX 1199 at 2.  Northeast shrank to $5.4 billion by December 31, 1989.  PX 1585.

## The January 8, 1990 Capital Plan

On January 8, 1990, Northeast submitted a capital plan to the Office of Thrift Supervision which set forth how it would comply with the new capital requirements under FIRREA.  Northeast was required under FIRREA "to submit a capital plan to the OTS showing how the Association will meet the new standards."  PX 173 at 1-1.  According to this plan, "[t]he fundamental deficiency in Northeast's current capital structure is in core capital which limits Northeast's ability to comply with each of the capital standards.  The deficiency in core capital is due to the exclusion of the cumulative preferred stocks and excess supervisory goodwill from core capital." Id. at 1-4.  Northeast reported that, as of November 30, 1989,  it had approximately $203.3 million of goodwill and $100 million of cumulative preferred stock on its books, and a total asset base of $5.6 billion.  PX 173 at 1-3 to 1-4.

Under FIRREA, Northeast had negative $28.6 million in tangible capital which was not sufficient to meet FIRREA's 1.5% requirement.  Id. at 1-3 to 1-4; see also PX 2007.  The prospects that Northeast would have been shut down as a result of having negative tangible capital were, in the words of Walters, "relatively high, quite high."  Tr. 274-75.  With a 1.5% tangible capital requirement, Northeast would require $120 million in tangible capital if it sought to be a $8 billion institution, or $90 million in tangible capital if it sought to be $6 billion institution.  Tr. 276.

Moreover, Northeast had only $54.5 million in core capital, which equated to 0.97% of assets -- short of the required 3% of assets.  PX 173 at 1-3 to 1-4.  This figure included only $83.1 million of Northeast's $203 million in supervisory goodwill and none of the preferred stock.  Id. at 1-3.

Finally, Northeast had $108.8 million in risk-based capital, resulting in a risk-based capital ratio of 3.62%, less than the 6.4% required under FIRREA.  Id.

---

[41] According to Northeast's 10-K, as of March 31, 1990, Northeast filed an application for waiver of approval to accept brokered deposits under certain conditions on June 23, 1990.  Interim approval was granted on February 5, 1990, and final approval was granted on May 3, 1991, with an expiration date of February 5, 1991.  PX 20 at 26.

To satisfy its new capital requirements under FIRREA, Northeast proposed a three-step response in its Capital Plan. First, it planned to form a savings and loan holding company "to exchange the two outstanding issues of cumulative preferred stock for preferred stock of the holding company and to downstream the preferred equity from the holding company to the thrift in the form of common stock which would qualify as core capital." Id. at 1-6. Second, Northeast planned to shrink in asset size to $5.2 billion as of December 31, 1990, "to reduce the leverage of core and of tangible capital." Id. The final step was to securitize $500 million in residential loans to MBS in calendar year 1990 to reduce the risk-based capital requirement. Id.

### January 9, 1990: Regulatory Bulletin 3a-1

On January 9, 1990, OTS issued Regulatory Bulletin 3a-1, which was a "Policy Statement on Growth for Savings Associations." PX 1594. In Regulatory Bulletin 3a-1, OTS stated that it was its general policy "to ensure that asset and liability growth of savings associations is prudent, adequately capitalized and conducted in a manner that is consistent with safety and soundness and the interests of the insurance fund." Id. at 1. To that end, OTS stated that:

> all associations except those whose regulatory capital already exceeds the "fully phased-in" requirement must increase their tangible, core and total capital by the capital requirements applicable at the time to support the growth at the time the assets are increased. Associations that meet the "fully phased-in" capital requirements must ensure that proposed growth will not cause them to fall below those requirements in the future. On a case-by-case basis, where appropriate, District Directors retain the authority and flexibility to impose more stringent growth restrictions than outlined below for associations with capital plans pending or that are otherwise of supervisory concern.

Id. (footnote omitted). Regulatory Bulletin 3a-1 defined "fully phased-in capital requirement" as "that amount of capital that an association will be required to hold on December 31, 1994, when the risk-based capital requirements will be fully phased-in and certain assets will be fully deducted in calculating an association's capital position." Id. at 2 n.1.

### May 1990: Northeast's 1990 Annual Report

In May 1990, Northeast issued an annual report. With respect to 1989 asset shrink, the report stated:

> Prior to the passage of FIRREA, we had begun implementing a new strategy that put us in the best possible position to meet the new capital requirements when they emerged from this legislation. This strategy called for a reduction in wholesale activities, ultimately leading to a reduced asset size more in line with our retail deposit base. We have reduced our asset size from $8.2 billion at December 31, 1988 to $5.0 billion at March 31, 1990.

44

PX 9 at 3.  Specifically, the annual report indicated that on March 31, 1989, there were $7.9 billion in assets, down to $5.0 billion in assets on March 31, 1990, for a shrink of approximately $2.9 billion.  Id. at 3, 10.  Approximately $1.2 billion in investments and $1.4 billion of mortgage-backed securities were sold during this time period.  Id. at 1, 11, 17.  Walters testified that the assets sold were selected on the basis of ease and access to quick sales in the market in order to shrink the balance sheet "as aggressively as possible to meet capital standards."  Tr. 304-05.  On the liability side, broker deposits were reduced by almost $700 million, FHLBB advances were reduced by $100 million, and $1.8 billion in securities sold under agreements to repurchase were reduced.  PX 9 at 1.  The liabilities reduced were largely wholesale in nature.  Tr. 305.  On the retail side, there was a reduction of $230 million in loans and a $90 million reduction in retail deposits. PX 9 at 1.

The result of the shrink was a reduction in net income interest from $94 million for year-ended March 31, 1989, to $78.5 million for the year-ended March 31, 1990.  Id. at 1; Tr. 306, 308.

The 1990 annual report also discussed Northeast's write-off of goodwill.  As of March 31, 1990, Northeast wrote off $109.4 million of its goodwill leaving $90 million in unamortized contractual goodwill remaining.  PX 9 at 1, 4.  Northeast's 1990 annual report outlined the reasons for the write-off of goodwill as follows:

> Since our March 31, 1989 year-end, certain significant and unusual events have occurred which have caused the Company to reappraise the supervisory goodwill on our balance sheet.  They are:
>
> • The passage of FIRREA on August 9, 1989, which all but eliminated goodwill as tangible and core capital and phased out the use of the remainder as capital over a five-year period.
>
> • The OTS capital regulations which became effective on December 9, 1989 and all but eliminated goodwill in risk-based capital and phased out the remainder over a five-year period.
>
> • The passage of the Connecticut Interstate Banking Law, which together with other laws eliminating barriers to interstate branch banking, will eliminate the uniqueness of our three state charter.
>
> • The deteriorating condition of the banking industry in New England.
>
> As a result of these factors, and upon the advice of Kaplan, Smith & Associates, a subsidiary of First Boston Corporation[,] regarding the value of our Connecticut and Massachusetts franchises, we have taken a reduction of $109.4 million in supervisory goodwill as an extraordinary expense as of March 31, 1990.

Id. at 4.  Northeast echoed these reasons for the 1990 goodwill writeoff in its March 31, 1990 10-K report.  PX 20 at 36.

## March 1990: Northeast's Thrift Financial Report

Northeast submitted a thrift financial report for March 1990 to the Office of Thrift Supervision, the same month as Northeast wrote down over $109 million in goodwill.  PX 124.  The thrift financial report indicated that Northeast had $73.3 million in "qualifying supervisory goodwill" that counted towards core capital.  Id. at 25.  In addition to the goodwill write-off, Northeast amortized $11.5 million in supervisory goodwill, leaving $90 million at the end of FY 1990.  Id. at 3, 6; PX 20 at 46-47.

## April 23, 1990: Northeast's Internal Goodwill Impairment Analysis

Northeast created a worksheet entitled "Goodwill Impairment Analysis" dated April 23, 1990, which stated Northeast's rationale for writing off supervisory goodwill.  PX 1246.  This analysis was prepared by Northeast's controller and the head of its financial planning division under Walters' supervision.  Tr. 322-23.  The analysis stated, in relevant part:

> At March 31, 1990, Northeast Savings had $199.4 million of supervisory goodwill.
>
> The value of this asset has potentially been permanently impaired because Northeast can no longer leverage this asset because it must be deducted from capital.
>
> The unimpaired value of the Connecticut and Massachusetts franchises is approximately $85 million - resulting in a potential write-down of $114.4 million.
>
> Permanent impairment does not mean that the impaired asset is worthless.

PX 1246 at 1.

Walters further testified that the "value of goodwill" was tied to "a future earning stream, that's based on . . . how you run the company, what your ability is to generate net income, which . . . ties into our ability to run leverage, the balance sheet of a particular size and such."  Tr. 324.  He went on to testify that "the predominant value of supervisory goodwill was, in fact, to allow us to leverage, you know, it would generate [net income], because of the acquisition of some troubled institutions."  Id. 325.

**June 11, 1990: Kaplan Smith Report**

Kaplan Smith provided Northeast with a report, dated June 11, 1990, entitled "Valuation of the Connecticut and Massachusetts Franchise of Northeast Savings, F.A." valued as of March 31, 1990. PX 68. Before the write-off, Kaplan Smith stated that Northeast's nearly $200 million in supervisory goodwill was entirely related to the supervisory mergers in 1982-1983. Id. at 1. Kaplan Smith noted that "[t]he three acquisitions allowed Northeast, which was previously a New York State thrift, to enter and operate in the states of Connecticut and Massachusetts, creating a unique three-state franchise. The acquisitions also created additional leverage on Northeast's capital base." Id. However, Northeast had to revalue its goodwill due to the decreased value of the Connecticut and Massachusetts franchises:

> As a result of recent changes in federal and state banking laws, the value of the Connecticut and Massachusetts franchise has decreased significantly. Northeast's management is therefore obliged to make an appropriate adjustment to the carrying value of the Connecticut and Massachusetts franchise, i.e. decrease the amount of supervisory goodwill related to that franchise.

Id.

There are several approaches in valuing Northeast's Connecticut and Massachusetts franchise and Kaplan Smith chose the "earnings approach." Under the earnings approach, Kaplan Smith projected Northeast's future earnings over a period of years, based on Northeast's business plans. Id. at 1-2, 14. Kaplan Smith projected the earnings of Northeast by using Northeast's May 1, 1990 three-year business plan's projected earnings for fiscal years 1991 through 1993, and then assumed constant 1993 earnings for fiscal years 1994 through 2007. Id. at 10-14. The projected earnings, before taxes and goodwill amortization, were $30.9 million for FY 1991, $48.3 million for FY 1992, and $48.1 for FY 1993 through FY 2007. Id. at 14. After projecting the portion of Northeast's earnings attributable to the Connecticut and Massachusetts franchise over the 17 years of remaining supervisory goodwill lifetime, Kaplan Smith discounted the projected earnings to arrive at a net present value for the Connecticut and Massachusetts franchise of $80-$100 million. Id. at 2,11. As a result of that valuation, as of March 30, 1990, Northeast wrote down $109 million of goodwill to leave a balance of $90 million. Id.

Under the heading "Events Triggering the Writeoff of Goodwill," Kaplan Smith first cited APB No. 17 as the relevant accounting standard which served as the basis for the writeoff in supervisory goodwill. Id. at 5. The relevant portion of APB Opinion No. 17 Kaplan Smith cited was that management must continually evaluate the "value and future benefits of an intangible asset" and that the "estimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly by a deduction in determining net income." Id. at 5; PX 668 at ¶¶ 31, 35. Walters testified that on a quarterly basis, management was required to consider the valuation of goodwill, and if "there is a material change in the valuation or some material event that has impacted the goodwill, then at that point you do a full analysis and you consider all factors, not only the one or two that may have been material factors." Tr. 331-32.

47

The Kaplan Smith report further stated in relevant part:

> On August 9, 1989 President Bush signed into law [FIRREA]. The new law substantially changed the federal statutes and regulations governing savings associations. In doing so, the law significantly decreased the value of the Connecticut and Massachusetts franchise that Northeast had acquired in 1982. Northeast's management was therefore required to make an appropriate adjustment to the carrying value of the Connecticut and Massachusetts franchise, i.e, decrease the amount of supervisory goodwill related to that franchise.

Id. at 5-6. When asked whether Northeast (if it had been able to count all of its supervisory goodwill towards all its post-FIRREA capital requirements) would have written off its supervisory goodwill solely as a result of the change in the Connecticut interstate banking law, Walters responded, "No, I don't believe so." Tr. 332. However, Walters also testified that the write-off of goodwill increased Northeast's future earnings because the thrift did not have the amortization expense of the goodwill. Id. 423.

## June 15, 1990: Northeast's Three-Year Business Plan

On June 25, 1990, Northeast forwarded a three-year business plan, dated June 15, 1990, to OTS. DX 187. The plan was for fiscal years ending March 31, 1991-1993, and reviewed the history of the effect of FIRREA on Northeast's operations. The June 1990 business plan also articulated the reasons for Northeast's write-off of goodwill from the balance sheet and its effects on earnings:

> As a result of the changes in the legislative and regulatory treatment of supervisory goodwill, the extended time frame anticipated for the resolution of Northeast's litigation with the OTS and the FDIC, and the passage of full interstate banking in Connecticut, the Association recorded a $109.4 million voluntary reduction in the value of supervisory goodwill as of March 31, 1990. The legislatively mandated exclusion of supervisory goodwill from capital reduces the capital available to the Association to leverage and thereby diminishes the value of the goodwill asset – all of which is associated with Northeast's acquisition of its Massachusetts and Connecticut franchises through supervisory mergers. The voluntary reduction at March 31, 1990 was based on a valuation of the Association's Massachusetts and Connecticut franchises done by the firm of Kaplan, Smith & Associates. Although the valuation reduction substantially reduced total stockholders' equity, it had no impact on the Association's regulatory capital position at March 31, 1990, or on its ability to meet the interim capital targets set forth in the Association's capital plan. Actually, the reduction eliminates a substantial drag on earnings and improves future earnings by more

48

> than $6 million per year which also improves Northeast's regulatory
> capital position through increased retained earnings.

Id. at 1-2.

The June 1990 business plan then recounted Northeast's implementation of its new business strategy and shrinkage of the balance sheet:

> The reduction in the size of the Association from $7.9 billion at
> March 31, 1989, to $5.0 billion at March 31, 1990, served both the
> purpose of enhancing the capital ratios of the Association and of
> returning the balance sheet to a more traditional thrift profile since the
> assets and the liabilities which were reduced were largely wholesale
> assets and liabilities.  In addition, Northeast reduced its portfolio of
> high-yield investment securities from $314.1 million net of reserves
> at March 31, 1989, to $16.1 million at March 31, 1990.

Id. at 2.

Northeast stated that it would continue to pursue its basic business strategy of "operat[ing] as a traditional thrift institution making residential housing loans and raising retail deposits."  Id. at 3.  The June 1990 plan noted that, unlike the plan for the past fiscal year, the current "three year business plan calls for modest asset growth at a compound annual growth rate of 6.3%."  Id. at 3. Specifically, Northeast projected that Northeast would increase its asset size from $4.97 billion as of March 31, 1990, to $5.14 billion as of March 31, 1991.  Asset size would further increase to $5.58 billion as of March 31, 1992, and $5.97 billion as of March 31, 1993.  Id. at 20.  However, the plan also noted that "[t]he operative constraint on Northeast's asset size throughout the three year plan horizon is the Association's risk-based capital position."  Id. at 3.  It noted that the phase-in of the risk-based capital standard from 6.4% to 8.0% combined with the phase-out of qualifying supervisory goodwill over four years would limit Northeast's size.  Id.

The June 1990 business plan assumed that interest rates would maintain their current levels for fiscal year 1991, with small increases in August 1990 and November 1990.  Id. at 5.  Rates were projected to remain unchanged through fiscal years 1992 and 1993.  Id.

**Implementation of the Capital Plan and Corporate Reorganization of Northeast**

After the regulators approved the January 8, 1990 Capital Plan on March 12, 1990, Northeast implemented the three-step response to FIRREA's capital provisions as outlined in the Capital Plan. PX 21 at 24.

First, on July 6, 1990, the FDIC and Northeast's stockholders approved a plan to reorganize Northeast.  Id.  On July 9, 1990, the reorganization was completed, and the new holding company, NFC, downstreamed capital to Northeast in the form of common stock, which raised regulatory capital by about $100 million, $60 million of which replaced the FSLIC preferred stock dollar for

49

dollar, thereby fully mitigating that portion of the breach, and $40 million of which represented preferred stocks held by others. Id.; PX 173 at 1-6. The stockholders were required to approve the change because they directly held shares in the thrift, while under the corporate restructure, they would own the shares of the holding company one step removed from the thrift. Tr. 357. By doing so, the thrift converted its $100 million in cumulative preferred stock which did not count towards regulatory capital to common stock which did count toward regulatory capital, on a dollar-for-dollar basis. Id. 280-81.

Next, Northeast shrank its assets. By March 31, 1990, Northeast had shrunk to $5.0 billion. PX 9 at 3; PX 20 at 38. Finally, Northeast securitized $344 million of its loans by March 20, 1991, at an annual cost to Northeast in excess of $650,000. PX 241 ¶ 18.

By July 9, 1990, Northeast attained compliance with all then-existing capital requirements and had $4.9 billion of assets. PX 21 at 24; PX 1585 at 1.

## OTS' May 7 - August 1, 1990 Examination

From May 7, 1990 through August 1, 1990, OTS conducted a regular examination of Northeast, led by Kovac, who was examiner-in-charge. PX 194. As of May 7, 1990, Northeast was $5.0 billion institution. Id. at 1. Overall, the regulators found that Northeast had improved since its previous examination, stating: "[u]nder the leadership of George Rutland, CEO and Chairman of the Board, this institution has had marked improvement since the previous examination. Compliance with regulatory capital requirements has recently been achieved through formation of a holding company, significant asset shrinkage and changes in balance sheet composition." Id. The regulators also found that Northeast's "capacity to regenerate recurring core earnings has improved since December 1988, as shown in the net interest spread and yield." Id. The regulators then stated that "[i]mplementation of the current business plan, revised as of June 15, 1990, should lead to further reductions in interest rate and credit risk." Id. However, the regulators also found that Northeast had $227.5 million in criticized assets which, while lower than the $537.8 million found in the previous examination, was still at 283.3% of tangible capital. Id. The regulators also found that Northeast's "heavy investment in low documentation loans coupled with its policy to qualify the borrower at the 'teaser' rate could impact future asset quality." Id.

The regulators found:

> management has exhibited a great deal of competency while the board of directors appears to be properly performing its role of oversight, monitoring and guidance. Based on the findings of this examination, the course and manner of action in which Mr. Rutland and his assistants have lead this institution appears to have been beneficial and has resulted in much of the improvement to date.

Id. at 1.1. The regulators gave Northeast a composite MACRO rating of "3." Id. at 1.1.

However, the regulators expressed concern with certain aspects of Northeast's lending practices, stating:

> The large increase in residential lending has involved use of non-traditional underwriting techniques and products which raises some concern. In particular, 72 percent of residential mortgages originated in the past 16 months have been qualified under a limited documentation program. This program does not require income, asset or down-payment verification, relies heavily on credit report analysis, and is designed for "quick" approval. In addition, debt ratios are calculated using the initial discounted interest rate. The combination of these factors exposes the institution to greater than normal risk considering the high volume of loans originated under this program.

Id. at 2.4

The regulators also found that the limited documentation program was used in Northeast's California residential loans:

> The limited documentation program is also used to underwrite COFI ARMs with negative amortization features, thereby increasing the perceived risk. This product, which is only offered in California, has equaled 15 percent of total residential originations during the past 16 months with a material portion underwritten in conjunction with the limited documentation program.

Id. The regulators also found that, aside from work-outs, management had ceased all commercial mortgage lending in October 1989. Id. Similarly, consumer lending had been curtailed, with the cessation of originating student, home improvement, personal, auto and fixed home equity loans. Id. at 2.5.

With respect to Northeast's investments, the regulators found that:

> [u]nder management's restructuring strategy, the investment portfolio has been relegated to a secondary function of providing a source of liquidity rather than a primary function of yield enhancement. As a result, high yield corporate debt securities have been reduced by approximately $350 million to $10 million (net) as of April 30, 1990. In addition, CMO residuals have been reduced by $33 million to $89 million. Most of the remaining security portfolio is in highly rated MBSs and CMOs and other lower risk investments.

Id. at 2.5.

The ROE reviewed Northeast's capital, stating:

> Based on management's updated financial projections dated June 15, 1990, which appear reasonable, capital compliance appears capable of being maintained at least through the next interim requirement level for risk based capital.  Even with management's success in restructuring the balance sheet, building core earnings capability and reducing the overall level of risk, future adequacy of capital remains very vulnerable to changes in interest rates and the general economic environment.  Present and projected margins of capital compliance are quite narrow, amounting to only a few million dollars.

Id. at 2.7. The regulators stated that Northeast's capital plan "is now in effect with its goals and projections being met or exceeded as of this examination. The original file year capital plan has been supplemented with a business plan covering a three year period ending March 31, 1993." Id.

The ROE noted that, prior to the holding company conversion, Northeast was not in compliance, in whole or in part, with the three capital standards as a result of the exclusion of goodwill and cumulative preferred stock from regulatory capital.  Id.  However, after the holding company reorganization, Northeast was in full compliance with capital standards.  Id.

The regulators noted that as of March 31, 1990, Northeast had written down $109.4 million in goodwill, with $90 million remaining.  The regulators stated the reasons for and effect of the writedown:

> [The $109.4 million goodwill writedown] was reported to have been done to reflect the estimated value of the franchise following the passage of FIRREA and Connecticut interstate banking legislation.  Although this greatly diminished GAAP capital, it had no direct impact on regulatory capital as only $70 million of goodwill could be counted for core and risk based capital.  Going forward, however, this writedown will benefit future earnings by reducing goodwill amortization expense.

Id. at 2.9.

## May 14, 1991: Rutland's and Walters' Quarterly Visit to OTS

A May 14, 1991 memo from Ford Peckham to the file reported Walters' and Rutland's quarterly visit to OTS, and indicated that all of Northeast's junk bonds had been sold off and that the regulators gave Rutland a signed letter freeing Northeast from the Capital Plan.  PX 1318 at 1. As of March 31, 1991, Northeast had capital ratios of 2.15% (tangible), 3.65 % (core), and 8.71% (risk-based).  Id.  The memo stated that Northeast was shrinking to meet a new proposed 4% core

capital requirement by June 30, 1991.  Id. at 2.[42]  During the quarter ended March 31, 1991, Northeast sold the following assets -- $212.5 million in purchased loans, $105.7 million in MBS, $8.9 million in CMO residuals, $3.4 million in high-yield bonds and $9.9 million of home equity loans -- for a total of $340.4 million total assets, the proceeds of which were used to pay wholesale liabilities.  Id.  The memo also noted that "[n]o dividends can be paid because all earnings will have to be retained to offset the roll-off of the supervisory goodwill.  Also, the earnings streams will be smaller due to the downsizing of the institution."  Id. at 4.

**August 2, 1991: Northeast Federal Corporation and Northeast's Business Review**

Northeast produced a lengthy document entitled "Northeast Federal Corp. [and] Northeast Savings, F.A. Business Review, Aug. 2, 1991."  PX 161.  In this document, Northeast provided its FY 1991 results, a financial overview of Northeast from FY 1985 through 1994, and a three-year business plan for fiscal years ending March 31, 1992, 1993, and 1994.  The document recited the major accomplishments of Northeast from July 1988 to the date of the report, including:

- Rebuilding its residential mortgage loan origination capacity to provide Northeast with high-quality ARMs to replace wholesale assets in its portfolio;

- Discontinuing commercial real estate lending;

- Restricting consumer lending to products that are deposit-related;

- Reducing the size of Northeast from $8.2 billion at December 31, 1988 to $4.0 billion by June 30, 1991, "and in the process significantly restructured [Northeast's] balance sheet to be more consistent with [Northeast's] basic strategy and reduce its overall credit and interest rate risk";

- Maintaining stable base of retail deposits;

- Reducing G&A expenses from $93.7 million in FY 88 to $75.5 in FY 91;

---

[42] On April 22, 1991, OTS proposed to amend its capital requirements by requiring well-run thrifts with MACRO rating of 1 to meet a 3% core capital (leverage) ratio defined as the ratio of core capital to adjusted assets).  All other banks would be required to meet a 4% core capital requirement. Proposed Rules: Regulatory Capital; Leverage Ratio Requirement, 56 Fed. Reg. 16283 (Apr. 21, 1991).  According to Walters, this new minimum core capital requirement was brought about by the passage of FDICIA, which was enacted in December 1991, after OTS proposed the new 4% core capital requirements.  Tr. 313; Pub. L. No. 102-242, 105 Stat. 2236 (1991).

- "Achiev[ing] sustainable core earnings for the first time since the mid-1970s, before Northeast was formed";

- Reducing Northeast's interest rate risk without relying on hedges;

- "Successfully anticipat[ing] the change in thrift capital requirements and brought the company into capital compliance within 7 months of the implementation of FIRREA standards"; and

- Increasing Northeast's capitalization by June 30, 1991 to 4.13% core, 2.63% tangible and 9.09 risk-based.

PX 161 at 0002 - 0004.

The August 1991 business review contained a financial overview of Northeast from FY 1985 through 1994, which showed that from FY 1985 through 1988, Northeast had negative core earnings. PX 161 at 0021; Tr. 417-18. In FY 1989 and 1990, however, Northeast reported positive core earnings, but reported negative earnings. PX 161 at 0021; Tr. 417-18.

This business review also contained a three-year business plan for the fiscal years ending March 31, 1992, 1993, and 1994. First, Northeast reviewed its results for the fiscal year ended March 31, 1991, which it described as a "successful complet[ion of] a very challenging year." Id. at 0041. Northeast had "earned a modest profit of $11.7 million for the fiscal year and established a pattern of consistent core earnings." Id. The plan also discussed its completed capital restructuring through the creation of a holding company "and thereby achieved compliance with the new capital standards mandated by FIRREA and promulgated by the OTS in November, 1989." Id. Northeast also increased its tangible capital and reduced its risk-based assets and total assets which allowed it to exceed its risk-based capital requirement a quarter ahead of its "effective date of December 31, 1990." Id. The business review also noted that Northeast satisfied all of the requirements of the Capital Plan it had been operating under since March 1990, and that it had been notified by the Boston OTS that it would be released from its capital plan on May 3, 1991. Id. Northeast continued with its strategy of retail or "basic thrift banking," and during the fiscal year, originated $768 million in residential mortgage loans, $719 million of which were ARMs. Id. Total assets as of March 31, 1991, were $4.56 billion. Id. at 0044. It summarized its achievements during the fiscal year as follows:

> All in all, the achievements of the past year have positioned Northeast to respond to what has become an increasingly more challenging banking environment, both regionally and nationally. As Northeast begins fiscal year 1992, it does so with higher capital levels, stronger core earnings, a wider net interest margin, and lower general and administrative expenses than it has had since the Company adopted its new strategic direction in 1988.

Id. at 0042.

54

However, in its three-year plan, Northeast noted that the OTS' proposed increases in the minimum core capital standards would cause it to reduce its asset size further:

> On the regulatory front, as a result of an increase in the minimum core capital requirement for national banks promulgated by the Office of the Comptroller of the Currency, the OTS has proposed an increase in the minimum core capital standard for savings associations. The new standard, which Northeast expects to be effective as soon as June 30, 1991, would require that all but the most highly rated savings associations maintain core capital equal to at least 4.00% of adjusted assets. Northeast Savings' core capital at March 31, 1991, was 3.65% of adjusted assets. In order to meet a 4.00% minimum, therefore, the Association is planning to reduce its asset size by June 30th to approximately $4.1 billion. Northeast Savings already has committed asset sales of $230 million towards the total required of $460 million in sales necessary to reach the target asset size.

Id. (emphasis added). Northeast projected net income for fiscal years 1992, 1993, and 1994 to be $5.1, $7.0, and $14.6 million, respectively. Id. at 0056. Such results were lower than projected in its June 15, 1990 three-year business plan, which had projected net income of $22.1 and $30.3 million for 1992 and 1993. DX 187 at 11.[43] In the June 1990 business plan, the tangible core capital ratio was 2.25% and 2.65% of adjusted tangible assets for fiscal years 1992 and 1993. Id. The new projections of tangible capital ratios for fiscal year 1992, 1993, and 1994 were 3.06%, 3.38%, and 3.90% respectively. PX 161 at 0057. In the three-year business plan for FY 1992-94, Northeast stated that "the most significant factor contributing to these lackluster results is the downsizing necessitated by the new minimum core capital requirement of 4.00%." Id.

The business review continued:

> Based on a 3.00% core capital requirement, the previous plan projected that the Company's average asset size for fiscal year 1992 would be $5.4 billion. The current plan projects that the average asset size for fiscal year 1992 will be $4.1 billion. This reduction in average asset size results in a loss of approximately $22.6 million in net interest income compared to the previous plan (or a loss of $12.2 million in net income).

Id. at 0057.

---

[43] As noted in this Business Review, an October revision to the 1990 three-year Business Plan had subsequently reduced projected net income to $16.2 and $26.4 million in fiscal years 1992 and 1993, respectively. PX 161 at 0056-57.

The business review contemplated that "Northeast's fundamental business strategy continues to be to operate as a traditional thrift institution making single family residential housing loans and raising retail deposits. Although the increased core capital requirements will force Northeast to be a smaller institution than planned in the past, the fundamental strategy of the Company remains the same." Id. at 0044.

### Northeast Federal Corporation's 1991 Annual Report

Northeast's 1991 Annual Report discussed the impact of the anticipated increase in required minimum capital proposed by OTS. PX 10. In the report, Northeast estimated that the new capital requirements would take place on or about June 30, 1991:

> These proposed increases in capital requirements will have a substantial impact on the operations of this company. An increase in the minimum required level of core capital, together with the phase-out by December 31, 1994 of the portion of supervisory goodwill which qualifies as core capital, will require a further reduction in our asset size, which will reduce earnings in the next few years by more than 50% from our current level. As a smaller institution, we will have less capacity to grow capital through retained earnings. We therefore anticipate that we will be unable to pay any dividends before 1995 or 1996 at the earliest, although no guarantee can be made.

PX 10 at 6-7; see Tr. 315-16.

### OTS' Analysis of Gains on Sales of Assets

On September 18, 1991, Michael Moriarity, OTS Examiner in Charge for Northeast, and Richard Kane wrote a memo to Ford Peckham concerning possible gains trading at Northeast Savings. PX 1361; Moriarity Dep. at 24-25. The authors concluded that Northeast was not engaging in gains trading, but rather:

> permanently disposing of assets as part of new management's business plan to maintain compliance with increasing regulatory [capital][44] standards and change the focus of the institution from retail to wholesale in nature. Planned asset shrinkage began in 1989 and continued through the first quarter 1990 when assets reached a desired level o[f] approximately $5.0 billion, a $3.2 billion decline. As it became apparent that Northeast's core capital requirement [would] probably increase to four percent, management began to shrink assets further in 1991.

---

[44] The word "capital" is inserted here in handwriting.

Id. at 1.  The regulators went on to state that:

> [t]otal assets have decreased from $5 billion at year end 1990 to $4 billion at June 30, 1991.  Accompanying this 20 percent shrinkage has been a return to core and operating profitability and compliance with current and proposed (4.0 percent core) regulatory capital standards.

Id.  The regulators stated that the Board of Directors authorized the transfer of assets out of the "held for sale" portfolio and the sale of assets in the "held for investment" portfolio for this purpose.  Id.  Such authorization was granted on December 14, 1990, and rescinded on July 19, 1991, once the desired asset size was achieved.  Id.  The regulators further stated that "[l]ack of capital mandated the need to shrink asset size.  The same lack of capital removes the ability to take net losses while shrinking."  Id.[45]

## DEPCO Acquisitions

On September 25, 1991, Rutland called a special meeting of Northeast's Board of Directors. DX 391.  The previous day, Rutland had been asked to attend, on short notice, a meeting with Ralph Gridley, the Deputy Regional Director of OTS in Boston, in which he was required to sign a confidentiality agreement, binding Northeast.  Id. at 1.  The meeting was about certain state-chartered, privately insured credit unions and banks in Rhode Island that had been closed by the Governor of Rhode Island in January 1991, because they were inadequately insured due to the failure of the private insurance fund that supported them.  Id.; Tr. 338.  As a result, the deposit accounts were frozen, and depositors had no access to their funds for up to nine or ten months.  Id. 338-39.  At the request of the Governor and the Rhode Island congressional delegation, OTS was seeking a resolution to the problem.  DX 391 at 1; Tr. 328.[46]

After a potential acquisition of four such institutions had failed, Gridley requested Northeast to consider acquiring these credit unions.  DX 391 at 2.  Gridley revealed that the purpose of an accelerated examination of Northeast by OTS that had commenced in August 1991, was to determine

---

[45]  Kovac testified that these two sentences may have been a reference to tangible capital, not regulatory capital, because the lack of tangible capital removes the ability to take net losses while shrinking.  Tr. 1714-15.

[46]  OTS had previously entered into negotiations with a Rhode Island OTS-regulated institution to acquire four of these credit unions, but the transaction ultimately failed because an examination by the OTS and FDIC demonstrated that this Rhode Island institution was too weak to acquire them and the regulators forbade the transaction.  The Governor of Rhode Island was previously scheduled to announce the acquisition of the Rhode Island credit unions on September 27, 1991.  DX 391 at 1.

whether Northeast was eligible to be a potential acquirer of the four institutions. Id. at 2.[47] However, time was of the essence, and the OTS needed a prompt expression of interest before the Governor's scheduled announcement later that week. Id. It was then proposed that Northeast acquire the assets and liabilities of East Providence Credit Union which had $110 million in deposits and five branches. Id. The acquisition would permit Northeast to expand into another New England state and enhance its capital position. Id. Although Rutland had some concerns about the underwriting of East Providence's commercial loans, they were relatively small -- in the $100,000 category. Moreover, East Providence had other assets. Id.

The OTS regulators outlined the proposed transaction. All the assets of the credit unions would be acquired, the assets being marked to market with a provision for third-party resolution in case of differences concerning market value. Id. The excess of the value of the liabilities assumed over the market value of the assets purchased would be paid to Northeast in cash. Id. In addition, the State of Rhode Island or an agency of the State would invest in equity of Northeast, most likely in the form of preferred stock to the extent of 10% of the liabilities assumed. Id.

Rutland indicated that if Northeast could structure a satisfactory transaction to acquire East Providence, the transaction could serve as a "prototype" for acquiring the other three credit unions which were more like traditional savings banks. Id. Rutland then asked Northeast's Board for an expression of interest in pursuing these negotiations, and the Board reached a consensus to go forward with due diligence and negotiations with the Rhode Island state agencies. Id.

On May 8, 1992, Northeast acquired the four failed Rhode Island credit unions. PX 24 at 50-51. Under the final agreement, Northeast's holding company, ("NFC"), sold to the Rhode Island Depositors Economic Protection Corporation ("DEPCO")[48] 351,700 shares of a new class of cumulative preferred stock, its $8.50 cumulative preferred stock, Series B, and issued to DEPCO a warrant to purchase 600,000 shares of NFC common stock at $2.50 per share and a warrant to purchase 200,000 shares of NFC common stock at $4.25 per share.[49] PX 24 at 3, 47, 50-51. DEPCO purchased these shares and warrants for $35.17 million. Id. at 47. The net proceeds from this sale were used to build the equity capital of Northeast. Id. at 3. The preferred stock contained a payment-in-kind ("PIK") feature which allowed NFC to either pay the first five years of dividends to DEPCO in cash or in additional preferred stock. PX 25 at 134; Tr. 344-45.

---

[47] The regulators wanted Northeast to acquire the Rhode Island credit unions because Northeast had liquidity, or sufficient amount of cash or marketable securities, in case there was a run on the bank once the doors were re-opened. Tr. 339-40.

[48] DEPCO was an entity established by the State of Rhode Island to resolve closed financial institutions that were privately insured, where the private insurer failed. Tr. 338.

[49] These warrants were "in the money" warrants -- which are a right to acquire shares of stock at a particular price for a period of time. Here, there was an inherent gain because the exercise price was below the market price of Northeast stock on that date. Tr. 724-25; see also PX 2050.

Also, in conjunction with the DEPCO acquisitions, Northeast repurchased from the FSLIC Resolution Fund, its adjustable rate preferred stock for $28 million in cash, and $7 million of the company's 9% Sinking Fund Uncertified Debentures due for a total fair market value of $32.5 million.  PX 24 at 3.  Walters testified that if Northeast had a sufficient capital cushion or excess capital available, it would not have sought this infusion because it was not inexpensive capital in terms of the dividends that were being paid and the warrants that were issued.  Tr. 341-42.

Thus, as a result of the DEPCO transaction, Northeast was able to repurchase FSLIC preferred stock which had a value of $71.3 million for $32.5 million.  Tr. 431-32.  Walters testified that these acquisitions were not done to replace capital and were independent of the enactment of FIRREA or any breach of contract.  Id. 427.

### December 1991: Enactment of the Federal Deposit Insurance Corporation Act

The Federal Deposit Insurance Corporation Improvement Act ("FDICIA") was enacted in December 1991, and became effective in December 1992.  Pub. L. No. 102-242, 105 Stat. 2236 (1991) (codified in scattered sections of 12 U.S.C.).  FDICIA created new categories of capital compliance: "undercapitalized," "adequately capitalized" and  "well capitalized".  105 Stat. 2236, § 131 (codified at 12 U.S.C. § 1831o); see also 12 C.F.R. § 565.4 (1993).  If a thrift was not at least "adequately capitalized," it became subject to various penalties.  A thrift that had a "well capitalized" rating had significant benefits including reduced insurance premiums.  In order to be "adequately capitalized," a thrift had to maintain a core capital ratio of at least 4% and a risk-based capital ratio of at least 8%.  In order to be "well capitalized," the thrift had to maintain a core capital ratio of at least 5% and a risk-based capital ratio of at least 10%.  12 C.F.R. § 327.3 (1993).

### Northeast's 1992 Annual Report

Northeast's 1992 Annual Report discussed the impact of the increase in required minimum capital as well as the phase-out of supervisory goodwill that could count towards core capital on Northeast.  PX 11.

The 1992 Annual Report continued:

> It happened as predicted.  The increase in the minimum required level of core capital, together with preparing for the phase-out by December 31, 1994, of supervisory goodwill which qualifies as core capital, required a reduction in asset size which accounts for the Company's decline in net earnings from last year.

PX 11 at 4; see also Tr. 317.

**Northeast Federal's 10-K for the Year-Ended March 31, 1992**

Northeast's 10-K, as of March 31, 1992, explained Northeast's reduction in size between March 31, 1991 and March 31, 1992, as follows:

> During the years ended March 31, 1992 and 1991, respectively, total interest income decreased by $122.1 million and $159.6 million when compared with each of the prior years. These decreases were primarily the result of significant decreases in average interest-earning assets which were required in order to meet current and anticipated capital requirements.

PX 23 at 49. Walters testified that the "anticipated capital requirements" referenced would have been the FDICIA requirements and the "prompt corrective action standards that were passed by the OTS." Tr. 318.

The 1992 10-K stated that Northeast's asset reduction was accomplished through reducing wholesale assets and wholesale funding sources (liabilities):

> The downsizing of the Association which resulted in the decreases in interest-earning assets and interest-bearing liabilities discussed above, is consistent with the Association's business plan to meet both the current and anticipated capital requirements mandated by FIRREA and subsequent proposed regulations and was accomplished primarily through reductions in the investment, mortgage-backed securities, purchased residential mortgage loan, and consumer loan portfolios. The proceeds were used to reduce wholesale funding sources, primarily brokered deposits, reverse repurchase agreements, and collateralized floating rate notes.

PX 23 at 49. Kovac testified that he never heard from Rutland or Walters that the shrink in assets in 1991 was caused by removal of supervisory goodwill. Tr. 1712-13.

The 1990 10-K further indicated that in managing its interest rate risk at the time, Northeast structured its portfolio to be positively gapped:

> As a result of its overall strategy of originating adjustable rate loans for portfolio and of reducing fixed rate assets, the volume of liabilities maturing and/or repricing is exceeded by the volume of assets maturing and/or repricing on a cumulative basis for all time frames within 10 years. As a consequence, [Northeast's] interest-earning assets can be expected to respond more quickly to changes in interest rates than its interest-bearing liabilities, resulting in an

> increase in net interest income when rates increase and a decrease
> when rates decrease.

PX 23 at 65.

## September 28, 1992: OTS Report on Examination

On September 28, 1992, OTS commenced an examination of Northeast. DX 244. The ROE noted that Northeast had charged off $57 million of goodwill, including $38 million of qualifying supervisory goodwill, leaving $1 million in qualifying supervisory goodwill remaining. DX 244 at 10. Qualifying supervisory goodwill was, by definition, includable in core and risk-based capital. Walters testified that the OTS had informed Northeast that once it had met the fully-phased in capital standards, Northeast could not grow its assets if such growth would cause it to fall below its fully-phased in capital requirements, even if Northeast exceeded the applicable minimum capital standards established for the duration of the FIRREA phase-in period. Tr. 336-37.

## October 15, 1992:  Kaplan Associates, Inc. Report

Northeast hired Kaplan Associates, formerly Kaplan Smith, to value Northeast's franchise rights in Connecticut and Massachusetts as of September 30, 1992. Kaplan Associates issued a report on October 15, 1992, which discussed the reasons for the 1992 goodwill writeoff. Under the heading "Key Factors Affecting Remaining Value of Franchise Rights," Kaplan Associates stated that "the collapse in franchise values brought about through the efforts of the FDIC and RTC to rapidly liquidate hundreds of banks and thrifts during the deepest and longest real estate recession since the Great Depression has led Northeast to continually adjust the scope of its operations. As a result, Northeast has had to shrink its operating base substantially, reducing its assets by half." PX 69 at I-4 .

The October 15, 1992 Kaplan Associates valuation report went on to enumerate the key factors affected Northeast's franchise values.

> During the latter part of the quarter ended September 30, 1992, a
> confluence of factors has prompted Northeast to reevaluate the
> prospective net benefits reasonably attributable to its remaining
> Connecticut and Massachusetts franchise rights. These factors include
> a number of key events since 1990 that have diminished the expected
> benefits of the Association's Connecticut and Massachusetts franchise
> rights that include, but are by no means limited to, the following:
>
> • The enactment of FDICIA and the promulgation of various
>   federal capital regulations and PCA pertaining to FIRREA and
>   FDICIA.

61

- For the next two years, under OTS <u>Regulatory Bulletin 3a-1</u> ("RB3a-1"), because Northeast is already in compliance with its applicable fully-phased-in capital requirements, the Company may not leverage itself in a manner that would cause its actual capital ratios to fall below its applicable fully-phased-in requirements even if it continued to comply with currently applicable (i.e., not fully phased-in) capital requirements.

- The OTS' adoption of new regulations that permit nationwide branching for federally chartered thrifts.

- The consummation of various interstate acquisitions that, over the next few years, will change substantially the competitive profile in Connecticut and Massachusetts.

- The proposed revision of the risk-based capital component to include measures for interest rate risk and credit concentration risk.

- Recently finalized increases in federal deposit insurance premiums based on levels of risk.

- Deteriorating economic conditions throughout the nation and New England, in general, that have led to increasing levels of nonperforming assets and decreased earnings for many banks and thrifts, including Northeast.

- Other federal statutory and regulatory initiatives to impose new operating standards and restrictions on federally insured financial institutions.

PX 69 at I-4 to I-5.

The Kaplan Associates study also discussed the effect of Regulatory Bulletin 3a-1 on Northeast's operations:

> This statement of OTS policy conflicts in various ways with the federal capital regulations issued previously by the OTS that, in accordance with FIRREA, establish lesser capital standards during the phase-in period. However, during the quarter ended September 30, 1992, [Northeast] confirmed that, inasmuch Northeast had previously achieved compliance with its fully phased-in capital standards, under RB 3a-1, it is the position of the OTS that [Northeast] may not grow its assets if such growth would cause it to fall below its fully phased-

in capital requirements, even if [Northeast] continues to exceed its applicable minimum capital standards established previously for the duration of the phase-in period.

The effect of this OTS policy statement is to accelerate dramatically the effective date of the fully phased-in capital standards for companies such as Northeast that have achieved fully phased-in compliance in advance of the effective date, and to thereby hold such companies to higher capital standards than those applicable to companies that have not achieved fully phased-in capital compliance as of yet but are otherwise in compliance with their applicable minimum capital standards.   This clearly places Northeast at a competitive disadvantage and will decrease the prospective earnings that Northeast may expect to realize from its Connecticut and Massachusetts franchise rights.

Id. at I-7.

Kaplan Associates used a different method of valuing Northeast's franchise value than in Kaplan Smith's prior study.  Rather than using an earnings-based methodology, it used a "market comparables" methodology for two reasons.  Id. at I-9.  First, since March 31, 1990, when Northeast made its previous writedown of goodwill, there were large numbers of banks and thrifts that had resolved by the FDIC and the Resolution Trust Corporation ("RTC") in federally-assisted transactions as well as numerous private transactions -- far more than in March 1990.  Id.  This made the market comparables valuation method more reliable than in the past.  Id.  Second, the pervasive effects of FIRREA and FDICIA on the thrift industry, as well as the downturn in the national economy and the real estate economy resulted in a high level of variability in reported earnings, making earnings a less reliable measure of valuation.  Id.

Under the market comparables method, Kaplan determined the value of the franchise, or the goodwill, by a metric based upon the deposit base in institutions and the premium at which institutions were sold to acquire the deposit base.  The medium premium for government-assisted transactions was 0.27% for RTC-assisted transactions and 0.36% for FDIC-assisted transactions. Kaplan determined that Northeast had a superior branch network in Massachusetts and Connecticut and could therefore command a premium between 1.5% and 1.6 %.  The dollar amount of premium paid, using a midpoint range of 1.6% would be $21.7 million.  After adjusting for mark-to-market on the deposit portfolio and for above-market rent, Kaplan calculated a net value of the Connecticut and Massachusetts franchises in the amount of $1.1 million.  Id. at IV-9 to IV-10.

**April 1, 1992-December 31, 1992: Northeast Federal Corp. Transitional 10-K**

Northeast's Transitional 1992 10-K report set forth the reasons for the 1992 write-down as follows:

> As a result of the analysis of the value of its remaining supervisory goodwill, Northeast Savings reduced supervisory goodwill by $56.6 million in the quarter ended September 30, 1992.  This reduction was precipitated by several factors that had diminished the value of the Association's Connecticut and Massachusetts franchises.   The primary factor was the adverse impact on the value of the Association's Connecticut and Massachusetts franchise rights of OTS regulations promulgated pursuant to FIRREA and FDICIA, as well as other positions taken by the OTS regarding regulatory capital requirements. . . . Another significant factor included implementation of the final rule issued by the OTS which permits federal  savings associations to branch interstate to the full extent permitted by federal statute and which greatly increased  opportunities for out-of-state institutions to enter these states.  Accordingly, the Company hired an independent consulting firm to perform a valuation of the Association's franchise rights in Connecticut and Massachusetts. This study was completed during the quarter ended September 30, 1992 and supported the value of the Company's remaining supervisory goodwill at September 30, 1992. The reduction in supervisory goodwill  had no effect on Northeast  Savings fully phased-in regulatory tangible, core, or risk-based capital.

PX 24 at 65.[50]

## Northeast Federal Corporation's Three-Year Business Plan for 1994, 1995, and 1996, Dated April 15, 1994

On April 15, 1994, Northeast issued a three-year business plan for 1994-96.  This business plan indicated Northeast had an operating loss for 1993 as a result of the recessions in the northeast and California, resulting in foreclosures and charge-offs.   The plan stated:

> For the twelve months ended December 31, 1993, Northeast recorded a loss of $14.1 million or $1.75 per common share.  The results for the year were dramatically impacted by the recessions in the northeast and California. Continued job losses in the regions and weak housing markets resulted in exceptionally high levels of foreclosures and charge-offs.  Foreclosures in 1993 totalled $61.2 million, net loan charge-offs totalled $16.0 million, and write-downs on foreclosed real estate totalled $10.0 million.   In total, direct costs for [non-

---

[50]   The remaining supervisory goodwill was eliminated in the quarter ended December 31, 1992 "as a result of normal amortization and the utilization of net operating loss carryforwards." PX 28 at 3.  Northeast provided nearly identical reasons for the 1992 goodwill writedown in its 10-K, for year ended December 31, 1993.  PX 25 at 133.

performing assets] for 1993 were $40.9 million: $23.3 million for the provision for loan losses and $17.6 million for the costs of real estate acquired in settlement of loans (REO).

DX 203 at 3.

## SAIF Deposit Insurance Premiums

After the breach, Northeast Savings was an FDIC-insured institution under the Savings Association Insurance Fund ("SAIF"). Under FDICIA, the deposit insurance premiums that thrifts would pay to SAIF would be determined by a combination of its capitalization classification and its CAMEL (Capital, Asset Quality, Management, Earnings, and Liquidity) rating. 12 C.F.R. § 327.3 (1993); 60 Fed. Reg. 42687; PX 2052; Tr. 650, 751-55. CAMEL ratings were a composite score from 1 to 5 (1 being the highest score) that the OTS gave to a thrift based on its overall health. The capitalization classification was determined by the thrift's core and risk-based capital together. In order to be classified as "well capitalized" for purposes of SAIF premiums, the thrift had to be well capitalized from both the core capital perspective and the risk-based capital perspective. The SAIF premiums ranged from 0.23% to 0.31% of the thrift's total deposits, depending on the thrift's capitalization level. 12 C.F.R. § 327.3 (1993); 60 Fed. Reg. 42687; PX 2052; Tr. 751-54.[51]

In March 1993, September 1993, and March 1994, Northeast was "well capitalized" from a risk-based perspective but only "adequately capitalized" from a core capital perspective. PX 2017 at 3; PX 2053, 2054. Consequently, Northeast was "adequately capitalized" for the corresponding SAIF assessment periods. PX 2017 at 3; PX 2054; PX 2053. From March 1993 through March 1994, Northeast's CAMEL rating was a 3. DX 248 at 1; DX 249 at 1-a-4.

Accordingly, during the June 1993, January 1994, and July 1994 assessment periods, Northeast paid its SAIF insurance premiums at the rate of 0.29% of its total deposits. PX 2052; PX 2053; PX 2054. If Northeast had been "well capitalized" from March 1993 through 1994, Northeast would have paid its SAIF insurance premiums at the lower rate of 0.26% of total deposits. PX 2052.

## Shareholder Rights Offering

In 1993, Northeast considered raising additional capital through a shareholders rights offering -- an offering that is made first to existing shareholders to purchase additional shares at a particular

---

[51] Premium assessments were made twice per year – once for the January 1 – June 30 period and once for the July 1 – December 31 period. For the assessment period beginning January 1, the thrift's capital ratio from the previous September was used to determine the premium rate. For the assessment period beginning July 1, the thrift's capital ratio from the previous March was used to determine the premium rate. Payments were made on a quarterly basis using the thrift's deposit balance as it stood six months before: September deposit balance for March payment; December deposit balance for June payment; March deposit balance for September payment; and June deposit balance for December payment. 12 C.F.R. § 327.8 (1993); PX 2055 at note (a).

price before the shares are offered to the external investment community. Tr. 348-49; PX 90. As of June 30, 1993, Northeast's core capital was 4.05%, just above the "adequately capitalized" level. PX 2017 at 3.

Northeast hired Keefe, Bruyette and First Albany as its financial advisors on the rights offering and paid them fees of $300,000. PX 90 at 152-53. Northeast filed a registration statement with the SEC for its rights offering in July 1993, and incurred filing fees in the amount of $13,000. PX 90 at 1. However, Northeast withdrew the offering in August 1993. PX 59 at 7.

## Sale of California Portfolio

Northeast had begun expanding into the California market at the time of Rutland and Walter's arrival to Northeast because Rutland had experience in the California market and California had a large market for variable rate mortgages. Tr. 350, 432; PX 146 at 1, 3, 4. According to Northeast's December 1988 Business Plan, Northeast hoped to originate $340 million in residential mortgage loans in California. Northeast originated many of its California loans through negative amortization loans which were variable rate loans that would adjust on a monthly basis in accordance with the Cost of Funds Index ("COFI") of the 11th District, which consisted of all thrifts within California and their costs of funds. To the extent that the mortgagor's payment was not sufficient to pay the interest, then the difference was added to the principal. Tr. 350-52. These loans were known as COFI ARMs. Negative amortization COFI ARMs, which were offered only in California, represented approximately 15 % of Northeast's total residential originations for the 16 months prior to May 7, 1990. PX 194 at 2.4; Tr. 350-52.

In addition, Northeast generated limited documentation loans which require less documentation than would be required by Fannie Mae or Freddie Mac. Tr. 436-37. According to the regulators, 72% of Northeast's residential mortgages in the 16 months prior to May 7, 1990, were under a limited documentation program. PX 194 at 2.4. Much of the negative amortization COFI ARM loans were underwritten under the limited documentation program, which exposed Northeast to "greater than normal risk considering the high volume of loans originated." Id. As of March 31, 1990, Northeast had $997 million in single-family residential loans in California, out of $2.6 billion total single-family residential loans in its portfolio. PX 20 at 7, 9.

On April 4, 1991, Kaplan Smith completed an updated study for Northeast on the California residential real estate market and on the negative amortization COFI ARMs, which was presented to the Board of Directors on April 26, 1991. DX 491 at 0653. The study stated that since Kaplan Smith completed its original study in August 1990, the California real estate market entered into a severe recessionary period and "[negative amortization] COFI ARMS are likely to become problematic to lending institutions." Id. at 0752.

In an interim ROE, dated October 2, 1991, the regulators stated that "primary areas of concern include the deteriorating quality of the single family loan portfolio and the quality of the current underwriting for single family loans which are being originated by NEMAC, a wholly owned service

corporation which originates loans in Southern California." PX 195 at 1. Subsequently, OTS found in its September 28, 1992 ROE that Northeast's asset quality had "deteriorated," stating:

> Asset quality deterioration [was] primarily attributed to delinquent residential mortgage loans due to economic problems, particularly in California. A larger portion of residential real estate owned (REO) is now comprised of California properties, as management has aggressively foreclosed on loans. In addition, delinquencies in the California portfolio are high and continue to increase. These problems have reduced earnings to breakeven and have placed added pressure on capital.

DX 244 at 1. The FDIC's report of examination dated September 28, 1992, also found that Northeast's asset quality was unsatisfactory, citing foreclosures in Southern California and, to a lesser extent, in New England. PX 202 at 3. The FDIC also noted that Northeast's non-performing assets were increasing as the result of "current recessionary economic conditions" combined with the limited documentation loans and [negative amortization] loans that were offered by Northeast during 1988 and 1989 that "proved to have serious weaknesses." Id.

In 1993, the FDIC reported that "[a]s was also noted during the 1992 examination, the volume of adverse classifications stems largely from . . . loans originated in the State of California." PX 204 at 1. In part, because of the problem assets in California and the continued origination of adjustable rate mortgages as Northeast's primary investment vehicle, the FDIC, in its examination commencing on September 7, 1993, gave Northeast a rating of "3." Id. at 1 to 1-a-4; see also id. at 1 - 1-a. As of March 31, 1991, and 1992, and December 31, 1992, and 1993, California loans accounted for 45.8%, 48.5%, 53.1% and 47% of Northeast's total gross loan portfolio, respectively. PX 21 at 7; PX 25 at 11. In fiscal years 1991, 1992, and 1993, Northeast recorded provisions for loan losses of $8.9 million, $10.2 million, and $23.2 million respectively. PX 23 at 73; PX 28 at 92.

Northeast closed its lending operation in San Diego and discontinued the origination of new loans in California in February 1994. PX 12 at 2. At that time, Northeast sold $812 million of California single-family adjustable rate mortgages residential mortgage loans, of which $41 million were non-performing. Id. In the quarter ended March 31, 1994, Northeast realized a gain of $13.6 million on sales of $876.1 million of loans, 93% of which were secured by California properties. PX 60 at 6-7. However, the gain Northeast realized that quarter was partly offset by a $7 million loss it recorded to "facilitate an accelerated sale of California single-family residential [real estate owned]." Id. at 7, 14. In addition, during April and May 1994, Northeast sold "virtually all of its foreclosed real estate in California." PX 28 at 2, 58, 66. Northeast recorded a loss on these and other sales in the amount of $6.5 million. Id. at 66.

Walters testified that Northeast sold its California operations because it received inquiries from other banks interested in acquiring the company. The banks interested in acquiring Northeast were interested in the Northeast area, particularly, the Albany, Schenectady, and upstate New York markets, and California was not an attractive market for them. Tr. 349-50.

The sale of the California assets would have made Northeast more negatively gapped – or less positively gapped -- because the level of assets that would be repricing in short intervals would be reduced.  Tr. 353-54.  According to Northeast's internal document entitled "Plausible Changes in Interest Rates," as of June 30, 1994, Northeast expected that there was a higher plausibility of interest rates going up rather than going down.  PX 585 at 6, 8; Tr. 354-55.  The interest rate risk position of the bank, however, according to Walters, was only one of many factors that Northeast considered in selling its California branches, including the fact that buyers placed the most value on Northeast's franchise in the Northeastern United States.  Tr. 356.

## Northeast's Acquisition

On June 9, 1995, after the complaint in this case was filed, a subsidiary of Shawmut National Corporation. ("Shawmut") acquired NFC and Northeast Savings.  DX 99 at 3.  In July 1995, Shawmut New York Corporation, the subsidiary of Shawmut that was formerly NFC, redeemed the preferred stock that NFC issued to DEPCO and the accumulated but unpaid dividends on that stock.  Id. at 38.  Shawmut was subsequently acquired by Fleet Financial Group, Inc. ("Fleet").  Fleet was subsequently acquired by Bank of America.  Bank of America continues this action as Northeast's successor-in-interest.

## Dr. Baxter's Damages Methodology

Dr. Nevins Baxter, an expert witness for Northeast, proposed a calculation of the lost profits that Northeast suffered as a result of the breach.[52]  Dr. Baxter made the following assumptions about Northeast's conduct in the absence of the breach:

- Northeast would have followed the December 1988 Business Plan;

- Supervisory goodwill would have fully counted towards regulatory capital;

- Northeast would have kept its balance sheet constant (except when it sold off $600 million in California loans in 1994);

- Northeast would have gradually shifted from wholesale activities to retail activities  over a period of five years; and

- Northeast would have met capital requirements with a 50 basis point cushion.

---

[52]  Dr. Baxter was admitted as an expert in the areas of banking (in particular, the thrift business), economics, finance, and thrift financial planning.  Tr. 521.  Dr. Baxter earned a Ph.D. in economics with a specialty in banking and finance from Princeton University.  Dr. Baxter has long served as a consultant for numerous banking entities and has been admitted as an expert in several other Winstar-related cases.  Tr. 513-18.

Tr. 531, 656-59, 1230-34, 1247, 1302. Dr. Baxter opined that had the breach not limited Northeast's ability to count its supervisory goodwill towards regulatory capital requirements, Northeast would have maintained $6.7 billion in total tangible assets throughout the damages period until the sale of the California assets in 1994, and that thereafter its tangible assets would have decreased by the same amount as the actual bank's tangible assets decreased. Tr. 656; PX 2017 at 3.

Baxter concluded that, but for the breach, Northeast would have complied with all of FIRREA's and FDICIA's new capital requirements throughout the post-breach period. He also concluded that the but-for Northeast would have been "well capitalized" in December 1992 -- a year earlier than Northeast actually was -- and that the but-for Northeast would have had a healthy capital cushion throughout the post-breach period.

Baxter's calculation of Northeast's lost profits had two components: 1) lost profits of $73.221 million on assets that Northeast divested to meet FIRREA's new capital requirements (PX 2063; PX 2032), and 2) lost profits of $39.131 million representing earnings on replacement assets that Northeast would have acquired absent the breach as existing assets ran off of Northeast's balance sheet in the regular course of business. PX 2043.

**Lost Profits on Divested Assets**

Dr. Baxter first calculated the balance of assets that Northeast divested as a result of the two shrinks on a quarterly basis, and then applied Northeast's actual wholesale net interest spread to each quarter's balance of divested assets. Dr. Baxter accounted for any gains or costs avoided as a result of the breach and offset such amounts from the lost profits calculation on divested assets. Such offsets included incremental wholesale G&A costs that Northeast avoided as a result of the shrink and gains from selling divested assets.

He then multiplied the average replacement asset balance by the actual net wholesale interest spread for that quarter less the incremental G&A. He then summed the results for each quarter.

Calculation of the Balance of Divested Assets

Dr. Baxter calculated the value of the balance of divested assets, i.e., assets foregone as a result of the shrink, in two steps.[53] First, Baxter calculated the balance of divested assets on a quarterly basis. For the quarter ending September 30, 1989, representing the beginning of the shrink,

---

[53] The vast bulk of the assets that were sold were wholesale assets. Tr. 304. The proceeds from the divested assets were used to pay down liabilities, the bulk of which were also wholesale. See PX 2021 (showing that 96% of liabilities paid down during the 1989-90 period and all of the liabilities in the 1991 period were wholesale); PX 2022; PX 23 at 49 (The shrink "was accomplished primarily through reductions in the investment, mortgage-backed securities, purchased residential mortgage loan, and consumer loan portfolios. The proceeds were used to reduce wholesale funding sources, primarily brokered deposits, reverse repurchase agreements and collateralized floating rate notes.").

the amount of shrinkage equaled the difference between $6.7 billion (the value of assets in the but-for bank) and Northeast's actual balance of tangible assets at September 30, 1989 -- $640,485,000.  PX 2030 at 2.[54]  For the remaining quarters, during both shrinks, Dr. Baxter measured the actual amount of shrinkage by the difference between the actual balance at the beginning of the quarter and the end of the quarter.  PX 2030 at 2-5.

In the second step of the calculation of the balance of divested assets, Dr. Baxter adjusted for assets and liabilities running off the balance sheet, as borrowers repaid their loans or other assets matured.  In the but-for bank, as stated in the December 1988 Business Plan, Northeast would have held onto these divested assets until they ran off and would have replaced them with new assets.  To account for the runoff rate, Dr. Baxter used Northeast's actual runoff rates -- called "pool factors" -- of all pools of Freddie Mac MBS of $1 million or larger that Northeast actually divested as a result of the breach, and applied them to the amount of shrink in a particular quarter.  Tr. 665-66; 669-73; PX 2023; PX 2024.[55]

Based on these calculations, Dr. Baxter determined that the balance of divested assets would have gone from about $1.709 billion at March 31, 1990, to about $2.266 billion at March 31, 1992, and then down to about $946 million at December 31, 1994, as the assets continued to run off.  PX 2024; PX 2025; PX 2026; PX 2030 at 2-5; Tr. 669-73.

Once Dr. Baxter determined the balance of divested assets for each quarter, he calculated the amount of damages attributable to each quarter by applying Northeast's actual wholesale net interest spread to each quarter's balance of divested assets.  Tr. 673.[56]

---

[54]  Dr. Baxter used the $6.7 billion but-for bank as the starting point for the calculation of the quarterly balance of replacement assets for each quarter.  From that figure, he subtracted the amount of tangible assets of the actual bank for each quarter to determine foregone tangible assets for each quarter.  From the amount of foregone tangible assets for each quarter Dr. Baxter subtracted the divested asset balance for each quarter to arrive at the quarterly balance of replacement assets.  PX 2030; PX 2043 at 2-3.

[55]  Dr. Baxter assumed that if a divested asset ran off slower or faster than the Freddie Macs, the total lost profits damages would not be affected.  Rather, only the allocation of assets from the divested asset category to the replacement asset category would have been affected.  Tr. 3043-44.

[56]  Dr. Baxter testified that the actual net interest spread was a conservative estimate of the net interest spread of the divested assets in the nonbreach world for three reasons.  Tr. 673-77.  First, Northeast's purchased loan assets tended to earn a higher yield than the other divested wholesale assets, but the actual wholesale yields did not account for the higher yields on purchased loans.  Tr. 677; PX 2027.  Second, Northeast sold its higher-yielding assets first because Northeast needed to shrink by billions of dollars quickly before other thrifts dumped their assets on the market in response to FIRREA.  Tr. 289, 304-05.  Third, the actual net interest spread understated what would have been the spread on the divested assets due to the market interest rates.  Northeast's wholesale

(continued...)

Dr. Baxter accounted for any costs avoided as a result of the breach and offset such amounts from the lost profits calculation.  Dr. Baxter accounted for incremental wholesale G&A costs avoided by the sale of wholesale assets by making an adjustment of five basis points -- five basis points is 0.05% or $500,000 per $1 billion shrink.  Tr. 679-80.

Next, Dr. Baxter deducted any gains from selling divested assets from the net interest income calculated on the divested assets.  Tr. 681.

In summary, Dr. Baxter calculated the total lost profits on divested assets as follows.  For each quarter, he averaged the starting balance and ending balance of divested assets.  He then multiplied the average balance for each quarter by the actual net wholesale interest spread for that quarter minus 5 basis points.  From this product, he subtracted the gains on sales of divested assets for each quarter.  Then he totalled the result from each quarter.  Tr. 678-79; PX 2030 at 2-5.

The results of this calculation are as follows: for the divested assets sold off during the 1989-1990 shrink, Dr. Baxter calculated total lost profits of $45.642 million.  PX 2030 at 1, 3; PX 2031; PX 2045.  For the divested assets sold off during the 1991 shrink, Dr. Baxter calculated total lost profits of $27.579 million.  PX 2030 at 1, 5; PX 2031.  These two figures added together yield total lost profits on divested assets in the amount of $73.221 million.  PX 2063; PX 2032; PX 2033.

**Lost Profits on Replacement Assets**

Dr. Baxter next calculated the lost profits on the assets that Northeast would have replaced as the wholesale liabilities ran off the balance sheet, assuming that Northeast would have maintained a constant balance of $6.7 billion in tangible assets.  As a proxy for the replacement assets, Dr. Baxter used a wholesale spread, even though the but-for Northeast would have replaced some of the wholesale assets with retail assets.  Dr. Baxter used this proxy because the characteristics of wholesale assets and liabilities were more "certain" and "measurable" than the retail assets, since he could not predict Northeast's origination of retail business in a but-for world.  Tr. 695-97, 884-86.

Had Northeast carried out its plan to gradually shift from wholesale to retail, Northeast anticipated that it would have earned higher spreads in retail banking than in wholesale banking.  Tr. 229.  Dr. Baxter opined that Northeast would in fact have received higher spreads for retail banking than wholesale banking so long as the G&A expenses on the additional retail banking would not have exceeded 150 basis points.  PX 2042.

---

[56](...continued)
assets ran off the balance sheet on a continuous basis and were replaced with assets yielding a market rate.  Because interest rates fell during the damages period and the decline occurred when the total balance of divested assets was highest, the divested assets would have had higher yields than the actual wholesale assets.  Tr. 674-76; PX 2059; PX 2026; PX 2027.

Dr. Baxter determined the 150-basis point figure in the following manner. First, he compared Northeast's actual net retail yields to its actual net wholesale yields. He found that during the damages period, the actual net retail yields regularly exceeded the actual net wholesale yields by, on average, 73 basis points. Tr. 536, 637-38, 700-08, 802; PX 2038; PX 2039. Dr. Baxter stated that his analysis accounted for "all of the lending losses that Northeast actually suffered based on the commercial loans that were on their books at the time," Tr. 802, as well as losses from the California market. Tr. 813; see also Tr. 229, 2009-10.

Dr. Baxter then compared Northeast's actual net retail cost of funds to its actual net wholesale cost of funds. He found that the actual wholesale cost of funds regularly exceeded that of actual net retail funds. He calculated that the average funding benefit for retail over wholesale was 50 basis points. Tr. 710-11; PX 2040; PX 2041; see also Tr. 229; 3174. Thus, adding the average retail yield of 73 basis points to the average retail funding benefit of 50 basis points, Northeast's actual net retail interest spread exceeded its actual net wholesale interest spread by 123 basis points during the damages period. PX 2042.

To the 123 basis points, Dr. Baxter added 22 basis points for expenses arising from foreclosed real estate deducted from the retail yields to arrive at the net retail yields, which were in fact G&A expenses. He then added 5 basis points to account for incremental wholesale G&A expenses, because such expenses reduced the net wholesale spread. Tr. 714-15. Thus, Dr. Baxter found that so long as incremental retail G&A did not exceed 150 basis points, Northeast's retail replacement assets would have been more profitable than wholesale replacement assets. PX 2042.

Dr. Baxter went on to find that the but-for bank's incremental G&A would in fact have been considerably less than 150 basis points because a thrift normally has a G&A expense of approximately 200 basis points, and the cost of gradually shifting Northeast's business from wholesale to retail banking would have been small because most of the retail branches already were in place and Northeast would only have had to add some additional marketing and personnel to service additional customers. Tr. 716-18, 1168-70, 1221-22. The evidence shows that, at the time of the shift from wholesale to retail in December 1988, Northeast's G&A was too high overall. PX 67 at 2; see also PX 192.

Dr. Baxter calculated the lost profits on replacement assets as follows. For each quarter, he averaged the starting balance of replacement assets and ending balance of replacement assets.[57] He then multiplied the average replacement asset balance by the actual net wholesale interest spread for that quarter less the incremental G&A. He then summed the results for each quarter and calculated the total lost profits on the replacement assets as $39.131 million. PX 2043; PX 2044.

---

[57] The starting point for the calculation of the quarterly balance of replacement assets for each quarter is the $6.7 billion but-for bank. From that figure, the amount of tangible assets of the actual bank for each quarter is subtracted. The result is the amount of foregone tangible assets for each quarter. From the amount of foregone tangible assets for each quarter is subtracted the amount of the divested asset balance for each quarter, (as calculated in the divested assets lost profit calculation. See PX 2030. The result is the quarterly balance of replacement assets. PX 2043 at 2-3.

72

**Dr. Baxter's Testimony Regarding DEPCO**

In order for Northeast to acquire the four failed Rhode Island institutions, Northeast's holding company, NFC, issued to DEPCO $35.17 million par value cumulative preferred stock with an 8.5% yield.  NFC also issued to DEPCO a warrant to purchase 600,000 shares of NFC common stock at $2.50 and a warrant to purchase 200,000 shares of NFC common stock at $4.25 per share.  NFC then downstreamed the proceeds to the bank as capital.  PX 24 at 3, 50-51; PX 84 at 2.

In Dr. Baxter's view both the preferred stock and the warrants were necessary components of the transaction.  Because market yields at the time were approximately 14%, the yield of 8.5% on the preferred stock was "well below what the market would have required to provide that cumulative preferred stock to Northeast at the time."  Tr. 725; see PX 24 at 50.  As a result, $35.17 million par value in preferred stock would have been worth much less than the $35.2 million that DEPCO was paying, and the warrants made up the difference.  Tr. 725.

Dr. Baxter opined that the breach caused Northeast to issue the cumulative preferred stock and the warrants to DEPCO, because if Northeast had the regulatory goodwill counted as capital it could have done this deal without raising capital based upon its core and tangible capital ratios with goodwill included.  Tr. 731-36; PX 2047.

According to Dr. Baxter, Northeast incurred damages associated with the in-kind dividends NFC paid on the preferred shares it issued to DEPCO.  Tr. 740-42.  If Northeast was permitted to count supervisory goodwill as capital, NFC would not have had to pay dividends on the preferred stock, as Northeast would have had enough regulatory capital to raise money on the open market.  Tr. 741-42.  In quantifying the damages, Dr. Baxter started with the value of the in-kind dividends paid.  Tr. 738.  From there, Dr. Baxter recognized that the goodwill capital in the but-for world, unlike the cash actually received from DEPCO, would not have earned interest.  Tr. 742.  Thus, Dr. Baxter's damages calculation included the value of the dividends paid to DEPCO on the preferred stock, less the return on cash received from DEPCO as an offset.  Tr. 742; PX 2049.

Dr. Baxter also testified that Northeast incurred damages when NFC issued the warrants to DEPCO.  Tr. 746.  To calculate the costs incurred by Northeast, Dr. Baxter subtracted the purchase prices of the warrants -- $2.50 per share for 600,000 shares, and $4.25 per share for 200,00 shares -- from Dr. Baxter's market price.  Based on "trading stock prices," Dr. Baxter valued the warrants at $6.62 per share.  Tr. 747.  Dr. Baxter calculated that the difference between the market stock price and the purchase prices was $2,950,000.  Tr. 747; PX 2050.

In addition, Dr. Baxter asserted that Northeast's DEPCO damages should have reflected a tax adjustment, or gross-up.  Tr. 749-50; PX 2051.  Because these costs "never created a tax expense for Northeast," Dr. Baxter claimed that Plaintiff can be made whole only if this portion of the award was grossed-up such that Plaintiff received the full value of DEPCO damages after taxes.  Tr. 749.  With the gross-up, the total claim for DEPCO damages is $10,604,000.  Tr. 750.

**SAIF Deposit Premiums**

According to Dr. Baxter, the government's breach also caused Northeast to pay increased SAIF insurance premiums. Tr. 751-54. Deposit insurance premiums, levied by FDICIA, were assessed using a risk-based matrix based on an institution's CAMEL ratings. Tr. 751. In the actual world, at the time FDICIA became effective, Northeast had a CAMEL rating of 3, and was considered to be "adequately capitalized." Tr. 752-53. Dr. Baxter explained that, while he believed Northeast's CAMEL rating in the but-for world would still have been 3, the bank would have been considered "well-capitalized," rather than "adequately capitalized." Tr. 753. For the assessment periods in which Northeast would have been considered "well-capitalized," Northeast would have realized a savings of three basis points on its premiums. Tr. 758. In total, Dr. Baxter calculated that, in the but-for world, Northeast would have paid $1,334,000 less in deposit insurance premiums. Tr. 759; PX 2055.

**Professor Fischel's Critique of Plaintiff's Damages Methodology** [58]

The government's damages expert, Prof. Daniel R. Fischel,[59] testified about his opinions regarding the effects of the government's breach on Northeast and his analysis of Dr. Baxter's damages methodology. According to Prof. Fischel, Northeast was not harmed by the government's breach – specifically, the phase-out of supervisory goodwill as capital. On the contrary, according to Prof. Fischel, Northeast benefitted from the FIRREA-inspired adjustments. Prof. Fischel's principal opinion focused on Dr. Baxter's damages analysis, which Prof. Fischel called "fundamentally flawed," as it was based on certain "pillars" and assumptions, all of which were "wholly implausible." Tr. 1778.

**The Breach Benefitted Northeast**

Prof. Fischel explained that:

> [T]he breach led Northeast to take certain steps that, with the benefit of hindsight, allowed Northeast to be less vulnerable to the severe recessionary conditions in the northeast and California than it would

---

[58] The Court denied Plaintiff's post-trial motion to strike portions of the testimony of Professor Fischel. Northeast Sav., F.A. v. United States, No. 92-550, 2007 WL 5177410 (Fed. Cl. Feb. 8, 2007).

[59] Prof. Fischel was admitted as an expert in the areas of valuation, financial institutions, financial markets, regulation of financial markets, and economic analysis of lost profits and other damages claims. Prof. Fischel is the president of Lexecon, a consulting firm in Chicago, IL, a professor of law and business at the University of Chicago Law School, and a professor of law and business at Northwestern University School of Law and the Kellogg School of Management. Prof. Fischel has served as an economics expert in approximately 200 cases. Tr. 1770. His testimony has been received in numerous FIRREA cases.

have been had it not taken the steps that it did in response or at least
partially in response to the breaching provisions in FIRREA.

Tr. 1791. Specifically, Northeast took four steps in response to FIRREA that Prof. Fischel believed ultimately benefitted Northeast. First, because of the "capital constraints imposed by FIRREA," Northeast reduced residential mortgage loan originations from March 1990 through December 1993. Tr. 1792-93; DX 3005 (citing excerpts from Northeast's 9/30/90 10Q and 3/31/92 10-K); DX 3006. Because Northeast originated fewer mortgage loans during this period, it was less exposed and, thus, avoided losses during "a severe recessionary climate." Tr. 1794. Without the capital constraints imposed by FIRREA, in Prof. Fischel's view, Northeast's loan originations would have been much higher, and, as a result, it would have sustained increased losses when those loans failed. Tr. 1793.[60] Thus, "to the extent that Northeast was less exposed to the recession because it made fewer loans, it benefitted." Tr. 1794.

Second, Prof. Fischel opined that Northeast implemented a system to securitize residential loans, and remove recourse provisions in response to the "risk-based capital requirements in FIRREA." Tr. 1797-99.[61] Prof. Fischel estimated that Northeast securitized approximately $1.364 billion worth of assets between March 1990 and December 1994. Tr. 1804; DX 3008. Without FIRREA's capital requirements, Prof. Fischel believed that Northeast would not have taken the steps to securitize assets or remove recourse provisions. Had these steps not been taken, the credit losses on the assets would have been incurred by Northeast, rather than by the federal agency securing the assets.[62]

Third, again because Northeast could not count supervisory goodwill as capital and had an expressed need to become a less risky bank, Northeast curtailed or exited high risk lines of business, including commercial real estate lending activities, lending and investment activities that required high levels of capital, and commercial lending. Tr. 1815; DX 3009. According to Prof. Fischel, to the extent that Northeast curtailed or exited riskier lines of business, it avoided the higher losses associated with those businesses during the recession, and, as such, benefitted from the new capital requirements in FIRREA.

---

[60] Prior to FIRREA, Northeast had a goal of $1 billion a year in loan originations, according to Northeast's December 1988 business plan, and its revised business plan of May 1989. DX 3006.

[61] Prof. Fischel highlighted portions of Northeast's January 9, 1990 Capital Plan, in which Northeast called for, inter alia, the "securitization of $500 million in residential mortgage loans to mortgage-backed securities . . . to reduce the risk-based capital requirements." DX 208; see also PX 241.

[62] Prof. Fischel criticizes Dr. Baxter's damages model because it did not take into account the credit losses that would have been incurred by Northeast if Northeast had not taken steps to secure its assets. Tr. 1804-05.

Fourth, as a result of FIRREA, the bank had less capital, and had to take steps to conserve its remaining capital reserves. One of those steps, according to Prof. Fischel, was to omit the payment of dividends, which allowed Northeast to conserve capital. Tr. 1829.[63] In addition, Prof. Fischel explained that "the omission of dividends is what created the ability to have the preferred stock redeemed at a discount, because preferred stock that pays no dividends is obviously less valuable than preferred stock that pays dividends." Tr. 1831.[64] Prof. Fischel estimated that Northeast conserved approximately $38.8 million through omitting dividends ($11.2 million) and discounting its preferred stock at redemption ($27.6 million). DX 3011.

Fundamental Flaws in Dr. Baxter's Damages Methodology

Prof. Fischel's primary role for the government was to highlight flaws in Northeast's lost profits analysis. To that end, Prof. Fischel testified that there were four principal errors in Dr. Baxter's damages analysis that rendered his calculations fundamentally flawed.

1.      Dr. Baxter's Assumptions Regarding the Composition of the Forgone Assets.

According to Prof. Fischel, Dr. Baxter's damages calculations "focus[ed] solely on Northeast's wholesale assets and wholesale liabilities in the post-FIRREA period." Tr. 1842.[65] Dr. Baxter's focus on wholesale activities is inconsistent with Northeast's well-chronicled goals in the real world to become a retail bank, and to "de-emphasize wholesale activities." Tr. 1844-50 (citing DX 990; DX 178 at 12-13; DX 179 at 14-15). According to Prof. Fischel's analysis of Northeast's 1989 Business Plan (DX 178),[66] Northeast was planning to add approximately $283 million worth of retail assets, and projected a $292 million decrease in wholesale assets. Tr. 1851; DX 3014. This differs dramatically from what Dr. Baxter assumed in his analysis, which forecasted that Northeast would have, in the but for world, increased retail assets by $14 million, and increased wholesale assets by $6 million. Tr. 1852. This perceived "disconnect" was even more pronounced when Prof. Fischel compared Dr. Baxter's analysis to the projections in Northeast's May 1989 revised business plan. Tr. 1852-54. Prof. Fischel also drew similar conclusions when comparing the real-world

---

[63]  Prof. Fischel cited the portion of an affidavit from Mr. Rutland, in which Mr. Rutland acknowledges that "Northeast has foregone declaring a dividend for five quarters" "to increase capital." PX 241 ¶ 19.

[64]  Prof. Fischel cited a letter from Mr. Rutland to an owner of Northeast's preferred stock, in which Northeast offered to purchase the preferred stock at a "significant discount from the liquidation value of the stock." PX 1401. According to the letter, the discount was, in part, a result of the lack of "future cash flow from dividends." Id. In 1991, Northeast did not project paying dividends on its preferred shares until the end of FY 2000. Id.

[65]  "There is no other asset in Dr. Baxter's damage calculations." Tr. 1843.

[66]  DX 178 was also admitted as PX 146.

forecasts included in Northeast's Capital Plan projections with Dr. Baxter's assumptions.  Id. 1854-55.

      2.      <u>Dr. Baxter's Assumption About the Profitability of the Assumed "Incremental Bank"</u>

Dr. Baxter's assumption with regard to the profitability of Northeast's foregone assets in the but-for world is, according to Prof. Fischel, "completely implausible" when compared to Northeast's actual performance in the pre- and post-FIRREA worlds, as well as the experiences of Northeast's peer thrifts.  Tr. 1858.

     Prof. Fischel noted that Dr. Baxter envisioned a Northeast in the but-for world with billions of dollars of additional assets -- referred to as "forgone assets." Tr. 1860.  Prof. Fischel explained that Dr. Baxter improperly assumed that there would be no additional credit losses associated with the additional assets, "notwithstanding the completely contrary experience of the bank in the real world." Id.

Among other things, Prof. Fischel took issue with Dr. Baxter's assumption that the larger Northeast would not have jettisoned its mortgage-backed securities in the non-breach world.  Tr. 1861.  Prof. Fischel remarked that Northeast's pre-FIRREA pattern of selling its mortgage-backed securities and its repeatedly stated goal of exiting the wholesale business demonstrated that Northeast would have sold <u>more</u> of its mortgage-backed securities in the non-breach world.  Tr. 1863.  Thus, according to Prof. Fischel, Northeast's foregone assets would have been comprised of other types of assets (i.e., not mortgage-backed securities), which would have been riskier, and would have incurred credit losses.  Id.  That Dr. Baxter assumed that none of these assets would have had credit losses was "speculative and implausible."  Id.

Next, Prof. Fischel testified that Dr. Baxter's lost profits calculations "assume[d] a massive bet [on] interest rates;" an assumption that regulators had criticized, and Northeast's own management said was "impermissible." Tr. 1865.[67]  Additionally, Dr. Baxter assumed that Northeast would have planned for interest rates to fall in the non-breach world.  Prof. Fischel explained that this assumption was inconsistent with Northeast's behavior in the real world, where it was predicting and planning for an <u>increase</u> in interest rates.  Id.  Dr. Baxter's implausible assumption on interest rates, according to Prof. Fischel, affected the calculation of all of Northeast's alleged lost profits.  Tr. 1879; DX 3023.

Prof. Fischel also took issue with the assumptions underlying the size of Dr. Baxter's non-breach version of Northeast.  Tr. 1883-84.  Specifically, Prof. Fischel suggested that Dr. Baxter did not properly account for the G&A expenses associated with the additional assets held by Northeast in the non-breach world.  Tr. 1884.  For purposes of his damages calculation, Dr. Baxter assumed

---

[67]  Prof. Fischel stated that Dr. Baxter, using an RCA program, calculated the lost profits as the difference between "the actual interest earned on Northeast's wholesale assets" and "the interest paid on its wholesale liabilities." Tr. 1865.

that, G&A expenses would comprise 0.05% of Northeast's average tangible assets in the non-breach world. Tr. 1887. Prof. Fischel compared Dr. Baxter's estimate to Northeast's actual G&A expense ratios in the pre- and post-FIRREA worlds, the estimated G&A expense ratios for Northeast's retail portfolio[68] in the pre- and post-FIRREA worlds, and the average G&A expense ratio for Northeast's peer thrifts as estimated by Plaintiff's consultant. DX 3024. In each case, Dr. Baxter's G&A expense ratio was much lower. The low G&A expense ratio used by Dr. Baxter had the effect of inflating his lost profits calculation. Tr. 1890-91.

### 3.  Dr. Baxter's Assumptions Regarding Securitization and Recourse Removal

According to Prof. Fischel, Dr. Baxter made an "implausible" and "extreme" assumption that Northeast would have made the exact same decisions regarding securitization and removal of recourse provisions in the but-for world that it did in the actual world. Tr. 1894-95. Prof. Fischel, citing to the bank's own statements, asserted that these decisions were made in response to FIRREA, and that the incentives behind Northeast's securitization would have been "weaker in the absence of the Government's breach." Tr. 1895. Without these assumptions, Dr. Baxter would have had to factor into his lost profits analysis the credit losses that were avoided in the real world. Id. With regard to Dr. Baxter's testimony that Northeast would have undertaken the same steps in the but-for world because "everybody did a lot of" securitizing, Prof. Fischel pointed to evidence that suggested that Northeast's peer thrifts never securitized to the extent that Northeast did. Tr. 1898; PX 2067.

### 4.  Dr. Baxter's Assumptions Regarding the Size of the But-for Bank.

Prof. Fischel challenged Dr. Baxter's assumption that Northeast, in the non-breach world, would have had a constant size of $6.7 billion of actual assets from FIRREA until Northeast's California branches were sold in 1994. Tr. 1898-99. Dr. Baxter failed to consider certain developments, unrelated to the government's breach, which would have decreased the size of the but-for bank. Tr. 1903-04. Prof. Fischel hypothecated that "a more realistic assumption that could have been made, that Dr. Baxter did not make, would be to reduce the size of the bank in response to FDICIA and the severe recession in the same way that that occurred with the bank in the real world for nonbreach reasons." Id. 1904. Prof. Fischel also referred to a list of 24 capital-compliant thrifts that reduced their asset size between the third quarter 1989 and the fourth quarter 1993. Tr. 1905-06; DX 3029. Because these thrifts were capital compliant, Prof. Fischel used them to demonstrate that thrifts were downsizing regardless of the capital constraints imposed by FIRREA.

Prof. Fischel questioned Dr. Baxter's statement that Northeast would not have reduced its size in the absence of the breach because reducing its size was "not something they wanted to do because of the earning power leverage." Tr. 1906 (quoting Tr. 630-31). This statement, according to Prof. Fischel, is a "fundamental economic error" and "there is no inherent earnings power associated with leverage." Id. 1907. Prof. Fischel also challenged the capital ratios used by Dr. Baxter, and indicated,

---

[68] Prof. Fischel highlighted the estimated G&A expense ratio for Northeast's retail portfolio because Northeast's intentions were to become a retail bank.

as he had for other assumptions, that the capital ratios were not in line with other capital compliant thrifts.  Id. 1909-11.

**Prof. Fischel's Testimony on DEPCO and Warrants**

> Dr. Baxter's Assumptions That the DEPCO Transactions Would Have Taken Place on the Same Terms.

Prof. Fischel also critiqued Plaintiff's claim that in the non-breach world, Northeast would have implemented the DEPCO transaction but would not have sold preferred stock and warrants to DEPCO in the absence of the government's breach.  Tr. 1915.  First, Prof. Fischel explained that the DEPCO transaction was a "successor plan" to a prior plan, in which Northeast also contemplated selling preferred stock to the state.  Id. 1916-17 (citing DX 391).  Thus, according to Prof. Fischel, Dr. Baxter's assumptions that Northeast would not have sold preferred stock and warrants to DEPCO is speculative and contrary to the bank's own prior plans.  Tr. 1917.

Prof. Fischel also challenged Northeast's claim that it would not have raised capital in the but-for world to execute the DEPCO transaction because Northeast would not have needed to.  Here, Prof. Fischel observed that Dr. Baxter's assumption that Northeast would not have needed to raise extra capital was premised on Dr. Baxter's faulty assumptions regarding Northeast's expenses, credit losses, and interest rates in the but-for world.  Id. 1918.

In addition, Prof. Fischel explained that the costs associated with the DEPCO transaction should not be included as damages because they were not actually incurred by Northeast because Northeast's holding company, NFC, issued the preferred stock, the dividends were not paid in cash (they were paid "in-kind"), and cash was not paid until the bank was acquired.  Id. 1921.

According to Prof. Fischel, Dr. Baxter assumed that Northeast would have raised the same amount of funds at the average cost of funds, and then Dr. Baxter compared that to the cost of funds attributable to the DEPCO transaction.  Id.  Prof. Fischel explained that Northeast's average cost of funds consisted largely of low-cost "retail deposits," which likely would not have been available to Northeast in a non-breach world.  Id. 1922.

Finally, Prof. Fischel challenged Northeast's claim for costs allegedly incurred when Northeast issued warrants to DEPCO.  Dr. Baxter claimed that Northeast incurred a cost the day it issued the warrants "equal to the value of the warrants that it issued."  Id. 1922-23.  According to Prof. Fischel, Northeast received fair, market-based consideration for these warrants, which were issued in exchanged for $35 million.  Id.

79

**Testimony of Dr. Thakor**

Defendant called Dr. Anjan V. Thakor to render opinions regarding Dr. Baxter's damages calculations.[69]  Dr. Thakor testified that: Dr. Baxter's lost profits analysis was inconsistent with basic economic principles and based on "invalid" assumptions; Dr. Baxter's purported DEPCO damages were exaggerated and also based on flawed assumptions; and Dr. Baxter's claim for insurance premiums paid by Northeast was unsupported and speculative.  Tr. 2442-43.

Conceptual Criticisms

Dr. Thakor criticized Dr. Baxter's use of risk-controlled arbitrage to calculate the spread to compute net interest income, which formed the basis of Northeast's alleged lost profits.  Id. 2447 (citing DX 5003).  More fundamentally, Dr. Thakor explained that Dr. Baxter's focus on net interest income did not "make any sense," and that Dr. Baxter's analysis should have started with Northeast's core earnings instead.  Tr. 2452-53.  According to Dr. Thakor, when shareholders and management are assessing the profitability of a thrift, they focus on core earnings, which, essentially, constitute the net interest income minus credit losses, plus non-interest income, and minus G&A expenses.  Id. 2449.  Dr. Thakor explained that a bank may have positive net interest income, but negative core earnings.  Indeed, Northeast itself, pre- and post- FIRREA, had positive net interest income, but mostly negative core earnings.  Id. 2454-55.[70]  In addition, a methodology that uses net interest income (like Dr. Baxter's) ignores certain principles of risk, including, inter alia, risks regarding interest rate movement.  Id. 2457-58.

Additionally, Dr. Thakor offered three conceptual criticisms of Dr. Baxter's methodologies.  First, if Northeast received fair market value for its divested assets, then it could not have incurred damages.  Tr. 2464-65.  Second, Dr. Thakor highlighted what he thought were "mutually inconsistent assumptions" in Dr. Baxter's analysis, which were that Northeast's lost profits were foreseeable, and that Northeast was unable to raise capital to capture the foreseeable lost profits.  Id. 2467.  If it was foreseeable that these assets would have produced profits, then Northeast should have been able to raise additional capital to hold onto those assets.  Id. 2470-71.  Dr. Thakor suggested that Northeast could have raised additional capital through, inter alia, a rights offering, by forming a holding company, or a bet on interest rates.  Id. 2471-84.  Third, the value Dr. Baxter asserted that Northeast

_____

[69]   Dr. Anjan V. Thakor, John E. Simon Professor of Finance at the Olin School of Business, Washington University of St. Louis, was admitted by the Court as an expert in economics, corporate finance in banking, the economics of bank regulation, cost of raising capital, interest rate risk, the cost of capital, capital structure, leverage, corporate investment decisions, and valuation.  Tr. 2438-39.

[70]   See also Tr. 2643 ("[N]et interest income is a very poor indicator of overall profitability . . . it is not sufficient to understand whether the bank is profitable or it's losing money.").

ascribed to its goodwill – i.e., that the loss of goodwill caused a loss of $112 million – was inconsistent with Northeast's own pre-FIRREA experiences.[71]

### Dr. Baxter's Invalid Assumptions About Northeast's Strategy

Dr. Thakor challenged several assumptions underlying Dr. Baxter's lost profits calculations as being inconsistent with Northeast's actual portfolio strategy. Tr. 2512. According to Dr. Thakor, Northeast adopted a new strategic direction in the fall of 1988, under which Northeast would focus more on traditional banking activities. Id. 2513. This is important because "it implies that even prior to FIRREA, Northeast's strategy was to move away from the very thing that generates all of the lost profits in Dr. Baxter's model, namely a divested portfolio of wholesale assets and wholesale liabilities." Id. 2514. Similarly, Dr. Thakor took issue with Dr. Baxter's assumption that Northeast would have retained its wholesale portfolio in the but-for world. Id. 2515-16. Dr. Thakor pointed to several documents that indicated that Northeast, in fact, was planning to divest its wholesale assets and exit the wholesale business prior to FIRREA.[72] Even though Northeast intended to jettison its wholesale assets, rising interest rates in 1988 made selling these assets difficult because it would have led to a significant loss. Tr. 2534-35.

Dr. Thakor explained that, as interest rates began to decline in 1989, Northeast began to shrink, and it was shrinking because Northeast "finally encountered an interest rate environment in which rates were falling and they could sell some of these assets without incurring the loss," and not because they needed goodwill to leverage the portfolio. Id. Thus, according to Dr. Thakor, the shrinkage in 1989 was consistent with Northeast's strategy regarding RCA and its wholesale assets. Id. 2536.[73] Dr. Baxter's lost profits model, however, contemplated and relied upon the continued use of RCA and the maintenance of Northeast's wholesale assets and wholesale liabilities. Id. 2545-47.

Dr. Thakor also testified that Dr. Baxter's foregone asset portfolio had no relationship to Northeast's actual profitability. Id. 2547. Most of Northeast's alleged lost profits in but-for world would have occurred between 1991 and 1993, according to Dr. Thakor's analysis of Dr. Baxter's

---

[71] Dr. Thakor explained that prior to FIRREA when Northeast had goodwill that it could leverage: 1) its profitability, stock price, and shareholder value did not increase; 2) Northeast's focus was on increasing its tangible net worth; and 3) Northeast had previously voluntarily written off a portion of its goodwill. Tr. 2487-88.

[72] Dr. Thakor referred to PX 1146; PX 250; PX 1152; PX 251; PX 1156; PX 146; PX 192 Tr. 2520-34.

[73] Dr. Thakor also testified that even if Northeast's strategy was not to sell its wholesale assets, but to let the portfolio run off its books over a five-year period, the assets would have been off of Northeast's books in less than five years. According to Dr. Thakor, falling interest rates from 1989 into the early 1990s caused a surge in "prepayments," which occurs when customers borrow money at a lower interest rate to use to pay off or "prepay" their higher rate loans. Tr. 2537-38. This was not reflected in Dr. Baxter's model. Id. 2538.

model. Id. 2642.  In the actual world, Dr. Thakor explained that Northeast actually lost money during this period.  Id. 2548-50.  Dr. Baxter's profitability analysis was based on erroneous assumptions regarding interest rate movements, an assumption that Northeast would have had no credit loss, and implausible assumptions regarding Northeast's G&A expenses.  Id. 2550.

With regard to Northeast's but-for world expectations on interest rate movement, Dr. Thakor characterized Dr. Baxter's assumptions as counterfactual.  Id. 2551.  Citing various corporate documents from between 1989 and 1992, Dr. Thakor emphasized that Northeast initially planned on interest rates falling, and then changed its forecast to plan for an increase in rates.  Id. 2559-61. Furthermore, Dr. Thakor indicated that Northeast seemed to have positioned its portfolio expecting interest rates to rise in 1991 and 1992.  Id. 2564-68.

Dr. Thakor also analyzed the differences between the interest rate risks taken by Northeast in the actual world, and the interest rate risks taken in Dr. Baxter's but-for world.  Dr. Thakor found that Dr. Baxter but-for bank, especially the bank's foregone asset portfolio, was "exposed to a lot more risk than the actual bank, and therefore its interest rate risk profile [was] not the same as that of the actual bank.  It's actually quite a bit different."  Id. 2587.  Dr. Thakor's comparison of the interest rate risks in the actual and but-for worlds reinforced his conclusion that Northeast in the actual world was planning for an increase in rates, while Dr. Baxter speculated that Northeast would have planned for the opposite in the but-for world.  Id. 2588-89.  Such speculation, according to Dr. Thakor was implausible.  In addition, Dr. Thakor testified that Dr. Baxter's assumptions regarding Northeast's wholesale portfolio and his bet on interest rates were directly affected by the drop in interest rates -- i.e. Dr. Baxter's lost profits become positive only after interest rates start to decline.  Id. 2635-36.

DEPCO Transaction

Dr. Thakor challenged Dr. Baxter's assertion that Northeast incurred costs when it issued preferred shares to DEPCO.  According to Dr. Thakor, there is no evidence that the DEPCO preferred stock was sold at anything but fair market value.  Id. 2669.  Assuming that the stock was sold at fair market value, Northeast could not have incurred damages from the sale.  Id.

Dr. Thakor also disputed Dr. Baxter's assumption that Northeast would have used the proceeds from the DEPCO sale to pay down its liabilities at the average costs of funds.  Id. 2673. According to Dr. Thakor, Northeast would have been more likely to, for example, invest in earning assets, invest in paying off its most expensive liabilities, invest in selling deposits, or some combination thereof.  Id. 2673-76.  Dr. Baxter's analysis understates the benefits of the DEPCO proceeds and does not include any leverage benefits from the DEPCO investments.  Id.

Deposit Insurance Premiums

Dr. Thakor also challenged Dr. Baxter's assertion that Northeast paid a higher deposit insurance premium because it could not count goodwill as capital.  Id. 2678.  Dr. Thakor testified that whether Northeast could have counted goodwill as capital would have been irrelevant to its deposit insurance premiums.  Id. 2681.

**Barefoot Bankhead**

The Government's expert in financial institution accounting, Barefoot Bankhead, offered four opinions about Dr. Baxter's damages model.[74] First, he opined that Dr. Baxter's lost profits calculation is speculative and implausible because the interest rate risk profile of the but-for thrift was implausible and counterfactual. Tr. 2146-47. Second, Dr. Baxter's lost profits calculation is based upon implausible and counterfactual assumptions and contains methodological errors. Tr. 2147. Third, he opined that Dr. Baxter's lost profits calculation is inflated because it fails to consider that non-breach reasons caused goodwill to be excluded from Northeast's regulatory capital. Id. Fourth, Dr. Baxter's calculation of Northeast's deposit insurance premiums is speculative and understated. Id.

Mr. Bankhead defined interest rate risk as the exposure inherent in the portfolio of a thrift where net interest income will be negatively impacted by changes in interest rates. Tr. 2121. Mr. Bankhead utilized a "gap analysis" to analyze the interest rate risk exposure of the but-for thrift and compared it to that of the actual thrift. Tr. 2158. Northeast used a gap analysis to analyze its interest rate risk. Tr. 2156.[75] A gap analysis is the identification at a point in time of an institution's exposure to either increasing or decreasing interest rates as well as a measurement of the thrift's relative exposure. Tr. 2149. The gap analysis is expressed as a dollar amount (or as a percentage of total assets) in a certain time period in which either more assets or more liabilities reprice. Tr. 2150. A gap analysis shows what impact a change in interest rates has on a portfolio, i.e. whether the net interest income is negatively or positively impacted by an increase or decrease in interest rates. Id.; DX 4001.

Based upon Northeast's June 16, 1989 interest rate risk management policy, Bankhead concluded that its management considered that interest rate risk management was a crucial element of managing the institution. Tr. 2156; PX 560 at 2. Bankhead testified that virtually all of but-for

---

[74] At the time of trial, Barefoot Bankhead was a managing director of Navigant Consulting. Tr. 1206. He is a certified public accountant licensed in the State of Texas and a member of the commercial panel of the American Arbitration Association. Tr. 2107. Mr. Bankhead earned a Bachelor's Degree in business administration with a major in accounting at the University of Texas in Austin in 1976. Id. Mr. Bankhead served in a two-year professional accounting fellowship program with the FLHBB from 1987-1989, Tr. 2111, and served as a chief financial officer and executive vice president of First Cook Community Bank, where he managed interest rate risk and accounted for the goodwill of the institution. Tr. 2111, 2120-22. He was admitted as an expert in auditing and accounting for depository financial institutions, including but not limited to, GAAP and RAP; financial institution management and regulation pertaining to compliance with interest rate risk and accounting and operational regulations, interest rate risk; and financial analysis and valuation of depository financial institutions, including their underlying assets and liabilities. Tr. 2145.

[75] Northeast also used a simulation model to analyze interest rate risk, but Bankhead did not. Tr. 2156, 2158. Dr. Baxter did not provide an analysis of Northeast's interest rate risk in his expert report. Tr. 2156.

Northeast's lost profits were generated from the significant decline in interest rates between December 1990 and December 1993, as a result of the way Dr. Baxter structured the but-for bank. Tr. 2159-60. He noted that the "spread," defined as the difference between the average yield in interest-earning assets minus the average cost of interest-bearing liabilities, increased as interest rates decline, which means that the spread of Northeast's foregone assets was significantly negatively gapped. Tr. 2160. This negative gap takes advantage of declining interest rates because when the interest rates fall, the spread and profits increase. Tr. 2160-61; DX. 4003. Dr. Baxter used the actual wholesale portfolio of Northeast as a proxy for what the spread would have been in the asset portfolio in the but-for Northeast. Tr. 2163. Northeast's actual liabilities repriced much more quickly than the assets, generating higher yields in a declining interest rate environment as the cost of liabilities decreased. Tr. 2163-64.

The but-for lost profits calculated by Dr. Baxter were negative $5.4 million, but increased to $100.8 million in December 1993, as a result of the decline in interest rates during the time period while the portfolio was negatively gapped. Tr. 2166-67. This $100 million represented almost all of the $112 million in lost profits that the wholesale portfolio generated. From this, Bankhead concluded that the portfolio was structured by Dr. Baxter to take advantage of the decline in interest rates during this time period. Tr. 2167. In comparison, Northeast's actual one-year gap was mostly moderately positive during the damages period as opposed to the massive negative one-year gap in Dr. Baxter's foregone portfolio. Tr. 2169; DX 4007. Similarly, a comparison of Northeast's actual versus Dr. Baxter's foregone portfolio on a six-month gap basis shows that the foregone portfolio was significantly negatively gapped during the damages period with the exception of the March and June 1992 quarters. Tr. 2170; DX 4009 .

Mr. Bankhead also testified that it was counterfactual for Dr. Baxter to structure the foregone portfolio to benefit from declining interest rates when Northeast restructured its actual portfolio to minimize its interest rate risk exposure. Tr. 2172. He opined that Northeast was willing to accept interest rate risk only insofar as to take advantage of increasing interest rates. Tr. 2171. He based this conclusion on the actual bank having a positive one-year gap in each quarter during the damages period except for two quarters in March 1990 and September of 1990. Tr. 2173-74; DX 4006; DX 4007. He opined that the actual bank was positively gapped because management intended it that way. Tr. 2180. However, the but-for bank is highly negatively gapped because the foregone portfolio is so negatively gapped that it changes the interest-rate risk profile of the entire but-for bank from positive to negative, resulting in almost all of the lost profits. Tr. 2182.

Mr. Bankhead also noted that the but-for Northeast was much more significantly gapped than the actual Northeast, meaning that it was much more exposed to increases in interest rates than actual Northeast. Tr. 2182-83. However, management was moving the actual Northeast towards a positive gap and managed it primarily around the one-year gap.

Bankhead also testified that Dr. Baxter's but-for Northeast's lost profits depended on interest rates rapidly declining, which was in contrast to Northeast's contemporaneous expectations. Tr. 2188. Bankhead pointed to Northeast's three-year business plan for fiscal years ended March 1992, 1993, and 1994, dated May 17, 1991, which projected interest rates to rise over the time period up

84

through March 1994. Tr. 2190; DX 192 at 1080, 1081. Likewise, Northeast's three-year business plan for fiscal years ended March 31, 1993, 1994, and 1995, dated May 18, 1992, projected a general increase through March 1995, across all rate categories except for the 30-year Treasury rate, which was projected to remain flat. DX 199 at 1232-33. However, interest rates actually declined from May 1991 through March of 1993 until leveling off. Tr. 2191; DX 4004. Likewise, Northeast's 10-K for year ended March 31, 1992 indicated that the thrift's portfolio was positively gapped, so that an increase in interest rates would increase net interest income. PX 23 at 7965. A thrift would not have a negative gap position, as the but-for bank, if it expected interest rates to rise. Tr. 2195.

Mr. Bankhead opined that the but-for Northeast would not have maintained average tangible assets of $6.7 billion through 1993 because Northeast was undercapitalized pre-FIRREA and, based on its own pre-FIRREA projections, would have had to shrink or raise capital in the but-for world in order to meet pre-FIRREA regulatory capital requirements and the proposed FHLBB risk-based capital requirements. Tr. 2209.

Bankhead further opined that Northeast wrote down its goodwill in March 1990 and September 1992 because it determined that its goodwill was impaired and that GAAP required it to do so. Tr. 2354. According to Northeast's 1990 annual report, Northeast wrote off $109.4 million in goodwill, with $90 million remaining in March 1990. Tr. 2355; PX 9 at 2948, 2945. APB 17 required the writedown of goodwill when the future benefits of the goodwill are less than the unamortized balance. Tr. 2356. Similarly, Northeast would have had to write down its goodwill under RAP because Northeast did not report GAAP/RAP differences in goodwill accounting. Tr. 2356. Northeast cited the factors which caused the impairment of its goodwill in its 10-K for fiscal year-ended March 31, 1990. PX 20 at 429. The factors that caused the impairment of the goodwill were regulatory and legislative actions that diminished the value of the thrift's Connecticut and Massachusetts franchises, including the passage of the Connecticut Interstate Banking law enacted on March 14, 1990 as well as the passage of FIRREA and corresponding regulations of OTS which required deduction of supervisory goodwill in the calculation of regulatory capital, as well as deteriorating conditions in the New England banking industry. Tr. 2357.

Bankhead also pointed to a valuation of the goodwill of the Connecticut and Massachusetts franchises of Northeast conducted by Kaplan Smith. Tr. 2358; PX 68 at 3079. Kaplan Smith determined the value of the goodwill by projecting Northeast's earnings, as stated in Northeast's business plans, over the remaining life of the goodwill. Those earnings were allocated to the Connecticut and Massachusetts franchises based upon the deposit bases. Tr. 2359-60. Kaplan Smith then discounted those earnings back to present value to derive the valuation of the goodwill, which was $30.9 million for the first year, $48.3 million in the second year, and $68.1 million in the third year and thereafter. Tr. 2360.[76]

---

[76] Kaplan Smith then concluded that the value of the goodwill based upon Northeast's earnings was between $80 and $100 million dollars. Consequently, Northeast wrote down the goodwill to leave a balance of $90 million. Tr. 2360.

Bankhead noted that the $68 million in projected earnings from the third year and afterwards was significantly in excess of the earnings of Dr. Baxter's but-for bank.  Tr. 2361.  Bankhead explained the significance of this fact:

> Well, if it took 68 million of institution earnings to support a 90 million balance in goodwill, then to support a higher balance in goodwill, such as a 200 million balance, would have taken twice as much earnings.  Considering that Dr. Baxter's but-for Northeast earnings were less than $68 million, but-for Northeast would have been required to writeoff the goodwill also.

Tr. 2361.

In September 1992, Northeast wrote off $56.6 million in goodwill.  Tr. 2363-64; PX 56 at 2144.  After the writeoff, Northeast had only $1 million of goodwill on the books.  PX 56 at 2130.  Bankhead testified that Northeast had determined that its goodwill was further impaired after the March 1990 write-off and, consequently, APB No. 17 required Northeast to write it off.  Tr. 2364.  The factors cited by Northeast in its 10-Q included, primarily, OTS regulations promulgated pursuant to FIRREA and FDICIA, as well as other positions taken by the OTS regarding capital requirements.  Tr. 2365.  Northeast also cited as a factor the final rule issued by OTS which permitted federal savings associations to branch interstate to the full extent permitted by federal statute which increased competition from out-of-state institutions.  Tr. 2365.

Northeast then hired Kaplan Associates to perform another goodwill valuation study.  Tr. 2365-66; PX 69.  Kaplan cited eight factors that caused Northeast's goodwill to be impaired. Tr. 2367; DX 4029; PX 69 at 0201-0202.  The elimination of goodwill from regulatory capital by FIRREA was one factor.  Tr. 2368.  The remaining factors did not involve the deduction of goodwill from regulatory capital.  One factor that impaired Northeast's goodwill related to deteriorating economic conditions throughout the United States in general and New England in particular that caused increasing non-performing assets and decreased earnings for banks and thrifts, including Northeast.  Tr. 2368-69; PX 4029.  Related to this factor was the statement in the September 1992 Kaplan Associates study, "[a]lso, the collapse in franchise values brought about through the efforts of the FDIC and the RTC to rapidly liquidate hundreds of banks and thrifts during the deepest and longest real estate recession since the Great Depression has led Northeast to continually adjust the scope of its operations." PX 69 at 0201.  Bankhead testified that the impact of a collapse in franchise values would potentially cause a corresponding decline in value of Northeast's Connecticut and Massachusetts franchise.  Tr. 2369.  This collapse in franchise value was unrelated to Northeast's inability to include goodwill in regulatory capital.  Tr.  2370.

Kaplan Associates, in its September 1992 study used a "market comparables" approach to valuing the goodwill rather than valuing the earnings of the thrift as it did in March 1990.  Tr. 2370.  This "market comparables" approach determined the value of the goodwill by a metric based upon the deposit base in institutions, which was what comparable institutions had sold for as a premium to the deposit base and applied the average premium that had been paid to Northeast's deposit base.

Tr. 2370-71.  Northeast's deposit base was unrelated to Northeast's inability to include goodwill in regulatory capital.  Tr. 2371.

Bankhead opined that the phaseout of goodwill from regulatory capital did not cause the goodwill of Northeast to be impaired because otherwise every thrift with supervisory goodwill would have had to write it off, and that didn't occur.  Tr. 2372.  Had the phaseout of goodwill been the cause of the impairment of goodwill, Bankhead testified that Northeast either would have written off all of its goodwill in March 1990 because none of it was includable in tangible capital or would have written down to the amount of goodwill that would have been includable in core and risk-based capital.  Tr. 2373.  But as of March 30, 1990, Northeast had $70.3 million in qualifying goodwill in core and risk-based capital.  Tr. 2375-76; PX 124 at 0942, 0943.  That is less than the $90 million of goodwill that Northeast had left on its books after the March 1990 writedown.  Tr. 2374.  Similarly, in September 1992, Northeast was still able to include some goodwill in core and risk-based capital.  Tr. 2376-77.  However, after the September 1992 writeoff, there was only $1 million of goodwill remaining on the books, but Northeast could have included $38 million in core and risked-based capital in September 1992.  Tr. 2377-78; DX 244.  Consequently, Bankhead concluded that the elimination of goodwill did not cause the impairment of goodwill or require its writeoff.  Tr. 2379.

### Discussion

Northeast claims damages in three measures: lost profits, the cost of raising additional capital and incidental expenses related to the breach.  These components of Northeast's claimed damages fall under the rubric of expectancy damages -- the benefits Northeast could have obtained, in terms of profits earned and expenses saved, absent the breach.

"Contract remedies are designed to make the nonbreaching party whole.  One way to achieve that end is to give the nonbreaching party 'expectancy damages,' i.e., the benefits the nonbreaching party expected to receive in the absence of a breach."  CalFed Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005) (citing Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001)).  A plaintiff may recover expectancy damages, including lost profits, where: 1) the loss was the proximate result of the breach, 2) the loss was foreseeable at the time of the breach, and 3) the damages are shown with reasonable certainty.  La Van v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004); Astoria Fed. Sav. & Loan Assoc., 80 Fed. Cl. 65, 86 (2008) (citations omitted) rev'd on other grounds, (Fed. Cir. 2009); see also Citizens Fed. Bank, 474 F.3d 1314, 1318 (Fed. Cir. 2007).

The Federal Circuit has approved two different standards for causation in Winstar cases: the "but-for" test and the "substantial factor" test, explaining that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion."  Citizens Fed. Bank, 474 F.3d at 1318.  The Federal Circuit explained that the standard is comparable to that governing selection of an appropriate methodology for determining damages, which lies within the trial court's discretion."  Id.  As explained below, the Court chooses the "substantial factor" test in this case.

87

In order to demonstrate that the loss of profits was foreseeable, Plaintiff must establish that these damages follow "from the breach in the ordinary course of events," or "as the result of special circumstances, beyond the ordinary course of events" that the breaching party had reason to know. Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 351(2)); see So. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1334 (Fed. Cir. 2005). "Foreseeability 'requires only reason to foresee, not *actual* foresight.'" First Fed. Sav. & Loan Ass. of Rochester v. United States, 76 Fed. Cl. 106, 122 (2007) (quoting Anchor Sav. Bank, FSB, 59 Fed. Cl. at 146), aff'd, 290 Fed. Appx. 349 (Fed. Cir. 2008); see So. Cal. Fed., 422 F.3d at 1334 ("damages are recoverable provided they are actually foreseen or reasonably foreseeable" (emphasis added)).

Finally, Plaintiff's measure of damages must be "reasonably certain." CalFed Bank, 395 F.3d at 1267. If "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." Glendale Fed. Bank, FSB, 378 F.3d at 1313 (internal quotations omitted); see also Bluebonnet Sav. Bank, 266 F.3d at 1355 ("The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.").

## **Plaintiff Has Not Proven That FIRREA Proximately Caused Any of Its Claimed Damages**

Under Citizens Federal, this Court is permitted to choose either the "but-for" or "substantial factor" test in analyzing whether FIRREA caused Plaintiff's damages -- depending on the facts. 474 F.3d at 1318. Under the but-for standard, a plaintiff must prove that its damages were "directly and entirely" or "inevitably" caused by the breach. Id. Stated differently, a plaintiff must establish that the breach was the proximate cause of the damages with "no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage." LaVan, 382 F.3d at 1351 (quoting Myerle v. United States, 33 Ct. Cl 1, 27 (1897)).

To meet the substantial factor test, Plaintiff need not demonstrate that the breach was the sole cause of the loss, but must show that the breach "directly and primarily caused the lost profits." Columbia First Bank v. United States, 60 Fed. Cl. 97, 105 (2004); see also S. Cal. Fed. Sav. & Loan Ass'n, 422 F.3d at 1337 (affirming that the breach "was the principal cause of recapitalization and was the substantial factor in incurring higher costs of funds after the breach"); Am. Sav. Bank v. United States, 62 Fed. Cl. 6, 26 (2004) ("A breach is a 'substantial factor' causing the lost profits if it directly and primarily caused the injury."). Defendant urges the Court to apply the more stringent but-for test, while Plaintiff contends that the substantial factor test is appropriate.

The Court is persuaded that the "substantial factor" test is the proper standard here. Although Plaintiff claims that it would have earned profits had it not been for the enactment of FIRREA, there were a number of wholly independent internal and external economic factors at play during the timeframe Northeast is claiming losses -- Northeast's condition and MACRO rating of "4," just two months before FIRREA was enacted, its excessive exposure to interest rate risk, its lack of tangible capital and overly leveraged positions, the ramifications of Northeast's prior risky portfolio management strategy, the recession in the Northeast and California, the change in interstate banking

laws and non-FIRREA regulatory constraints. Courts have recognized that the substantial factor test is appropriate when Defendant asserts multiple causes for the claimed damages. See, e.g., Energy Capital v. United States, 47 Fed. Cl. 382, 395 (2000), aff'd in part and rev'd in part on other grounds, 474 F.3d 1314, 1319 (Fed. Cir. 2002) ("Because often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that 'the defendant's breach was a 'substantial factor' in causing the injury.'") (internal citations omitted).[77]  As such, this claim lends itself to an analytical framework assessing whether FIRREA was itself the primary or substantial factor which led to Northeast's failure to earn profits and incur costs during the timeframe in question.

## Lost Profits

Plaintiff is seeking $112,352,000 in profits it claims it would have earned had the Government honored its contract.  Plaintiff claims it lost profits because it was forced to shrink its asset base to achieve capital compliance when it could no longer count goodwill as regulatory capital.

Northeast claims that it shrank its assets in two phases.  Northeast alleges that the first shrink took place when it divested assets between the third quarter (July - September) of 1989, and second quarter (April - June ) of 1990.  PX 2017 at 2.  Between the end of the second quarter of 1990, to the end of the fourth quarter (June - December) of 1990, Northeast's tangible assets remained relatively stable.  PX 2016; PX 1585.[78]  The second shrink occurred during calendar year 1991.  Tr. 664.

## Northeast Would Have Reduced Its Assets in 1989-91 Even in the Absence of the Breach

Between February of 1987 and the end of 1988 -- some five years into contract performance and well before FIRREA was on the horizon and just when both parties expected Northeast to begin to turn a profit -- Northeast experienced poor earnings due to "fundamental flaws in the way the business was being operated."  Tr. 1470-71; PX 192.[79]  In the ROE for this time period, the regulators found Northeast to be in very serious trouble, in an "unsatisfactory condition," and assigned the thrift a MACRO rating of "4."  PX 192 at 1-1.3.  The regulators stated that, despite

---

[77]  As the Federal Circuit recognized in Citizens, that Court affirmed the Court of Federal Claims' award of lost profits in Energy Capital "without commenting specifically on the use of the substantial factor standard."  474 F.3d at 1319.

[78]  From June 30, 1990, to September 30, 1990, Northeast's assets grew from approximately $4.92 billion to $ 4.98 billion.  Its balance sheet then declined to $4.93 billion by December 31, 1990.  PX 1585.

[79]  In the viability study conducted by the regulators to assess Northeast's long-term prospects before they approved the mergers, the regulators projected that Northeast would operate at a loss for the first five years, but, beginning in the sixth year, would become profitable.  PX 1065 at 14.  As the mergers occurred in 1982, Northeast was expected to begin achieving profitability in 1988.

positive earnings reported in FYs 1986-1988, Northeast "fundamentally was and continues to be in a weakened condition. This was in large part brought about by a dwindling retail business generating capacity, a more heavily leveraged capital, and an unacknowledged, but greatly increased interest rate risk exposure." PX 192 at 1.1.  The report went on to say that the interest rate risk exposure "was masked by frequent reference to [a] one-year gap position that was misleading considering the hedges in place and other activities being conducted."  Id.

Further, as of December 1988, Northeast was insolvent on a tangible capital basis, which in Kovac's words meant the thrift was "broke."  Tr. 1484.  The ROE found that Northeast's capital level was "marginal" and that absent additional capital or reduced liabilities, Northeast would fail its capital requirement for the quarter ending March 31, 1990 -- even when FIRREA was not yet in the picture. PX 192 at 2.13 - 2.14.

The December 12, 1988 ROE expressly stated that Northeast "must also contend with the probability of generating little or no earnings for at least the next one to two years.  There exists, therefore, a strong need to shrink assets and for the recently hired new CEO, George Rutland to establish a basis for adequate future profitability in an extremely competitive New England banking environment." PX 192 at 1 (emphasis added).  Examiner-in-charge Kovac credibly testified that none of the findings in this report of examination were impacted in any way by FIRREA because FIRREA had not yet passed and he had no knowledge of what the provisions of FIRREA were going to be when this ROE was prepared.  Tr. 1456.  As such, this "strong need to shrink" -- in April 1989 when the ROE was finalized -- was not primarily caused by FIRREA.  Rather, the need to shrink at this point in time was primarily driven by the regulators' concerns about Northeast's poor performance, high interest rate risk exposure and overly leveraged capital position.  In their June 1989 letter transmitting the December 1988 ROE to Northeast, the regulators informed Northeast that "[o]f paramount importance now is the necessity to restructure your balance sheet by reducing the dependency on wholesale sources and uses of funds and establishing a stronger retail orientation for your institution."  Tr. 1497.  Kovac testified that this was based on his findings, and "it is telling management that they need to get rid of the RCA program and develop a retail bank."  Id.

On July 6, 1989, Northeast responded to the regulators stating that it was planning to shrink to $5.8 billion by December 31, 1989, and $5.4 billion by December 31, 1990, with all of its goodwill intact.  PX 211 at 19.  As examiner-in-charge Kovac testified, before the passage of FIRREA the thrift was planning to shrink its asset size to $5.4 billion for calendar year 1990, even with the inclusion of goodwill in regulatory capital.  Tr. 1502-03.  Mr. Kovac explained how this shrinkage would help Northeast meet its pre-FIRREA capital requirements:

> It would improve [its capital/asset] ratio by reducing leveraging and hopefully by the elimination of wholesale assets that pose greater interest and credit rate risk.  The downsizing in and of itself reduces the impact of interest rate risk and credit risk.
>
> . . . .

90

> Q.       From a regulatory standpoint, how, if at all, was this impact on tangible capital important?
>
> A.       Tangible capital did not include goodwill.  And we had a concern about the level of tangible capital in comparison to the amount of leveraging, in comparison to the degree of interest rate risk and credit risk that had been assumed.
>
> So the goodwill was not a factor in that consideration.

Tr. 1503-04.  Just before Northeast responded to the regulators, as of June 30, 1989, Northeast had already shrunk its assets to $7.8 billion or $7.2 billion counting asset sales commitments which would settle in July or August of that year.  PX 211 at 2.14A.  Northeast shrank to $5 billion on March 31, 1990.

Plaintiff contends that the December 1988 Business Plan establishes that Northeast would have held the size of its balance sheet constant maintaining assets of just over $8 billion through 1989.  Pl.'s Br. at 20.  Further, the linchpin of Plaintiff's damages claim is that absent the breach, Northeast would have shrunk no further than $6.7 billion in tangible assets throughout the claimed damages period.  Id. at 23.  While the December 1988 Business Plan did indicate that Northeast wanted to maintain its balance sheet at $8 billion, this document was not, on its face or in the context of the record as a whole, a demonstrably reliable benchmark for predicting Northeast's performance during the damages period.  PX 146 at 2.  There were, according to the testimony, numerous Northeast business plans, with numerous iterations.[80]  Moreover, the premise that the thrift would hold its balance sheet constant until FIRREA forced it to shrink was squarely contradicted by the December 12, 1988 ROE, and Kovac's testimony that Northeast had to shrink before and independent of FIRREA, as well as by Northeast's response to this ROE which promised shrinkage even counting the goodwill forbearance.

During the timeframe encompassed by the December 12, 1988 ROE, February 1987 - December 1988, there was a flurry of activity at Northeast which reflected Northeast's volatile condition and the regulators' growing concern -- all well before and independent of FIRREA.  PX 192.  On September 21, 1987, the regulators conducted a special examination of Northeast because of its significant reorganization, and noted a concern both with increased RCA activities and Northeast's failure to properly report those RCA activities to the Board of Directors.  DX 225 at 2.

On April 15, 1988, Northeast's Board of Directors held a special meeting because a potential acquirer of Northeast had soured on the deal because the amount of goodwill on the balance sheet

---

[80]  Plaintiff's claim that Northeast's May 1989 revised business plan is not an authoritative reliable statement of Northeast's policy illustrates this evidentiary problem.  Pl.'s Br. at 25.  So too, there is a July 1989 Business Plan appended to Northeast's response to the December 1988 ROE, which Plaintiff ignores.  Plaintiff has not provided convincing evidence as to why the December 1988 Business Plan is authoritative while other plans such as the May and July 1989 plans are not.

and the need to dismantle the RCA portfolio caused pricing problems.  DX 334.  Northeast's then-CEO Dixon said that for its future strategic direction the thrift needed to reduce goodwill and increase tangible net worth.  Id. at 1.

In July 1988, the Board hired Rutland as Northeast's new CEO in part as a result of deteriorating conditions, higher interest rate risk exposure, and the thrift's RCA mismatch problem.  PX 192 at 2.1 - 2.2.

At Northeast's July 22, 1988 shareholder meeting, Rutland noted that the faster Northeast's goodwill could be written off, the greater its tangible net worth would be, and identified the decline in Northeast's interest income margin as his immediate priority over the near term.  DX 513 at 17, DX 341.[81]

On July 28, 1988, the regulators called a meeting with Northeast's new management, where Rutland admitted that he shared the regulators' concerns about Northeast's past strategy, expressed his intention to make major changes to that strategy, and identified one alternative he was considering as "unwinding the money market operation which will shrink the bank by billions of dollars."  PX 1146 at 2.

In July 1988, Rutland commissioned Kaplan Smith to assess Northeast and evaluate strategic options as he was concerned about the impact of sharp increases in interest rates on the business strategy of Northeast.  DX 3341 at 1.  In September 1988, the Board, after considering the various options Kaplan Smith presented and upon Rutland's recommendation, approved moving forward with a branch sale of $2 billion, the sale of wholesale assets equal to that amount, and the continued sale of wholesale assets replaced by mortgage loans.  Tr. 2217; PX 250 at 3-4.  However, on October 20, 1988, the regulators would not support this restructuring proposal because it entailed selling the most valuable part of the bank -- the New York branches.  PX 1156.

When the regulators vetoed a sale of branches, Rutland threatened to resign until he was placated by the possibility that the regulators would approve a more measured approach.  Id.  Rutland's attempt to effect a radical sell-off highlights how far he was willing to go to unwind wholesale assets and reduce the size of the bank pre-FIRREA.  So too, in its Financial Management Committee Meeting Minutes dated March 17, 1989, Northeast projected that it might shrink to $5.2 billion by December 31, 1992, with all of its goodwill intact to comply with the pre-FIRREA FHLBB proposed risk-based capital requirement.  DX 509 at 1-2.

There is no indication in the record that either the regulators or Northeast's management retreated from their determination prior to FIRREA that Northeast would be required to shrink to improve its performance as reflected in the December 1988 ROE.  Plaintiff relies heavily on the fact that Northeast's December 1988 Business Plan stated an intention to keep the balance sheet constant but ignores the fact that this Business Plan was prepared before the end of December 1988 -- the

---

[81] Northeast's net interest income margin had declined from 1.778% to 1.3% between June 1987 and June 1988.  DX 513 at 17.

cutoff date of the data on which the ROE was premised and before the ensuing flurry of activity to remedy the regulators' concerns.

In sum, the evidence shows that before FIRREA was passed Northeast was contemplating shrinking and had decided to shrink in reaction to the regulators' insistence that Northeast raise its tangible capital levels. Plaintiff has not established that FIRREA primarily spurred this shrink, given the regulators' concerns together with Rutland's stated intentions. As such, the Court finds that Plaintiff failed to demonstrate that Northeast's decision to shrink was primarily caused by FIRREA.

Plaintiff argues that in calendar year 1991, Northeast was forced to shrink again for two reasons; 1) the regulators' acceleration of FIRREA's phase-out schedule for supervisory goodwill and its inability to count goodwill once it was in capital compliance, and 2) FDICIA's heightened capital ratio requirements.

During calendar year 1991, Plaintiff shrank from $4.933 billion on December 31, 1990, to $3.736 billion on December 31, 1991. PX 2017 at 2; PX 1585 at 1. The amount of supervisory goodwill that Northeast could count towards its core capital requirement was reduced from 1.5% to 1.0% as of January 1, 1992, and eventually to zero percent by January 1, 1995. Despite this, Northeast argues that the regulators imposed an accelerated "fully phased-in" compliance policy. Id. at 66-67. At the outset, the record does not establish that the regulators required accelerated compliance. Plaintiff goes on to argue that the regulators prohibited a thrift from relying on supervisory goodwill to support its level of assets once a thrift met its fully phased-in tangible, core, and risk-based capital requirements, even if the thrift was otherwise entitled to rely on the supervisory goodwill under FIRREA's phase-in schedule. According to Plaintiff, its attaining "fully phased-in" compliance was part of the reason Northeast undertook the 1991 shrink. PX 10 at 6-7; PX 195 at 14.

Northeast's theory that it was required to shrink its assets in 1991 because of OTS' policy with regard to thrifts that had reached their fully-phased in capital requirements is belied by the OTS policy itself. As set forth in Regulatory Bulletin 3a-1, and as characterized in Northeast's 10-Ks and the Kaplan report on Northeast's 1992 writedown of goodwill, OTS' policy only prohibited Northeast from growing its assets if such growth would cause it to fall below its fully phased-in capital requirements. Northeast was not prohibited from including goodwill in regulatory capital during the phase-out period to support its asset size through December 31, 1994. See PX 24 at 117 ("Northeast may not grow its assets if such growth would cause it to fall below its fully phased-in capital requirements."). As Bankhead testified, "[Northeast] could use [goodwill], for instance, if - - for some unforeseen loss it incurred that dropped it below fully phased-in, then it could use the goodwill still to meet capital standards in existence at that time." Tr. 3037. Plaintiff has failed to link this supposed, constructed "loss" of goodwill with its 1991 shrink.

In addition, Plaintiff cited the Federal Deposit Insurance Corporation Improvement Act's ("FDICIA") new minimum core capital requirement as a reason for the 1991 shrink. Increases to the regulatory capital requirements were proposed in early 1991, and ultimately became FDICIA, which was enacted in November 1991 and became effective in December 1992. Pub. L. No. No.

102-242. FDICIA created new categories of capital compliance: "undercapitalized," "adequately capitalized," and "well capitalized." If a thrift was not "adequately capitalized," it would be subject to various penalties. Although there was no penalty for falling below the "well capitalized" threshold, there were benefits for being "well capitalized," including reduced insurance premiums, more leeway from the regulators, and greater willingness from the financial markets to lend it money. 12 C.F.R. § 565.4 (1993); Tr. 629-30. In order to be "adequately capitalized," a thrift had to maintain a core capital ratio of at least 4% and a risk-based capital ratio of at least 8%. Tr. 628. In order to be "well capitalized," a thrift had to maintain a core capital ratio of at least 5% and a risk-based capital ratio of at least 10%. Id.

However, Northeast has not explained why the phase-out of goodwill as opposed to FDICIA's new core capital requirement was the substantial factor for its 1991 shrink. The elimination of supervisory goodwill constituted the breach -- not heightened capital requirements imposed as a result of FDICIA. Absent the breach, Northeast still would have had to meet FDICIA's capital requirements -- the breach prevented Northeast from using supervisory goodwill to meet them.

Northeast's own statements indicate that the 1991 shrink primarily resulted from an increase in core capital requirements under FDICIA -- not the inability to count goodwill toward these requirements. For example, in its 1991 business review, Northeast stated that "the most significant factor contributing to [its] lackluster results [was] the downsizing necessitated by the new minimum core capital requirement of 4.00% [pursuant to FDICIA]. Based on a 3.00% core capital requirement, the previous plan projected that the Company's average asset size for fiscal year 1992 will be $5.4 billion. The current plan projects that the average asset size for fiscal year 1992 will be $4.1 billion." PX 161 at 0057; see also PX 11 at 4; Tr. 317.

Similarly, according to a May 14, 1991 memo from the regulators recounting a quarterly meeting between the regulators and Northeast's management, Northeast was shrinking to meet a new proposed 4% core capital requirement published on April 21, 1991, and prompted by FDICIA. PX 1318; see also Tr. 3261-62. What Plaintiff failed to demonstrate is how if at all the phase-out of goodwill as opposed to FDICIA's core capital requirement was a substantial factor causing the 1991 shrink.[82]

The Court recognizes that once FIRREA passed, Northeast did represent that it was shrinking due to FIRREA in its Capital Plan and ensuing Business Plans and other public documents, and that Prof. Fischel -- without analyzing Northeast's history -- testified that, in general, FIRREA caused institutions to shrink to improve their capital ratios. However, these statements do not alter the fact that prior to FIRREA the bank and its regulators recognized that shrinking was a good tack for Northeast for reasons other than FIRREA. Northeast's history, the 1988 ROE, and Northeast's statements that FIRREA did not require a change in its business strategy -- which had just been

---

[82] Moreover, during the 1991 shrink, Northeast disposed of $8.9 million in CMO residuals and $3.4 million in high-yield bonds. PX 1318 at 2. These were highly risky assets that were relics of Northeast's old risk arbitrage business that Northeast wanted to get rid of, even absent the breach.

changed by Rutland -- persuade the Court that while FIRREA was one of several contributing factors to the bank's ongoing shrinkage strategy, it was neither the initiating factor nor the primary factor.

### Northeast Has Not Demonstrated That FIRREA Harmed It

Underlying Northeast's lost profits claim is the assumption that counting goodwill as regulatory capital was so valuable that its phase-out must have caused significant damage. However, the Federal Circuit has held that a <u>Winstar</u> plaintiff's loss of over a quarter of a billion dollars in contractually guaranteed regulatory capital did not in itself constitute proof of damage. <u>Granite Mgmt. Co. v. United States</u>, 416 F.3d 1373, 1383 (Fed. Cir. 2005). Rather, the Court in <u>Granite Management</u> required an "actual factual basis," for any damages claim. <u>Id.</u> On remand, this Court held that Granite failed to prove any damage and specifically rejected the notion that goodwill is always valuable. <u>Granite Mgmt. Co. v. United States</u>, 74 Fed. Cl. 155, 164-67 (2006). Indeed, the <u>Granite</u> Court found that, in the context of that case, goodwill was "an unnecessary and likely useless asset that amortized and would therefore, be an expense." <u>Granite</u>, 74 Fed. Cl. at 166.

In <u>CalFed</u>, the Federal Circuit approved the trial court's reliance on Prof. Fischel's testimony that the notion that "leverage creates wealth" is a fallacy. 395 F.3d at 1271. Prof. Fischel's testimony, along with other evidence, led the <u>CalFed</u> court to uphold the trial court's finding that the plaintiff had not met its burden on the issue of causation. <u>Id.</u> at 1272-73. Here, in a similar vein, Prof. Fischel questioned Dr. Baxter's statement that Northeast would not have reduced its size in the absence of the breach because reducing its size was "not something they wanted to do because of the earning power of leverage." Tr. 1906 (quoting Tr. 630-31). This statement, according to Prof. Fischel, is a "fundamental economic error" as "there is no inherent earnings power associated with leverage." <u>Id.</u> 1907. Further, as Mr. Bankhead persuasively testified, Northeast would likely have written off the vast majority of its goodwill even in the absence of the breach by September 1992, making it impossible for Northeast to obtain any measurable earnings predicated upon the leveraging of supervisory goodwill. Tr. 2363-64.

So too, shrinkage is not tantamount to damage or harm. As the Federal Circuit has recognized, shrinkage does not equate with harm and can actually help improve a thrift's performance. <u>Glendale</u>, 239 F.3d at 1378. The Federal Circuit determined that Glendale "reduced its losses" by shrinking to meet capital requirements. Similarly, the COFC, in a decision affirmed by the Federal Circuit, held that, "[i]f loss of supervisory goodwill forced plaintiff to 'shrink the bank' to improve its capital ratios, or to raise capital, the bank was not harmed by the process." <u>CalFed</u>, 54 Fed. Cl. at 706, <u>aff'd</u> 395 F.3d 1263 (Fed. Cir. 2005). The <u>CalFed</u> court explained that "Congress required plaintiff to remove from its books an accounting entry and to replace it with tangible capital. All of the new capital went into the bank, and the bank benefitted." <u>Id.</u> at 716. "Through shrinkage, the bank reduced its exposure to severe losses during a serious recession." <u>Id.</u> at 717.

Even if FIRREA caused Northeast to shrink its assets more than it would have in response to the regulators' concerns and its new management's mission to unwind the wholesale portfolio, Plaintiff has not demonstrated either that the shrink caused Northeast harm by weakening its

condition or that the shrink caused lost profits in any reasonably ascertainable amount.  Indeed, largely due to its outstanding management, as well as close oversight by the regulators, Northeast fared better after FIRREA than it had before.[83]

Although contemporaneous documents from the regulators reflect a loss of interest income as a result of the shrink, there was a concomitant gain in net interest income as a result of cost control, reduction in risk, and the change from wholesale to retail banking.  PX 195 at 14.  Given the improvement in net interest income from 1989 to 1991, as a result (in part) of reducing expenses and the thrift's risk profile, there was an actual improvement in the financial condition of the bank during the immediate post-FIRREA time period.

Indeed, the regulators found that Northeast was in a financially improved state as a result of the asset shrink.  After Northeast shrank its balance sheet, the regulators in the May 1990 ROE -- the first examination undertaken since the massive December 12, 1988 examination -- found that "[u]nder the leadership of George Rutland, CEO and Chairman of the Board, this institution has had marked improvement since the previous examination.  Compliance with regulatory capital requirements has recently been achieved through formation of a holding company, significant asset shrinkage and changes in balance sheet composition." PX 194 at 1.  The regulators increased Northeast's MACRO rating from the "4" it had received before the breach in December of 1988, to a "3" after the breach.  Id. at 1.1.  Although regulator Ford Peckham stated that Northeast "had the proverbial rug pulled out from under them by FIRREA" as a result of not being able to count goodwill towards regulatory capital, and Ralph Gridley, former Deputy Regional Director of OTS in Boston, agreed with this statement, Gridley also said that FIRREA's new capital requirements "might have saved them."  DX 207 at 1; Gridley Dep. at 38-39.  Kovac, who was Northeast's primary examiner, testified that he did not believe that the breaching provisions of FIRREA damaged Northeast at all, instead explaining that FIRREA "present[ed]" a challenge to Northeast, because it "faced significant restrictions apart from removing goodwill.  They had a very low level of tangible, positive tangible capital under GAAP.  And that would have . . . been a constraint in the courses of action they could have pursued, regardless of whether goodwill was counted or not."  Tr. 1706-07.  In short, the totality of the testimony of the regulators indicates that the asset shrink was likely beneficial rather than damaging to Northeast.

---

[83]  It is noteworthy that Northeast admitted that if its plans were approved, Northeast would be able to meet FIRREA's new capital requirements with "minimal cost to the association."  Id. at 1-7.  The regulators' May 1990 ROE stated that Northeast met its regulatory capital requirement when it formed its holding company, Northeast Federal, and that the phase-out of goodwill would only become meaningful to Northeast on December 31, 1991, when Northeast might not meet the capital requirements.  PX 194 at 1, 2.9.  So too, in Northeast's Business Review of August 2, 1991, Northeast recited as a major accomplishment that it "[s]uccessfully anticipated the change in thrift capital requirements and brought the company into capital compliance within 7 months of the implementation of FIRREA standards."  PX 161 at 2.

Moreover, a key impact of the breaching provisions of FIRREA on Northeast was the inability of Northeast to count its FSLIC cumulative preferred stock towards regulatory capital. Northeast admittedly is not seeking any damages related to this aspect of the breach. Nonetheless, this step it took to mitigate losses -- its capital restructuring -- also improved the institution. As stated in its January 8, 1990 Capital Plan, Northeast readily mitigated this aspect of the breach by changing its capital structure -- creating a holding company that enabled Northeast to exchange the cumulative preferred stock for preferred stock of the holding company, dollar for dollar, and to downstream the equity from the holding company's preferred stock to the thrift in the form of common stock. PX 173 at 1-6. Such stock increased the capital on Northeast's books and enabled Northeast to meet its new capital regulatory requirements in short order.

Plaintiff points out that the Court of Federal Claims has, in other cases, granted lost profits for a breach-induced shrink, e.g., Globe Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330 (2005); Commercial Fed. Bank v. United States, 59 Fed. Cl. 338 (2004), aff'd without opinion, 2005 LEXIS 6802 (Fed. Cir. 2005), and LaSalle Talman Bank F.S.B. v. United States, 64 Fed. Cl. 90, 106 (2005), aff'd in part and vacated in part on other grounds, 462 F.3d 1331 (Fed. Cir. 2006). However, in none of these cases were there findings, as there are here, that both the thrift management and the regulators recognized that the thrift was overly leveraged and needed desperately to reduce the balance sheet to increase tangible capital prior to, and for reasons unrelated to, the breach. In particular, in Globe, the thrift, prior to the breach, engaged in RCA activities, but unlike Northeast, did so in a manner that effectively minimized credit and interest rate risk, and the regulators gave the thrift a MACRO rating of "1" on the eve of the breach. Globe, 65 Fed. Cl. at 338-40. Similarly, in Commercial Federal, the thrift had a MACRO rating of "2" prior to the breach and was otherwise in sound shape. Commercial Federal, 59 Fed Cl. at 342-43.

Northeast Would Likely Have Written Off Its Goodwill in the Absence of the Breach

Under APB Opinion No. 17, a GAAP standard for the valuation of intangible assets, Northeast's management was required to continually evaluate the "value and future benefits of an intangible asset." This standard further provided that the "[e]stimation of value and future benefits of an intangible asset may indicate that the unamortized cost should be reduced significantly by a deduction in determining net income." PX 668. Consistent with this standard, Northeast wrote off $109.4 million in goodwill from its books in March 1990, and $57 million in goodwill in September 1992. Northeast cited a number of reasons for the write-offs, including, among others, the breaching provisions of FIRREA, changes in interstate banking laws that opened up multi-state branch banking in Massachusetts and Connecticut to competitors thereby decreasing the competitive advantage of Northeast's unique multi-state branch franchise, and deteriorating conditions in the economy and the real estate economy in particular.

While Northeast's public documents state that the breaching provisions were the primary factor driving Northeast to consider the write-off of goodwill, and Walters testified at trial in hindsight that he "did not think" Northeast would have written off its goodwill in the absence of the breach, the record and persuasive expert testimony indicated that it is more likely that Northeast would have written off its goodwill absent the breach. In conjunction with its valuation of the

Connecticut and Massachusetts branches, Kaplan Smith projected earnings of $68.0 million in FY 1993 through FY 2007.  PX 68 at 3079; Tr. 2360.  In order for the but-for thrift to justify keeping $200 million in goodwill on its books, the value of the goodwill would have to be justified by the future earnings of the thrift.  However, the $68 million of earnings each year exceeded the earnings of Baxter's but-for bank.  Tr. 2361.  As Bankhead explained, "[i]f it took $68 million of institution earnings to support a $90 million balance in goodwill, then to support a higher balance in goodwill, such as a $200 million balance, would have taken twice as much in earnings.  Considering that Dr. Baxter's but-for Northeast's [annual earnings] were less than the $68 million, but-for Northeast would have been required to write off the goodwill also."  Tr. 2361.[84]

In addition, the valuation and subsequent write-down of Northeast's goodwill in September 1992, was based upon the estimated market value of the premium of Northeast's retail deposits -- which was  unrelated to the phase-out of supervisory goodwill or the earnings that Northeast argues it would have made in the absence of the breach.  PX 69.  As Bankhead testified, "Northeast's deposit base didn't have anything to do with the inability to include goodwill in regulatory capital."  Tr. 2371.[85]

Finally, the Court is not convinced by Northeast's argument that the phase out of goodwill for regulatory purposes caused the impairment and writeoff of Northeast's goodwill.  As Bankhead pointed out, Northeast's treatment of its goodwill in March 1990 and September 1992 belie this argument.  In March 1990, Northeast wrote off $109 million of goodwill, which left it with $90 million on its books.  Tr. 2374.  Northeast's March 1990 thrift financial report demonstrated that Northeast included $73 million of goodwill in its core- and risk-based capital.  PX 124; Tr. 2374-76. The Court agrees that, had the breach caused an impairment of goodwill, Northeast would have either written off all of its goodwill, or included only the $73 million in qualifying goodwill.  Tr.

_____

[84]  Plaintiff emphasizes that Ralph Gridley, the Deputy Regional Director of OTS in Boston, testified in his deposition that the breach caused Northeast to write off its goodwill, Gridley Dep. 148-49.  However, even if Gridley's testimony could be accepted as an opinion that the breach was the sole reason for the write-off, it is contradicted by Northeast's annual reports and 10-Ks, as well as by the Kaplan Smith June 11, 1990 valuation report.

[85]  Bankhead also observed that there were at least eight factors set forth by Kaplan Associates that caused Northeast to conclude that its goodwill was impaired.  PX 4029.  Only one of the factors, "the enactment of FDCIA and the promulgation of various capital regulations . . . pertaining to FIRREA and FDICIA," would have been impacted by the elimination of goodwill from regulatory capital at this date as related to Northeast.  Tr. 2368.  As Bankhead observed, Kaplan Associates cited as its lead "Key Factor[] Affecting Remaining Value Of Franchise Rights": "the collapse in franchise values brought about through the efforts of the FDIC and RTC to rapidly liquidate hundreds of banks and thrifts during the deepest and longest real estate recession since the Great Depression has led Northeast to continually adjust the scope of its operations.  As a result, Northeast has had to shrink its operating base substantially, reducing its assets by half."  PX 69 at I-4.  As Bankhead stated, Northeast's ability to count goodwill towards regulatory capital was totally unrelated to the collapse of franchise value in the real estate market.  Tr. 2370.

98

2376.  In addition, in September 1992, Northeast could have included $38 million of qualifying goodwill in its core- and risk-based capital, but Northeast chose to write off all but $1 million.  Tr. 2377; DX 244.  As Bankhead opined, had the breach caused the September 1992 write-off, Northeast would likely have kept $38 million in qualifying supervisory goodwill on its books, but Northeast did not.  This behavior reinforces the conclusion that the write-off of Northeast's goodwill was primarily due to non-breach factors.

## Dr. Baxter's Opinion Did Not Provide a Reliable Model For Proving That Northeast Would Have Lost Profits in a Non-breach World

In assessing Dr. Baxter's opinion on lost profits, this Court is mindful that it is difficult for a Winstar plaintiff to prevail on a lost profits claim because of the formidable hurdle of establishing what the thrift's performance would have been in a hypothetical non-breach scenario.  As the Federal Circuit observed: "given the speculative nature of such a damages claim, . . . experience suggests that it is largely a waste of time and effort to attempt to prove such damages" in a Winstar-related case.  Glendale Fed. Bank, F.S.B., v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); accord Old Stone Corp. v. United States, 450 F.3d 1360, 1377 (Fed. Cir. 2006); Fifth Third Bank v. United States, 402 F.3d 1221, 1237 (Fed. Cir. 2005); see Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996).

The need to speculate about Northeast's performance in a non-breach world is heightened by the fact that at the time FIRREA was passed, Northeast was in the throes of transition and its future course was to be dictated by new management with substantial input from the regulators.  Given its recent MACRO rating of "4," its need to change radically its method of operation entailing a transition from wholesale to retail, its need to come clean with its interest rate risk hedging activities, which had been inaccurately reported and hidden from the Board, its need to come to grips with its high interest rate risk exposure, and its need to stop leveraging and increase tangible capital, Northeast had a significant challenge wholly independent of FIRREA.  These major internal problems were sufficiently daunting for Northeast's profitability prospects without taking into account the barrage of non-FIRREA external obstacles that confronted Northeast during the damages period such as rising interest rates, the recession in the Northeast and in California, the passage of the Connecticut Interstate Banking Law, deteriorating conditions in the New England banking industry, and the collapse in franchise values.

Against the well-documented backdrop of this thrift's challenges both prior to FIRREA and during the damages period, the notion that FIRREA's removal of goodwill from regulatory capital was the "substantial factor" causing Northeast to lose some $112 million in potential profits is dubious.  Northeast's expert's opinion on damages did not assuage this overarching doubt about Northeast's potential for profits.

## Dr. Baxter's Model Relies on Speculative Assumptions

Dr. Baxter opined that Northeast would have earned profits in the amount of $73.221 million from the assets that Northeast divested and $39.131 million from assets Northeast would have

acquired as assets ran off Northeast's books.  PX 2062.  Dr. Baxter's model, assumes that, from the third quarter of 1989, through March 1995, the but-for Northeast would have followed the December 1988 Business Plan.  Dr. Baxter explained that Northeast would have kept the size of the bank constant, at least $6.7 billion until the sale of the California assets in 1994.

However, the assumptions upon which Baxter's model relies suffer from numerous infirmities.  First, the December 1988 Business Plan purports to be a business plan for a single year -- 1989, and its financial projections do not go farther than the end of calendar year 1989.  PX 146 at 1, 4.  Given that there were numerous revisions to the Business Plan, it is likely that the but-for Northeast would have made changes to the business plan to account for changes in the regulatory and economic environment during or after 1989, as Northeast actually did prior to the breach (including plans to shrink while assuming the inclusion of supervisory goodwill towards regulatory capital and changes to the interest rate risk policy).

Second, Dr. Baxter, relying on the December 1988 Business Plan, assumes that Northeast could have continued purchasing wholesale assets funded by wholesale liabilities or engage in RCA activities, that the regulators, subsequent to adverse findings of the December 12, 1988 examination, were highly unlikely to permit Northeast to continue.  Kovac testified that "we wanted [Northeast] to get out of [RCA] as quickly as possible, without causing a threat to capital, . . . they would not have been permitted to loiter in the RCA program and let it hang around.  We wanted it closed out."  Tr. 1489.  Kovac's testimony was corroborated by Ralph Gridley who stated that the shrinking of Northeast "helped it to survive" because "if they had stayed with all of the assets that they had originally, when they were at about $9 billion, they'd have tanked."  Gridley Dep. at 18.  Gridley stated that Northeast would have not survived "because the assets stunk."  Id.  Such assets included "[h]igh risk [assets].  Junk bonds for one.  They had some . . . repos and some other stuff that was just dangerous stuff for them to have on the balance sheet."  Id.  Such assets had "interest rate risk dangers."  Id. at 19. Moreover, Dr. Baxter conceded on cross-examination that he did not know whether the regulators would have permitted Northeast to continue an RCA strategy.  Tr. 893.

Third, Dr. Baxter's model presumes that Northeast, but for the breach, would have maintained the interest rate risk policy contained in the December 1988 Business Plan, in which the thrift would tolerate a one-year gap of +/- 20% of total assets.  However, the record shows that, in reaction to TB13, and a desire to decrease its exposure to interest rate risk, Northeast adopted a new interest rate risk policy on June 16, 1989.  The new interest rate risk policy was based on acceptable limits of change in net asset values and net interest income.  In particular, the interest rate risk policy highlighted the interest rate risk of the pricing characteristics of originated or purchased loans relative to the company's liability base as the "single largest potential source of interest rate risk."  PX 560 at 7.  To manage such risk, Northeast would "originate adjustable rate loans which provide for the highest degree of adjustability as required by the funding base and as permitted by the market."  Id.; see also PX 21.

While Northeast had a policy of reducing its interest rate risk, Dr. Baxter's foregone assets had far greater interest rate risk than did the actual bank.  Tr. 922-23, 931-33.  The regulators in the December 12, 1988 ROE criticized Northeast's high interest rate risk, and would not likely have

permitted Northeast to have a portfolio with the kind of high interest rate risk allowed in Dr. Baxter's model.  The regulators found that Northeast's one-year gap policy, a policy which was assumed by the December 1988 Business Plan, was inappropriate.   As the regulators commented: "Management's interest rate risk policy, which largely focuses upon the one year 'gap' measure as an indicator of the degree of risk, is considered to be overly simplistic and inadequate as a guide to decision making and performance evaluation for [Northeast]."  Id.  The regulators also found that the interest rate risk profile was responsible for serious unrealized losses in the amount of $127.8 million in the wholesale portfolio, which could not be unwound without destroying the tangible base of the thrift.  Tr. 1493.

In Glendale, then Chief Judge Smith rejected a lost profits model by Dr. Baxter in which the foregone asset portfolio would have had greater interest rate risk than the bank actually took. Glendale, 43 Fed. Cl. at 401 n.3.   Chief Judge Smith explained:

> [W]hile there was much testimony about whether Glendale's model exposed it to interest rate risk levels beyond those that its board, or regulators, would have permitted, and the evidence on that point was inconclusive, it is indisputable that the foregone portfolio would have entailed far greater interest rate risk than the bank otherwise was taking. . . .  This raises some questions about whether Dr. Baxter's model adequately reflects what Glendale would have done with the foregone assets absent the breach. In the end, Glendale's model is premised upon the acquisition of low credit risk assets and the ability to accurately manage high interest rate risks. This kind of management, of course, is largely, if not exclusively, related to the ability to forecast interest rate movements. While the court has no doubt that Glendale would have been involved in this type of interest rate risk-taking, it is difficult to believe that its entire investment approach would be predicated on such a policy.

Id.

These same concerns that then Chief Judge Smith cogently articulated with respect to Dr. Baxter's model in Glendale pertain here. As Mr. Bankhead observed, the actual bank was deliberately structured with a positive gap to eliminate the risk of rising interest rates, in contrast to Dr. Baxter's but-for bank which reversed the desire of management and created a negatively gapped wholesale portfolio in most time periods.  As Bankhead testified: "I keep emphasizing that the bank's actual [gap position] was positive for a reason.  Management intended it that way.  They structured their portfolio to protect themselves from rising interest rates.  This, the portfolio that Dr. Baxter structures reverses that effectively."  Tr. 2180.  So too, Prof. Fischel explained that Dr. Baxter's assumption that Northeast would have planned for interest rates to fall in the non-breach world was inconsistent with Northeast's behavior in the real world, where it was predicting and planning for an increase in interest rates. Tr. 1865-66. As Bankhead recognized, in its May 17, 1991 Business Plan for the years up to the fiscal years ended 1992, 1993, and 1994, Northeast projected

101

that its interest rates would have gradually increased.  DX 192 at 62-63; Tr. 2191.  Similarly, in Northeast's three-year business plan, dated May 18, 1992, Northeast projected a general increase in interest rates through March 1995.  DX 199 at 78-79; Tr. 2191-92; see also PX 23; Tr. 2194-95.

Even assuming that the size of Northeast was larger, the Court is persuaded by Bankhead's opinion that Northeast would likely have continued to match as closely as possible the repricing characteristics of the assets and liabilities, and would not have held a portfolio of assets and liabilities that would have increased its interest rate risk over that of the actual bank.  In a similar vein, the Court is persuaded by Prof. Fischel's testimony that Dr. Baxter's lost profits calculations "assume[d] a massive bet [on] interest rates," an assumption that regulators had criticized, and Northeast's own management said was "impermissible."  Tr. 1865.

In addition, Dr. Baxter's lost profits model assumes that Northeast's foregone wholesale assets would not have incurred any credit losses.  Tr. 952.  However, in the real world, Northeast incurred "exceptionally high levels of foreclosures and charge-offs" in 1993 alone.  DX 203 at 3.  As Prof. Fischel explained, Dr. Baxter improperly assumed that there would be no additional credit losses associated with the additional assets, "notwithstanding the completely contrary experience of the bank in the real world."  Tr. 1860.  When asked whether the credit risk and interest rate risk of the but-for bank would have been the same as the actual bank, Walters stated "[t]hat's speculation, I don't know."  Tr. 488.  While the Court is persuaded that but-for Northeast would have shrunk its wholesale assets, the Court finds that Dr. Baxter's assumption that the divested assets would have had no credit risk is unwarranted.

Moreover, Dr. Baxter's assumptions concerning the credit risk of but-for Northeast's replacement retail assets are likewise questionable.  In calculating the damages resulting from the spread of the profits from the replacement retail assets that but-for Northeast would have earned, Dr. Baxter used Northeast's actual wholesale spread during the damages period as a proxy for calculating the damages of its replacement retail assets because he could not predict precisely when and what volume of retail assets Northeast would generate.  Tr.  695-97, 884-86.  Dr. Baxter claims that a wholesale spread is a proper proxy for a retail spread because Northeast's wholesale portfolio was not as profitable as its retail portfolio over the damages period, thereby understating the lost profits that Northeast would have generated from its replacement retail assets.

According to Prof. Fischel, Dr. Baxter's focus on wholesale activities is inconsistent with Northeast's well-chronicled goals in the real world to become a retail bank, and to "de-emphasize wholesale activities."  Tr. 1844-50 (citing DX 990; DX 178 at 12-13; DX 179 at 14-15).  According to Prof. Fischel's analysis of Northeast's 1989 Business Plan, Northeast was planning to add approximately $283 million worth of retail assets, and projected a $292 million decrease in wholesale assets.  Tr. 1851; DX 3014; DX 178.  Similarly, Dr. Thakor took issue with Dr. Baxter's assumption that Northeast would have retained its wholesale portfolio in the but-for world.  Tr. 2515-16.

A problem with using the actual wholesale spreads as a proxy is that it does not necessarily follow that the replacement retail spread would have been larger than the actual wholesale spread.

During the damages period Northeast incurred severe loan losses in California and to a lesser extent in New England as a result of the early 1990s recession.  If but-for Northeast would not have shrunk its balance sheet and would have been able to count goodwill towards regulatory capital, thereby enabling it to leverage its goodwill and make additional loans in the California market, Northeast's losses in California could have been much more severe.

**Northeast's Claimed Damages for the Cost of Capital Associated with the DEPCO Transaction Are Neither Foreseeable Nor Reasonably Certain**

In addition to lost profits resulting from the shrink of the balance sheet, Plaintiff seeks expectancy damages for the cost of raising capital in connection with the acquisition of four Rhode Island credit unions from DEPCO.  Plaintiff argues that, but for the breach, Northeast would have had sufficient capital, and would not have needed to issue the preferred stock and warrants to DEPCO to acquire the credit unions.

Dr. Baxter calculated the net cost to Northeast of "the DEPCO preferred stock deal" as the difference between the cost of the $35.2 million that Northeast raised  -- i.e., the cost of paying dividends -- and what Northeast would have paid to "just rais[e] the money" based on its "actual cost of funds [that] . . .  varied from period to period." Tr. 740-42; PX 2049.  The earnings that Northeast made on the $35.2 million were subtracted from the net cost because "you have to account for the fact that you can earn money on the cash and you can't earn money on the supervisory goodwill." Tr. 742; PX 2049.  Dr. Baxter concluded that this "net dividend cost" for the DEPCO preferred stock was $6.681 million.  Tr. 742; PX 2049.

Dr. Baxter calculated the net cost to Northeast of the issuing DEPCO the warrants as the difference between the exercise price -- $2.50 for 600,000 shares and $4.25 for the remaining 200,000 shares -- and the market price on the date of issue, May 8, 1992 -- $6.625.  Tr. 746; PX 2050.  According to Dr. Baxter, because Northeast could have obtained current market value for these warrants, Northeast incurred a net cost of $2.95 million when it issued them to DEPCO at below-market values.  Tr. 746-48; PX 2050.

In order to demonstrate that its claimed expectancy damages associated with the DEPCO transaction were foreseeable, Northeast must establish that these damages follow from the breach of contract in the ordinary course of events or are the result of special circumstances that the party in breach had reason to know.  Landmark Land Co., 256 F.3d at 1378**.**

Following the Federal Circuit's logic in Old Stone and Fifth Third Bank, this Court analyzes foreseeability of the DEPCO capital costs and "the closely related requirement" that the breach be the proximate cause of the damages "under the rubric of foreseeability." Fifth Third Bank, 518 F.3d at 1376 ("'Because these two doctrines are not meaningfully distinct, at least in the context of the case before us, we analyze them under the rubric of foreseeability.'") (quoting Old Stone, 450 F.3d at 1375)).

With regard to foreseeability, there is an important distinction between a thrift's potential need to raise capital as a direct consequence of FIRREA's phase-out of supervisory goodwill, and a thrift's need to raise capital in order to effectuate a separate agreement with a third party in a post-FIRREA world.  In the former case, the need to raise capital has been held to be foreseeable.  E.g., Home Sav. of Am. v. United States, 399 F.3d 1341 (Fed. Cir. 2005).  In the latter case, however, the thrift bears a much more difficult burden -- it must establish a chain of causation and demonstrate that the extended chain of causation was foreseeable.  See Old Stone, 450 F.3d at 1376 (Fed. Cir. 2006)

Northeast argues that it was foreseeable, and that it was indeed foreseen, that "Northeast would raise capital" to "mitigate the loss of its supervisory goodwill."  Pl.'s Br. 50.  Northeast further asserts that it was "not only foreseeable but was known . . .  that regulatory capital was needed to support a thrift's assets, including assets acquired through acquisitions of financial institutions."  Pl.'s Post-Trial Reply Br. 57, Feb. 20, 2007 ("Pl.'s Reply Br.").  Northeast cites Citizens Federal Bank v. United States, 474 F.3d 1314, 1321 (Fed. Cir. 2007), to support its position that "Northeast need prove only that it was foreseeable that Northeast would have to raise capital as a result of the breach."  Pl.'s Reply Br. 57.

In Citizens, the Federal Circuit affirmed the Court of Federal Claims' finding that "'it was foreseeable at the time of the contract that Citizens would have to replace the . . . goodwill in order to continue to be a self-sufficient institution' if the government breached."  Citizens, 474 F.3d at 1321 (emphasis added).  Furthermore, the Citizens court cited the Federal Circuit's holding in Bluebonnet, "that it was foreseeable that a thrift would be 'forced to seek even more capital to meet heightened regulatory requirements' and that it was also foreseeable that the costs and risks associated with meeting these requirements would have other negative economic consequences." Id. (quoting Bluebonnet, 266 F.3d at 1356) (emphasis added); see also Fifth Third Bank, 518 F.3d at 1377 ("[T]he damages compensate directly for steps taken by [the bank] to achieve regulatory compliance in the wake of FIRREA.") (emphasis added).  These decisions demonstrate that, not only must the need for additional capital be foreseeable, so too must the purposes for which the additional capital is sought.  Here, while it may have been foreseeable that Northeast would seek additional capital to meet regulatory capital requirements or "to mitigate the loss of goodwill"-- it was not foreseeable that Northeast would opt to acquire the Rhode Island institutions and need to raise additional capital toward that separate and unrelated end.

In this case, Northeast did not raise additional capital for a purpose that stemmed from FIRREA or that was foreseeable as a result of FIRREA.  Mr. Walters explained, quite clearly, that Northeast did not raise additional capital to mitigate the loss of supervisory goodwill or to meet regulatory requirements.  Rather, he stated that purchasing the Rhode Island thrifts was an independent business activity, wholly detached from any lingering effects of the government's breach:

> Q:    As I understand it, these acquisitions were not done to raise
>       capital to replace any capital lost as a result of the enactment
>       of FIRREA, was it?

A:      No, these acquisitions were not done to replace capital.

Q:      These were totally independent transactions?

A:      That's correct.

Q:      And when I say independent, independent of the enactment of
         FIRREA or independent of any breach?

A:      That's correct.

Tr. 427.  Moreover, Northeast admits that it "was in normal capital compliance" during the DEPCO transaction and issued the shares and warrants to DEPCO "as part of Northeast's acquisition of the four Rhode Island institutions."  Pl.'s Br. at 49.

For these reasons, the Court finds that the DEPCO transaction was a "collateral undertaking," and, as such, the costs Northeast allegedly incurred "are too remote to be classified as a natural result of the Government's" breach.  Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996) (quoting Ramsey v. United States, 121 Ct. Cl. 426, 434-35 (Ct. Cl. 1951)).  Accordingly, the cost of capital associated with the DEPCO transaction was not foreseeable and was not proximately caused by the government's breach.

Even assuming that Northeast has demonstrated foreseeability and causation, it still must demonstrate that it suffered some damages with reasonable certainty.  CalFed, 395 F.3d at 1267. "While the proof of the fact of damages must be certain, proof of the amount may be an estimate, uncertain or inexact."  1 Robert L. Dunn, Recovery of Damages for Lost Profits § 1.8 (6th ed. 2005) (emphasis in original); see also Bluebonnet Sav. Bank. v. United States, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001).

To establish the fact of damages, Northeast argues that absent the breach it "would have had sufficient capital to acquire the four Rhode Island institutions without a capital infusion.  And Northeast was not going to raise capital if it did not need to because raising capital was expensive." Pl.'s Br. at 49 (citations omitted).  Northeast's argument relies solely upon Dr. Baxter's construct of the but-for bank, and his conclusion that the but-for bank "would have had a tangible capital cushion of 173 basis points and a core capital cushion of 75 basis points."  Pl.'s Br. at 198 (citing PX 2017; PX 2047).

For the same reasons the Court concluded that Dr. Baxter's but-for bank was not a reliable model for purposes of proving lost profits, the Court finds that Northeast's claim that it would not have raised additional capital for the DEPCO transaction in the but-for world to be speculative and implausible.  Specifically, Dr. Baxter's model improperly relies on assumptions regarding, inter alia Northeast's interest rate risk policy that are contrary to what Northeast was actually anticipating, the profitability and credit risks associated with  Northeast's foregone assets, and the credit risks tied to

105

the but-for bank's replacement assets.[86] Dr. Baxter testified on cross-examination that if, in fact, his profitability model was wrong and Northeast's foregone assets had not been profitable, then Northeast "would have needed capital." Tr. 1129. Northeast has not shown with any degree of certainty that it could have done the DEPCO transaction in the nonbreach world without raising additional capital. Thus, Northeast has not met its burden to prove the fact of damages.

In addition, the facts underlying this transaction raise doubts that Northeast would have acquired the credit unions without raising capital if it still could count goodwill towards regulatory capital. Walters recalled that Northeast itself proposed issuing stock to DEPCO to raise capital, and that it would never have attempted to raise capital if Northeast had an adequate capital cushion. Tr. 341-42. Northeast's Board of Directors' minutes, however, show that it was the regulators who specified the requirement that any institution which acquired the credit unions would issue stock to the State of Rhode Island or a state agency of Rhode Island. This was made clear in the proposal to Northeast.[87] While it is possible that, in the ongoing negotiations, if Northeast could have counted goodwill towards regulatory capital, DEPCO might have agreed not to make an equity investment in Northeast, such a possibility is inherently speculative. Moreover, the regulators, even prior to FIRREA, had been critical of Northeast's level of tangible capital. Kovac, in describing Northeast's level of tangible as it related to it long-term viability, testified: "we viewed it as very low and exposed to very significant risk." Tr. 1483. Northeast provides no evidence to suggest that DEPCO or the regulators would have approved of the deal in the but-for world based upon Northeast's retention of goodwill. Thus, it is speculative to assume that DEPCO and the regulators would have allowed the deal to go forward in the absence of additional capital.

**Wounded Bank Damages**

In addition to lost profits, a party may recover expectancy damages for incidental losses in connection with a breach of contract. Glendale Fed Bank, F.S.B., 378 F.3d at 1311-12 (affirming award of incidental damages); Globe Sav. Bank, F.S.B. v. United States, 65 Fed. Cl. 330, 345-46

---

[86] This Court was persuaded by Mr. Bankhead's opinion, and concluded that the but-for bank would have written off its goodwill even in the absence of the breach. Mr. Rutland stated, pre-FIRREA, "[g]oodwill is a non-earning asset and the faster it can be written off, the greater our increased tangible net worth. Continuing to increase tangible net worth will also be among by goals." DX 513 at 17. Further, as early as the February 17, 1987 ROE, the regulators found that an accelerated write-off of goodwill was "highly desirable." DX 224 at 1.

[87] "It was stressed that a prompt expression of interest would be needed before the time of the Governor's scheduled announcement on Friday, and that only one other institution was under consideration at the moment as a potential acquirer. The transaction agreed to by the Rhode Island institution, which would be substantially the same for Northeast Savings, was then outlined by the OTS representative. . . . In addition, the state or an agency of the state would invest in equity of Northeast Savings, probably some form of preferred stock, to the extent of 10% of the liabilities assumed. This investment would not be required to be redeemed at any time, nor would it be diminished over time." DX 391 at 2.

(2005) aff'd in part, 189 Fed. App'x. 964 (Fed. Cir. 2006) ("Expectancy damages are often measured by the amount of profits lost but include any other losses caused by the breach, including incidental losses.").  As a result of the breach of the Government's goodwill promises, Plaintiff argues that it incurred two elements of incidental damages: $313,000 in advisory service fees and $1.334 million in excess SAIF insurance premiums.  Pl.'s Br. 16.

Subsequent to the DEPCO transactions, Northeast considered raising more capital through a shareholder rights offering in 1993, which it ultimately abandoned.  Plaintiff argues that it would not have had to pursue the rights offering in the non-breach world, since it would have had plenty of capital, and thus would not have incurred $300,000 in advisory service fees, and $13,000 in SEC registration statement fees.

Plaintiff also seeks incidental damages for higher SAIF deposit premiums that it was required to pay as a consequence of the breach.  Plaintiff argues that, but for the breach, Northeast would have been "well capitalized" in March 1993, September 1993, and March 1994.  As a result, it would have paid its SAIF premiums at a rate of 0.26% of its total deposits.  PX 2052.  However, in the actual world, Northeast had only an "adequate" capital position and a CAMEL rating of 3 in March 1993, September 1993, and March 1994.[88]   PX 2017 at 3; PX 2053; PX 2054; DX 248 at 1. Thus, it paid SAIF premiums at a rate of 0.29% of its total deposits.  Plaintiff calculates that it paid total excess insurance premiums in the amount of $1.334 million due to the breach.  PX 2055; Tr. 758-59.

Plaintiff has not demonstrated entitlement to these incidental damages.  Plaintiff's assumption that it would have had plenty of capital but for FIRREA is not supported by the record.  Even before FIRREA, Northeast and the regulators believed that Northeast needed additional tangible capital.  Tr. 1483; PX 192 at 2.16.  Moreover, at the time of his arrival at Northeast, Rutland stated that "[c]ontinuing to increase tangible net worth will also be among my goals."  DX 513 at 17.  Further, as Defendant points out, if the foregone assets did not perform as well as Dr. Baxter's model suggests, then Northeast would have been in a "very desperate need of capital" in the non-breach world and that Northeast might not have had favorable examination reports.  Tr. 1129.

Ultimately, determining whether Northeast would have raised capital and paid lower deposit insurance in 1993 and 1994 in the but-for world is an inherently speculative pursuit.  As explained above, Dr. Baxter's model assumes that the but-for thrift would follow its December 1988 Business Plan up through Northeast's acquisition by Shawmut (with the exception of a shrink related to the exiting of the California business).  Such an assumption is both speculative and highly unlikely given the fact that Northeast likely would have shrunk in the but-for world and lowered its interest rate risk exposure for reasons other than the breach.  Northeast's June 1989 MACRO rating of "4" even with all of its contractual goodwill intact was a result of many factors, including a failed RCA strategy and overly high interest rate risk.

---

[88]  Plaintiff argues that the but-for Northeast's CAMEL rating would have been at least as good as it was during this period because the but-for bank would have had larger capital cushions, generally lower interest rate risk, and consistently higher net earnings than the actual Northeast.

As Northeast was in need of tangible capital prior to the breach, it is too speculative to conclude that Northeast would have been "well capitalized" in 1993 and 1994, but for the breach. Finally, the Court has already determined that, more likely than not, but-for Northeast would have written off its goodwill in the absence of breach, just as it did in the actual world.[89]  Thus, by 1993, there would likely have been very little supervisory goodwill for Northeast to use to establish a "well capitalized" position.

Accordingly, Northeast has not shown it paid higher SAIF deposit premiums as a result of the breach, or that it would not have paid advisory service fees but for the breach.

## Plaintiff Is Not Entitled to Jury Verdict Damages

As an alternative to its lost profits claim, Northeast claims that the Court has the discretion to modify Dr. Baxter's calculation of damages as it sees fit.  Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1357 (Fed. Cir. 2001) ("We have also allowed so-called 'jury verdicts' if there was clear proof of injury and there was no more reliable method for computing damages – but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation.").  "In order to adopt the jury verdict method, '[the trial tribunal] must first determine three things: 1) that clear proof of injury exists; 2) that there is no more reliable method for computing damages; and 3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages.'" Grumman Aerospace Corp. v. Wynne, 497 F.3d 1350, 1358 (Fed. Cir. 2007) (quoting Dawco Constr., Inc. v. United States, 930 F.2d 872, 880 (Fed. Cir.1991)).

Here, Plaintiff is not entitled to jury verdict damages because it has failed to prove that the breach caused the injuries that it claims.  The Court found that Northeast failed to prove that the breach either caused Northeast to shrink or caused it harm in the form of lost profits.  Further, the evidence does not establish that the breach caused Northeast to incur costs related to the DEPCO transactions or that these costs were foreseeable.  Finally, Northeast did not show that its increased insurance premiums and an abandoned attempt to raise capital were caused by the breach.  Because Northeast has failed to prove that the breach caused it any injury, there is no basis upon which the Court may award it jury verdict damages.

## Conclusion

Plaintiff has not met its burden of proving that the breach was the "substantial factor" that caused it to lose profits and incur costs.  Accordingly, the Clerk of the Court is directed to enter judgment in favor of Defendant.  No costs.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

[89] In September 1992, Northeast had $38 million of qualifying supervisory goodwill. Rather than keep the $38 million on its books, Northeast wrote off all but $1 million. DX 244 at 10.